



**JUDGE HARJANI**

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Kalia Coleman, (312) 353-3540
AUSA Katie Durick, (312) 886-7641

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DEXSTIN BRYANT (a/k/a "Dex"), TREMAINE BRENT (a/k/a "Bud"), TEVIN ALVERIO, JARVIS BLAIR, ENRIQUE HOLLINS (a/k/a "Rique"), SHARONDA HOSEY, JUSTIN JOHNSON (a/k/a "BB"), TYJUAN MCDOWELL (a/k/a "Weezy"), RIKITA MITCHELL, ALLEN WASHINGTON (a/k/a "Peanut"), PAUL WILKINS, DOROTHY WILLIAMS, and INA WILLIAMS

CASE NUMBER: **20 CR 773**

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about April 23, 2020, to on or about September 1, 2020, in the Northern District of Illinois, Eastern Division, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1) and 846 | From on or about April 23, 2020, to on or about September 1, 2020, in the Northern District of Illinois, Eastern Division, the defendants did conspire with each other and with others to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled |

Substance, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and 28 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II Controlled Substance in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

This criminal complaint is based upon these facts:

   X   Continued on the attached sheet.

ARTYOM POSTUPAKA
Special Agent, Drug
Enforcement Administration
(DEA)

Pursuant to Fed. R. Crim. P. 4.1, this complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Sworn to before me and signed in my presence.

Date: <u>November 3, 2020</u>

*Judge's signature*

City and state: <u>Chicago, Illinois</u>

<u>Sunil R. Harjani, U.S. Magistrate Judge</u>
*Printed name and Title*

2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, ARTYOM POSTUPAKA, being duly sworn, state as follows:

## I. INTRODUCTION

1.     I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed since September of 2018. From September of 2012 to September of 2018, I was employed as a Police Officer with the Village of Lisle Police Department. I was assigned as a Task Force Officer to the DEA from July of 2014 to August of 2018.

2.     I am currently assigned to DEA Chicago High Intensity Drug Trafficking Agency Group 43 located in Chicago, Illinois. As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the federal controlled substance laws, including, but not limited to, Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, witnesses, and others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3.     I have received training in the area of narcotics investigations, money laundering, financial investigations, and methods used by drug dealers to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.     This affidavit is submitted in support of a criminal complaint alleging that DEXSTIN BRYANT (a/k/a "Dex"), TREMAINE BRENT (a/k/a "Bud"), TEVIN ALVERIO, JARVIS BLAIR, ENRIQUE HOLLINS (a/k/a "Rique"), SHARONDA HOSEY, JUSTIN JOHNSON (a/k/a "BB"), TYJUAN MCDOWELL (a/k/a "Weezy"), RIKITA MITCHELL, ALLEN WASHINGTON (a/k/a "Peanut"), PAUL WILKINS, DOROTHY WILLIAMS, and INA WILLIAMS have violated Title 21, United States Code, Sections 841(a)(1) and 846. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging BRYANT, BRENT, ALVERIO, BLAIR, HOLLINS, HOSEY, JOHNSON, MCDOWELL, MITCHELL, WASHINGTON, WILKINS, D. WILLIAMS, and I. WILLIAMS, with conspiring to distribute, and possess with intent to distribute, fentanyl mixed with heroin and cocaine base, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

5.     The statements contained in this Affidavit are based on: (a) my personal participation in this investigation; (b) information provided by other law enforcement officers, including oral and written reports that I have received from other law

enforcement officers; (c) telephone records, including subscriber information, toll records, pen registers, and trap and trace information, phone location monitoring, and intercepted communications; (d) information obtained from consensually-recorded conversations and undercover officers and in-person meetings; (e) information obtained from intercepted communications over Target Phone 3, Target Phone 4, BRYANT Phone 1 (Target Phone 6) and the DTO Phone (Target Phone 9)[1]; (f) the results of physical surveillance conducted by other law enforcement officers; (g) information provided by confidential sources working for the DEA or other law enforcement agencies; (h) information obtained from driver's license and automobile

---

[1] On April 17, 2020 Chief Judge Rebecca Pallmeyer authorized the interception of wire communications over telephone number (312) XXX-6507, referred in the relevant Orders and herein as Target Phone 3, for a period of 30 days from April 17, 2020 through May 16, 2020. On June 10, 2020, Chief Judge Rebecca Pallmeyer signed an order authorizing wire interceptions to and from Target Phone 3 for 30 days from June 11, 2020 to July 10, 2020. Interception of wire communications over Target Phone 3 were terminated on June 28, 2020.

On April 22, 2020, Chief Judge Rebecca Pallmeyer authorized the interception of wire communications over telephone number (773) XXX-3673, referred herein and in the relevant Orders as Target Phone 4, for a period of 30 days from April 22, 2020 to May 21, 2020. On June 10, 2020, Chief Judge Rebecca Pallmeyer signed an order authorizing wire interception to and from Target Phone 4 for 30 days from June 11, 2020 to July 10, 2020. Interception of wire communications over Target Phone 4 were terminated on June 30, 2020.

On June 10, 2020, Chief Judge Rebecca R. Pallmeyer entered an Order authorizing the interception of wire communications of several phones, including telephone number (773) XXX-9524, referred herein as "BRYANT Phone 1," (and in previous orders as Target Phone 6) for a period of 30 days from June 11, 2020 through July 10, 2020.

On August 4, 2020, Chief Judge Pallmeyer entered an Order authorizing the interceptions of wire communications to and from telephone number (312) XXX-4490, referred herein as the "DTO Phone," (and in previous orders as "Target Phone 9") for a period of 30 days from August 5, 2020 to September 1, 2020. Law enforcement believes that multiple people used the DTO Phone to distribute narcotics and the users of the DTO Phone will be identified accordingly in the context of various intercepted calls discussed herein.

registration records; (i) information from public records and law enforcement databases; (j) my training and experience and the training and experience of other law enforcement officers involved in this investigation; and (k) information obtained as a result of controlled purchases of narcotics and searches conducted during this investigation.

## II.    FACTS SUPPORTING PROBABLE CAUSE

### A.    Background of the Investigation

6.    Since approximately April of 2020, the DEA, the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and the Chicago Police Department ("CPD"), have been investigating the narcotics trafficking activities of the Gangster Disciples ("GDs") street gang, which operates primarily on the west side of Chicago. BRYANT has been identified as a member of the GDs and a manager/operator of a drug trafficking operation (the "BRYANT DTO" or the "DTO"). The BRYANT DTO sold fentanyl-laced heroin and crack cocaine to customers on the west side of Chicago, Illinois, using telephone number (312) XXX-4490 (the "DTO Phone") which was a call-up narcotics delivery phone line.

7.    Based on my training and experience, using a call-up service to sell narcotics is an efficient method of sales because it allows narcotics dealers to distribute narcotics to a large customer base throughout a wide distribution area. For example, traditional open-air drug markets are limited to the customers that pass through that area or to customers that have ability to travel to that open-air drug distribution location; however, operating a call-up narcotics delivery service allows

drug dealers to deliver narcotics to customers to a location that is advantageous to the customer and the dealer. Furthermore, because numerous workers work the phone line, operating a call-up narcotics delivery service limits the narcotics dealers' exposure to law enforcement and potential acts of violence from rival dealers/gang members.

8.      As discussed in detail below, based upon interception of calls to and from the DTO Phone, as well as controlled purchases of narcotics made by undercover officers who called the DTO Phone to place orders, the DTO's workers took shifts answering a dial-up service whereby the worker would take a narcotics order from a customer and then deliver the ordered narcotics to that customer. Based on intercepted calls and surveillance, law enforcement has identified the following individuals who used the DTO Phone to distribute narcotics on behalf of the BRYANT DTO: ALVERIO, BLAIR, HOLLINS, HOSEY, JOHNSON, MCDOWELL, MITCHELL, WASHINGTON, WILKINS, D. WILLIAMS, and I. WILLIAMS. These DTO workers sold narcotics to undercover law enforcement officers and others who placed orders by calling the DTO Phone.

   **B.   THE DEFENDANTS' ROLES**

9.      The BRYANT DTO was directed by BRYANT and, as discussed in further detail below, BRYANT determined who could work the DTO phone, scheduled workers, ensured workers were supplied with narcotics, and oversaw operations. In an intercepted conversation on June 11, 2020, as described below at ¶ 20, BRYANT said when the activity on the DTO Phone slowed down he felt it in the "pockets." In

addition, BRYANT managed the DTO Phone and coordinated the scheduling of the DTO shift workers. For example, during an intercepted conversation with ALVERIO regarding scheduling shifts over the DTO Phone, as described below in ¶ 38, BRYANT said, "I need to write me a schedule down. Do my weekly schedule." On June 12, 2020, when HOSEY said she was running low on narcotics BRYANT asked if she was out of "blue stars," a reference to the blue-star packaging that heroin/fentanyl sold by the BRYANT DTO was packaged in, and sent BRENT to re-supply her. Compl. at ¶22.

10.     BRENT assisted BRYANT in operating the DTO. BRENT delivered narcotics to the DTO workers at BRYANT's instruction. For example, as discussed below in ¶¶ 21-31, on June 12, 2020, BRYANT directed BRENT to re-supply HOSEY with narcotics. In addition, on June 28, 2020, BRYANT discussed clearing out his house of contraband and BRENT was seen leaving BRYANT's home with a backpack that was later seized by law enforcement and contained narcotics trafficking materials to include cutting agents, plastic baggies, a scale, a grinder, and multiple rounds of ammunition. Compl. at ¶¶ 83-91.

11.     The DTO's stash house was primarily operated by Johnnie Grant ("Grant") out of his residence at 803. S. Karlov Avenue in Chicago.[2] Based upon intercepted phone calls and surveillance, Grant's residence was used as a central hub for workers to trade in the DTO Phone at the beginning and end of their shifts as well as exchange money and/or narcotics related to the DTO's activity. On September 1,

---

[2] Grant is currently charged in *USA. v. Grant*, 20 CR 577, pending before the Honorable Judge Robert Dow and is not being charged in this complaint.

2020, pursuant to a court-authorized search warrant, law enforcement searched that residence and found multiple firearms, narcotics, narcotics packaging, and mixing tools.[3]

12.    BRYANT and BRENT directed numerous DTO workers, who took regular shifts answering calls from customers to the DTO phone and delivering narcotics as requested by those customers. With regard to the DTO workers, as described in greater detail below, between June 12, 2020, and August 25, 2020, undercover law enforcement officers conducted approximately twenty-four controlled narcotics purchases by calling the DTO Phone and meeting with various workers of the BRYANT DTO.[4]

13.    As set forth below, the following individuals participated in the BRYANT DTO by selling the DTO's narcotics using the DTO Phone: ALVERIO (*see* ¶¶151-160), BLAIR (*see* ¶¶292-301 and 344-351), HOLLINS (*see* ¶¶335-343), HOSEY (*see* ¶¶142-150, 215-222, and 223-231), JOHNSON (*see* ¶¶173-178, 179-186, 187-192, 193-206, 232-239), MCDOWELL (*see* ¶¶161-172, 207-214, 240-249, 250-257, and 258-268), MITCHELL (*see* ¶¶292-301), WASHINGTON (*see* ¶¶250-257 and 258-268),

---

[3] On August 31, 2020, the Honorable Maria Valdez signed a search and seizure warrant authorizing the search of the basement and main floor apartments at 803 S. Karlov Avenue (Grant's residence).

[4] Numerous undercover law enforcement officers were used in controlled buys during the investigation including: "UC-1," "UC-2," "UC-3," "UC-4," "UC-5," "UC-6," "UC-7," "UC-8," "UC-9," "UC-10," "UC-11," "UC-12," "UC-13," "UC-14," "UC-15," "UC-16," "UC-18," and "UC-19." These undercover law enforcement officers will be collectively referred to as the "UCs."

All meetings described in this Affidavit between the UCs and defendants were video and audio recorded, unless otherwise indicated, and all calls described in this Affidavit were recorded, unless otherwise indicated. All times for these calls and meetings are approximate.

WILKINS (*see* ¶¶278-283, 284-291, and 302-309), D. WILLIAMS (*see* ¶¶278-283 and 284-291), and I. WILLIAMS (*see* ¶¶161-172).

14.    Based on information obtained by the UCs, my review of consensually recorded communications, and the narcotics purchased and seized in this investigation, I know that the majority of the narcotics distributed by the BRYANT DTO were packaged in small, Ziploc-style baggies, priced at $10 per baggie, or, by a "pack" or "jab," referred to as a "whole one." Each jab contained between 10 and 13 individual small Ziploc baggies with a blue star print logo or a color tint containing a powdery like substance, each of which contained approximately 0.2 to 0.5 grams of narcotics. The small Ziploc baggies were taped together in a roll.  Below are photographs of some of the jabs recovered during this investigation from DTO workers:




15.     Baggies marked with a blue star print were not the only baggies recovered in this investigation – as discussed below, the DTO used different colored baggies to denote different types or quality of narcotics.

16.      Finally, as set forth below, during the course of this investigation, the BRYANT DTO distributed, and possessed with intent to distribute, at least 124.186 grams of a mixture of fentanyl and heroin, .32 grams of fentanyl, and 38.372 grams of cocaine base. Of that, approximately 74.318 grams (net weight) of fentanyl/heroin, .32 grams (net weight) of fentanyl, and 3.072 grams (net weight) of cocaine base was sold by DTO workers using the DTO phone to UCs and/or customers and approximately 49.868 grams (net weight) of fentanyl/heroin and 35.3 grams (net weight) of cocaine base was seized during a search of the DTO's stash house.

## C.     BRYANT Directed the DTO with the Assistance of BRENT

### 1.     April 23: BRENT and Individual KP Discussed Who Would Be Assigned the DTO Phone to Engage in Narcotics Transactions.

17.     On April 23, 2020, agents intercepted a call in which BRENT and Individual KP discussed who would be assigned the DTO Phone to engage in narcotics transactions on behalf of the BRYANT DTO.

18.     On April 23, 2020, at approximately 4:42 p.m., Individual KP, using (312) XXX-6507 (referred herein as "Target Phone 3") (Target Phone 3, Session 934) had a conversation with BRENT, who was using 702-XXX-2076 ("BRENT's Phone").[5]

---

[5] The identification of BRENT's voice in this Affidavit, including while using BRENT's Phone, is based on comparing the voice to two in-person investigatory stops of BRENT, specifically: (1) on April 27, 2020, Individual KP received a call from BRENT's Phone saying that the user of BRENT's Phone was outside of Individual KP's Residence (Target Phone 3, Session 1650).

Individual KP asked, "What's the deal?"[6] BRENT replied, "I just, uh… I think Trell [Individual SH] finna slide. I told him before he slide to come holler at Jake and just take it to you, I'm finna grab it [the DTO Phone] from him when I come back." Individual KP stated, "Alright. You know I got some girl [cocaine], but I asked him could I run a girl [sell cocaine] through there. He said I could." BRENT replied, "Oh, yeah?" Individual KP stated, "Yeah." BRENT replied, "Okay, okay." Individual KP stated, "So, if somebody is finna do it… I have couple in my phone that do." BRENT replied, "Alright, let me see where Trell [Individual SH] at, man, 'cause he can bring it [the DTO Phone] to you, it's almost time for him to go now. And before I shoot out there, I can stop right there and take the [DTO] phone with me, shit." Individual KP stated, "Yeah, he [Individual SH] called me, he said that you [BRENT] said to bring it [DTO Phone] to me." BRENT replied, "Alright."

---

Individual KP then met with the user of BRENT's Phone. After the meeting, agents conducted an investigatory stop of the car and identified the driver, who was the sole occupant of the vehicle, as BRENT. During the stop, agents also confirmed that BRENT's voice matched the user of BRENT's Phone and (2) on June 28, 2020, an investigatory stop was conducted of a vehicle BRENT was driving and the search yielded ammunition, narcotics packaging material, narcotics paraphernalia and known cutting agents. During the stop, law enforcement identified BRENT and confirmed BRENT's voice matched the user of BRENT's Phone.

[6] Summaries are provided herein based on drafts and not final transcripts and contain my interpretation of words and phrases used in the recorded communications. Unless otherwise noted, the quoted conversations in this affidavit are only portions, not full transcriptions, of the recorded conversations that occurred. At various points in the Affidavit, I have included in brackets my interpretation of words and phrases used in the recorded conversations. I base my interpretations on information received from cooperating sources, the content and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

### 2. June 11, 2020: BRYANT and Individual SH Discussed the Quality and Amount of Narcotics being Sold on the DTO Phone.

19. As described below, during an intercepted call between BRYANT and Individual SH, they discussed how narcotics sales over the DTO Phone on June 11, 2020 were slower than usual. BRYANT instructed Individual SH to call customers to gather their opinion regarding the quality of the narcotics they received from the DTO Phone. Individual SH provided BRYANT with the names of multiple customers he attempted to contact. Further, Individual SH reported to BRYANT that one of the customers reported that he/she did not like the narcotics that Individual SH had sold to him/her.

20. Specifically, on June 11, 2020, at approximately 3:50 p.m. (Target Phone 6, Session 25), BRYANT, using telephone number (773) XXX-9524 ("BRYANT Phone 1"), placed a call to Individual SH, who was using telephone number (708) XXX-4211 ("Individual SH Phone 1").

a. The identification of BRYANT in this Affidavit, including as the user of BRYANT Phone 1, is based on the following: (1) On June 24, 2020, at approximately 9:18 a.m., (Target Phone 6, Session 1256) Individual 1, using Individual 1's Phone, placed a call to BRYANT Phone 1. During this call, Individual 1 stated, "Yo, I'm finna swing [meet up with] on you." The user of BRYANT Phone 1 replied, "A'ight." At approximately 9:44 a.m., (Target Phone 6, Session 1257) Individual 1, using Individual 1's Phone, placed a call to BRYANT Phone 1. During this call, Individual 1 stated, "Down stairs." The user of BRYANT Phone 1 replied,

"You got down there quick, here I come." At approximately the same time, surveillance observed a vehicle known by law enforcement to be associated with Individual 1 arrive and park in front of an address associated with BRYANT. At approximately 9:52 a.m., surveillance observed BRYANT (as compared to a booking photograph of BRYANT) exit his apartment building and get into the front passenger seat of Individual 1's vehicle. At approximately 9:54 a.m., BRYANT exited Individual 1's vehicle and returned to the inside of his apartment building; (2) According to a post-arrest, *Mirandized* interview with Individual 1 on June 24, 2020, Individual 1 stated that "Dex"—a derivative of BRYANT's first name 'DEXSTIN'—is a nickname for BRYANT.[7] In addition, Individual 1 stated that he had met with BRYANT earlier in the day to pick up narcotics and identified "Dex" to be BRYANT by looking at a booking photograph of BRYANT. Furthermore, agents learned from the monitoring of court authorized interceptions that the user of BRYANT Phone 1 has identified himself as "Dex." For example, as discussed herein at ¶60, the user of BRYANT Phone 1, in a discussion with JOHNSON stated, "This Dex, boy"; (3) According to subscriber records, BRYANT Phone 1 is subscribed in the name of "Dex Max,"; (4) According to law enforcement databases, BRYANT is on house arrest and was at the time of the intercepted calls discussed herein. There are numerous intercepted calls where the

---

[7] According to criminal history records, Individual 1 has three felony arrests and one felony conviction, a 2018 conviction in the Circuit Court of Cook County for manufacture and delivery of fentanyl. Individual 1 is believed to be a supplier and a facilitator for heroin for the GD street gang.

user of BRYANT Phone 1 references being on house arrest; (5) Agents have reviewed recorded Cook County jail calls between an inmate and an individual who agents identified to be BRYANT based on the individual providing details during the call, specifically the courtroom number and judge, which matched that of a pending case for BRYANT. Agents compared the voice in those recordings to the voice of the user of BRYANT Phone 1 and determined that they were the same individual and; (6) Lastly, law enforcement obtained a court order for location information for BRYANT Phone 1 (Target Phone 6) which consistently showed BRYANT Phone 1 to be in the area of the residence where surveillance has observed a vehicle, registered to BRYANT, and known to be driven by BRYANT to be parked.

      b.     During this call (Target Phone 6, Session 25), Individual SH asked, "Hey, boy. What the fuck going on, man?" BRYANT replied, "With what?" Individual SH replied, "What's the business with the line [the DTO phone]?" BRYANT asked, "What's wrong with it?" Individual SH replied, "Shit. Nothing." BRYANT asked, "It's slow?" Individual SH answered, "I been calling. I mother fucking... I still got the same one and one [quantity of narcotics] since this morning." BRYANT replied, "No way!" Individual SH stated, "Swear to God buddy..." BRYANT replied, "You need to call and see what's going on.... Did you call some mother fuckers [customers]?" Individual SH replied, "Yeah, I just told you I been calling, ni--a." BRYANT asked, "What they [customers] been saying [about the quality of narcotics]?" Individual SH replied, "Ni--a, Erika said she don't like the color of it and all type of shit. Lake and Hamlin they stopped answering the phone. It's a couple

more. They ain't say they ain't like it, they just didn't call." BRYANT replied, "Ummm, you just threw me off with that, cuz. Everybody else been going decent, we just did 18 [sold $1,800 worth of narcotics] the other night... the other night boy." Individual SH replied, "The other night?" BRYANT stated, "Yeah, like two nights ago." Individual SH stated, "Yeah Ni--a...." BRYANT stated, "He [the DTO Phone worker] ain't do too bad yesterday neither." Individual SH stated, "I don't know what it is, if it's just today or what?" BRYANT stated, "That's what I think it is man." Individual SH stated, "Just today...." BRYANT stated, "It got to be cause it ain't been that fucked up [slow] Gangster, I ain't gonna lie, I pay attention when that bitch [the DTO Phone] goddamit start falling off... I feel it in the pockets cuz... [laughing]. Where you at?" Individual SH stated, "Ni--a right here in the hood. Bitch ain't rolling like... I just called dude and them. Lake and Hamlin [customer] they ain't answering. I called both numbers..." BRYANT replied, "What about Lou and them [customers]?" Individual SH stated, "I hit.... you know he usually want the CD's [crack cocaine]. He got the D... DVDs [heroin/fentanyl] he said he's gonna call when his sister....his brother come." BRYANT replied, "Right." Individual SH continued, "Red ain't call." BRYANT replied, "Bud [BRENT] just said he was finna get up with buddy." Individual SH replied, "Who?" BRYANT stated, "Bud [BRENT]..." Individual SH replied" Oh." BRYANT continued, "He had said he called him or some shit, but he ain't... He stop answering the phone." Individual SH replied "Shit we ain't calling to get up with him....." Later during this call, BRYANT stated, "Shit, you can do [work the DTO Phone] tomorrow night if you want to, Joe." Individual SH replied, "Oh,

that's cool." BRYANT continued, "Uh, yeah. Try to do the night, man, see if shit go well. I think it's gon' work different for you. I don't know. Might be a slow day. Don't panic buddy. Pull your panties out that mother fucker."[8]

> **3.    June 12, 2020: BRYANT Directed BRENT to Re-Supply HOSEY With Narcotics And HOSEY Distributed 2.488 Grams (Net Weight) of Fentanyl/Heroin to UC-4.**

21.    As described further below, on June 12, 2020, law enforcement intercepted a call between BRYANT and HOSEY in which HOSEY informed BRYANT that she needed to be re-supplied with additional narcotics. BRYANT instructed HOSEY to contact BRENT to receive additional narcotics. Law enforcement observed HOSEY meet with BRENT. After meeting with BRENT, law enforcement observed a suspect narcotics transactions between HOSEY and Individual DW and between HOSEY and Individual DJ. During an interview, Individual DW identified BRENT's Phone and the DTO Phone as the telephone numbers s/he contacted to purchase narcotics. Likewise, Individual DJ identified the DTO Phone as the number s/he contacted to purchase narcotics. Later that day, UC-4 ordered heroin from HOSEY, by calling the DTO Phone, and UC-4 purchased 2.488 grams of fentanyl/heroin from HOSEY.

22.    On June 12, 2020, at approximately 8:44 a.m., BRYANT, using BRYANT Phone 1 (Target Phone 6, Session 63), had a conversation with HOSEY,

---

[8] During this conversation, Individual SH and BRYANT refer to customers: Erika, Red, "Lake and Hamlin," and Lou. During the interception of the DTO Phone, these customers were intercepted on multiple occasions ordering narcotics over the DTO Phone.

who was using telephone number (312) XXX-4961 ("HOSEY's Phone").[9] During this call, BRYANT asked, "Hey Ronda, you said ain't no more blue stars [heroin/fentanyl packaged with the blue stars] or the other side? The clear [crack cocaine]?" HOSEY replied, "The um CD's [crack cocaine]." BRYANT replied, "Oh ok, ok, ok. Bud [BRENT] on his way to holler at you then [give HOSEY more crack cocaine supply]."

23.     At approximately 8:45 a.m., BRYANT, using BRYANT Phone 1 (Target Phone 6, Session 64), had a conversation with BRENT, who was using BRENT's Phone. During this call, BRYANT stated, "She [HOSEY] said she need you on…she need Bo'Legg [crack cocaine]." BRENT replied, "A'ight."

24.     At approximately 9:25 a.m., surveillance observed BRENT exit a residence located at 5756 S. Bishop Street in Chicago and enter the driver's side of a white Chevrolet Monte Carlo ("BRENT's Vehicle").[10] Law enforcement followed BRENT's Vehicle.

---

[9] The identification of HOSEY in this Affidavit, including as the user of HOSEY's Phone, is based on the following: As described below, on June 12, 2020, HOSEY distributed heroin/fentanyl to UC-4. Following the controlled buy, UC-4 and surveillance officers compared images captured in UC-4's audio/video recording to an Illinois Secretary of State driver's license photograph of HOSEY and concluded that they depicted the same person [HOSEY]. The recordings of the in-person meetings, as well as the UC's involved in the in-person meetings, were used to identify HOSEY throughout this Affidavit.

[10] BRENT was identified as the owner of BRENT's Vehicle based on the following: On April 27, 2020, in furtherance of this investigation, a CPD enforcement officer conducted an identification stop on BRENT's Vehicle. BRENT provided officers with a Nevada driver's license. Based on a photo comparison, law enforcement determined that the person depicted in the Nevada driver's license photo was BRENT. BRENT also provided officers with the title for BRENT's Vehicle and stated that he recently purchased the vehicle, but had been unable to properly transfer the title because the Illinois Secretary of State office was closed due to the COVID-19 pandemic.

25.     At approximately 9:40 a.m., surveillance observed BRENT's Vehicle exit I-290 onto California Avenue. BRENT's Vehicle continued on California Avenue and turned eastbound onto Gladys Street.

26.     At approximately 9:41 a.m., surveillance observed HOSEY approach BRENT's Vehicle window and appeared to have a conversation with the occupant of the vehicle in the 4700 block of Gladys Street. HOSEY then entered a white Dodge Avenger and departed the area.

27.     At approximately 9:41 a.m., BRYANT, using BRYANT Phone 1 (Target Phone 6, Session 72), had a conversation with HOSEY, who was using HOSEY's Phone. During this call, BRYANT asked, "Yeah, that ni--a [BRENT] got up with you yet?" HOSEY replied, "Yeah."

28.     At approximately 9:58 a.m., surveillance observed HOSEY, in the Dodge Avenger, travel through an alley located at Washburne and Racine Avenue in Chicago. Surveillance next observed an individual (later identified as Individual DW) enter the passenger side of the Dodge Avenger. A short time later, Individual DW exited the vehicle and entered a building located at Washburne and Racine Avenue.

29.     At approximately 10:01 a.m., surveillance observed Individual DW exit the building. A few minutes later, law enforcement officers approached Individual DW to perform a field interview. Individual DW showed officers his/her mobile phone, which showed the telephone numbers assigned to BRENT's Phone and the DTO Phone, and told officers that s/he contacted those numbers to obtain narcotics.[11]

---

[11] Law enforcement did not recover any narcotics from Individual DW's person.

30.     At approximately 10:47 a.m., surveillance observed the Dodge Avenger

HOSEY had driven, as described above, arrive in the area of Maypole Avenue and

California Boulevard. Surveillance watched as an individual (later identified as

Individual DJ) exited a black Jeep Cherokee and approached the Dodge Avenger.

Surveillance then observed HOSEY engage in what appeared to be a hand-to-hand

transaction with Individual DJ. After the transaction, Individual DJ entered the Jeep

Cherokee and departed.

31.     Law enforcement surveilled the Jeep Cherokee after it departed the

area, and at approximately 10:55 a.m., law enforcement officers conducted a traffic

stop of the Jeep Cherokee at the location of 2832 W. Fulton Street in Chicago. During

the stop, Individual DJ advised officers that he/she purchased heroin from the female

in the Dodge Avenger [HOSEY] and had called the DTO Phone to order the narcotics.

Individual DJ further stated that he had already used the heroin prior to the traffic

stop.

32.     As described below in more detail in ¶¶ 145 through 150, at

approximately 5:48 p.m., UC-4 purchased approximately 2.488 grams of

fentanyl/heroin from HOSEY after ordering from the DTO Phone.

## 4.     June 14, 2020: BRYANT Assigned HOLLINS to Work the DTO Phone.

33.     As set forth below, on June 14, 2020, BRYANT instructed HOLLINS to

meet with Individual SH to obtain the DTO Phone so HOLLINS could sell narcotics

for the DTO.

34.     Specifically, on June 14, 2020, at approximately 6:05 p.m. (Target Phone 6, Session 252), BRYANT, using BRYANT Phone 1, had a conversation with HOLLINS, who was using telephone number (312) XXX-2586 ("HOLLINS' Phone").[12] BRYANT said, "Yo. You popping out tonight [selling narcotics]?" HOLLINS replied, "Yeah." BRYANT said, "You finna be on time?" HOLLINS replied, "Shit, yeah. I'mma be right..." BRYANT said, "A'ight. You got Trell [Individual SH] number already, right?" HOLLINS said, 'He [Individual SH] gotta call me. Tell him when he [Individual SH] get done, to call me so I can uh... [unintelligible] I can't receive uh..." BRYANT said, "A'ight." HOLLINS replied, "I'mma pay my phone bill in the morning." BRYANT said, "Aight."

35.     At approximately 6:08 p.m. (Target Phone 6, Session 253), BRYANT, using BRYANT Phone 1, placed a call to Individual SH, at telephone number (708) XXX-4211. BRYANT said, "Call Reek [HOLLINS] when you ready to get of there." Individual SH replied, "Where he [HOLLINS] at?" BRYANT said, "I don't know. This ni--a [HOLLINS] asked... 'Cause his [HOLLINS'] phone ain't on. You ain't got his number?" Individual SH replied, "You say his phone ain't on? How I'mma call him?" BRYANT replied, "It only get the incoming call. I guess he [HOLLINS] got a Boost or some shit." Individual SH replied, "Oh. A'ight." Later in the conversation BRYANT said, "Just hit that ni--a [HOLLINS] up..." Individual SH replied, "Yup. I'mma hit him [HOLLINS]." BRYANT said, "Where y'all with it?" Individual SH said, "Shit, I

---

[12] The identification of HOLLINS throughout this Affidavit is based a comparison with HOLLINS' voice from recordings from the UC purchase of narcotics from HOLLINS on August 25, 2020.

just picked Lil Carl up here on Pulaski. I'm finna go hit these last couple P's [customers]." BRYANT said, "Oh, okay." Individual SH replied, "Ain't no mothafuckas [customers] been calling for what's uh name though. CD's [crack cocaine]." BRYANT said, "Oh?" Individual SH replied, "Nothing. They called earlier but wasn't nothing. You feel me?" BRYANT said, "Man, that shit [unintelligible] since last night." Individual SH replied, "Shit. This bitch [DTO Phone] just, just, just picked up, like at 4:00." BRYANT said, "Yeah?" Individual SH replied, "At 3:00 or 4:00. That bitch just picked up [more customers calling]." BRYANT said, "That ni--a Weezy [MCDOWELL] probably went in a little early last night. That's all that was." Individual SH replied, "Yeah, it's a'ight though. It's doing, it's a'ight [narcotics sales going well]." BRYANT said, "A'ight."

36.     At approximately 6:11 p.m. (Target Phone 6, Session 254), BRYANT, using BRYANT Phone 1, placed a call to HOLLINS, at HOLLINS' Phone. BRYANT said, "Yeah, buddy he [Individual SH] said he gonna call you when he [Individual SH] ready for you. Hey, I hope you don't slide in on a mothafucka [get in trouble] or none of that shit tonight, man! None of that crazy shit." HOLLINS replied, "Nah, I got shit handled." BRYANT said, "Damn, buddy. Ain't no room for that shit. Straight up." HOLLINS replied, "Huh?" BRYANT said, "Ain't no room for that shit." HOLLINS replied, "Oh, nah, nah. I know."

### 5.     June 12-15 2020: BRYANT Assigned ALVERIO to Work the DTO Phone.

37.     As set forth in more detail below, on June 12, 2020, law enforcement intercepted a phone call between BRYANT and ALVERIO, in which they discussed

ALVERIO working a shift on the DTO Phone. BRYANT informed ALVERIO that he had scheduled other individuals to work the DTO Phone, including Individual SH, HOSEY, and MCDOWELL, but BRYANT assured ALVERIO that he would be assigned a shift as well. On June 15, 2020, BRYANT assigned ALVERIO a shift to work the DTO Phone. During that shift, ALVERIO used the DTO phone to distribute 2.09 grams of heroin/fentanyl to an undercover officer (UC-4).

38.     Specifically, on June 12, 2020, at approximately 10:11 a.m. (Target Phone 6, Session 75), BRYANT, using BRYANT Phone 1, placed a call to ALVERIO, who was using telephone number (773) XXX-1770 ("ALVERIO's Phone").[13] During this call, ALVERIO stated, "Still waiting on this goofy ass PO [parole officer]. He taking his precious time. Talking about due to the COVID-19 he move slower. Man, come see me boy, I'm trying to get off house arrest." BRYANT replied, "Hell yeah. That shit weird. They be doing that shit, they be wanting a ni--a to tweak." Later during this call, BRYANT asked, "When you gon' be ready [work the DTO Phone], you gotta know when you gonna be out. I be needing like a couple [unintelligible]. I just sure locked my mornings down man. I be usually let Ronda [HOSEY] to do the mornings. She be off Friday, Saturday and Sundays. So I let her get them days really in the morning." ALVERIO replied, "Tomorrow, tonight or whatever." BRYANT

---

[13] The identification of ALVERIO throughout this Affidavit is based on records provided by the Illinois Department of Corrections Parole Unit showing that ALVERIO was the user of ALVERIO's Phone.

replied, "Tonight, I just told Trell [Individual SH] tonight. Tomorrow Weezy [MCDOWELL] doing it so you'll probably get Sunday night." ALVERIO replied, "A'ight bet... I'll do [work the DTO Phone] Sunday night." BRYANT replied, "You just gotta call and remind me so I don't give it [the DTO Phone] to nobody else. Just call and remind me like the day before." ALVERIO replied, "I'm a call you tomorrow and I'm a call you Sunday morning." BRYANT stated, "I been fucking around and I be double booking [DTO Phone shifts] sometimes, shit." ALVERIO replied, "I already know how that shit goes." BRYANT continued, "I need to write me a schedule down. [Laughing] Do my weekly schedule." ALVERIO replied, "I got you." BRYANT replied, "Trying to get back right, man." ALVERIO replied, "We'll get it back up there."

39.     On June 14, 2020, at approximately 11:46 p.m. (Target Phone 6, Session 222), BRYANT, using BRYANT Phone 1, placed a call to ALVERIO, who was using ALVERIO's Phone. During this call, ALVERIO stated, "Trying to see if we still on for tonight?" BRYANT replied, "Shit, I told you tonight?" ALVERIO replied, "Mmm... If it's full [DTO Phone work schedule], just hit me up talking about let me know when it's open." BRYANT replied, "Okay, I'll probably still put you in there but I did tell Lil' Reek [HOLLINS] I was gonna let him... just keep the line open for me, yo'." ALVERIO replied, "I just need a couple of days; specially for my b-day, my b-day next week Sunday but I'm having something Saturday." BRYANT replied, "Okay. I'm trying to locate this line [the DTO Phone] right now so let me hit you back lil' bro'. I'm trying to locate it 'cause Lil' Weezy [MCDOWELL] done went to sleep with it." ALVERIO replied "A'ight."

40.     On June 15, 2020, at approximately 8:06 a.m. (Target Phone 6, Session 271), BRYANT, using BRYANT Phone 1, placed a call to ALVERIO, who was using ALVERIO's Phone. BRYANT asked, "Can you pop out [work the DTO Phone] or you busy?" ALVERIO replied, "No, I could pop out [work the DTO Phone]." BRYANT replied, "How long till you can make it this way?" ALVERIO replied, "Shit, probably like 20." BRYANT replied, "That's cool. Gonna and get yourself together, I'm finna make sure they don't give that [the DTO Phone] motherfucker to nobody." ALVERIO replied, "I'm up now. I'm jumping out the door now." BRYANT replied, "A'ight."

41.     At approximately 8:17 a.m. (Target Phone 6, Session 281), BRYANT, using BRYANT Phone 1, had a conversation with ALVERIO, who was using AVLERIO's Phone. ALVERIO replied, "Yeah, pops. I'm in the car on my way." BRYANT replied, "Okay. Uh... where you want to meet this ni--a at? [Unintelligible] get ready to meet him [current worker of the DTO Phone]." ALVERIO replied, "Shit, it don't matter. Where you want to meet him on G street or something?" BRYANT replied, "Yeah, I'm a text you his number in 1 second. Let me answer this other ni--a real quick. I'm finna text it to you. In a few minutes." ALVERIO replied, "Cool, I'm coming from south now so it's gonna take me like 10."

42.     At approximately 8:22 a.m., toll records show BRYANT, using BRYANT Phone 1 (Target Phone 6, Session 287) sent a text message to ALVERIO.[14] Moments

---

[14] Law enforcement did not have authorization to receive the content of the text messages over BRYANT Phone 1 (Target Phone 6).

later, at approximately 8:22 a.m., (Target Phone 6, Session 289) BRYANT received a text message from ALVERIO.

43.     At approximately 8:44 a.m. (Target Phone 6, Session 296), BRYANT, using BRYANT Phone 1, had a conversation with ALVERIO, who was using ALVERIO's Phone. During this call, BRYANT asked, "He gave you everything else?" ALVERIO replied, "He gave me everything 850 [$850] in total." BRYANT replied, "Something like that." ALVERIO replied, "Yeah, he gave me 3 wholes [3 whole jabs] and 1... like, 2 open [2 opened jabs with baggies sold]. He said 1 of 'em was somebody else's. That they said that they was gonna finish or give/get back into it or some shit like that." BRYANT replied, "Yeah, well don't even touch that motherfucker." ALVERIO replied, "A'ight." BRYANT replied, "Straight up." ALVERIO stated, "A'ight. I'm finna hit [serve] somebody right now." BRYANT replied, "Go and do your thing. You by yourself or you got somebody with you?" ALVERIO replied, "I'm finna go pick up a lady after I hit this first motherfucker." BRYANT replied, "Yeah, that's what you need, Joe." ALVERIO continued, "Yeah, you know I know how to do this, pops. I might be rusty but ain't new to it. And he gave me a phone [the DTO Phone] that's dead." BRYANT replied, "Oh, that's crazy. You ain't got one of them flat chargers?" ALVERIO replied, "Hell no. I got an iPhone 10." BRYANT replied, "You should have told his ass to give you the charger too. They be having the charger to it, man. They be so petty, they keeping my chargers, Joe." ALVERIO replied, "I'm a grab one though. I got you, Pops." BRYANT continued, "My cousin Bud [BRENT] finna

come get up with you." ALVERIO replied, "A'ight, bet. Just give him my number." BRYANT replied, "A'ight."

44. At approximately 9:33 a.m. (Target Phone 6, Session 303), BRYANT, using BRYANT Phone 1, received a call from ALVERIO, who was using AVLERIO's Phone. ALVERIO stated, "I got 1 [1 baggie] left on the on the soft [heroin], pops." BRYANT replied, "1 whole one [1 jab] or just 1 [1 baggie]?" ALVERIO replied, "No, just 1. He only gave me like a half of 1." BRYANT replied, "Let me call this goofy ass ni--a, Bud [BRENT], man."

45. At approximately 9:34 a.m., (Target Phone 6, Session 305), BRYANT, using BRYANT Phone 1, placed a call to Grant, who was using telephone number (773)-XXX-0072 ("Grant's Phone").[15] During this call, BRYANT stated, "I need you on the uh, fuck with the big homie, yo'." Grant replied, "They ain't call me." BRYANT replied, "Ah shit, shorty don't even got your number, Lil' Tevo. Tevin, the light skin [unintelligible] [ALVERIO]." Grant replied, "Who the fuck is that?" BRYANT replied, "Man, twin lil' son stay on Adams." Grant replied, "Alright, give him my number." BRYANT replied, "I'm finna give him the number. You still got some of them blue

---

[15] The identification of Grant in this Affidavit, including as the user of Grant's Phone, is based on the following: (1) agents observed a meeting on April 24, 2020 between Individual KP and the user of Grant's Phone; a subsequent traffic stop of the vehicle in which the user of Grant's Phone was believed to be in revealed that Grant was the driver, (2) during the calls between Individual KP and BRYANT, on April 24, 2020, Individual KP references "Johnnie" as the person Individual KP was meeting; (3) on May 2, 2020, law enforcement intercepted a call between Individual KP and the user of Grant's Phone (Target Phone 3, Session 3272), during this call Individual KP calls the user of Grant "Johnnie"; and (4) on September 1, 2020, law enforcement arrested Grant, on a federal criminal complaint. Agents were familiar with Grant's voice from intercepted calls and after speaking with Grant during the arrest, agents further determined that Grant was the user of Grant's Phone.

27

stars [heroin/fentanyl] left?" Grant asked, "Some who?" BRYANT answered, "Some stars [heroin/fentanyl]." Grant replied, 'Yeah, hell yeah." BRYANT asked, "I thought that shit was over with. How many of them bitches you got?" Grant replied, "I gave him a…I don't know, it's probably like 3 left, I gave him 3 yesterday." BRYANT replied, "Alright, I'm finna have him [ALVERIO] call you."

46.     At approximately 9:37 a.m. (Target Phone 6, Session 308), BRYANT, using BRYANT Phone 1, placed a call to ALVERIO, who was using ALVERIO's Phone. During this call, BRYANT stated, "Yeah, I text you Johnny [Grant] number. Get up with him, he ready for you." ALVERIO replied, "A'ight, I'm finna hit this one [serve this customer] then I'm finna head to him."

47.     At approximately 9:46 a.m., surveillance observed, via a court-authorized location tracking device placed on BRENT's Vehicle, that the vehicle was located in the rear of BRYANT's Residence.

48.     At approximately 9:47 a.m. (Target Phone 6, Session 310) BRENT, using BRENT's Phone, had a conversation with BRYANT, who was using BRYANT Phone 1. BRENT said, "At the back." BRYANT replied "Alright."

49.     At approximately 9:55 a.m., BRENT sent BRYANT Phone 1 a text message (Target Phone 6, Session 311).

50.     On June 15, 2020, according to toll records, ALVERIO had 23 calls with Grant's Phone and Grant had six calls with the DTO Phone during a similar time period.

51.     At approximately 11:30 a.m. (Target Phone 6, Session 314), BRYANT, using BRYANT Phone 1, placed a call to ALVERIO, who was using ALVERIO's Phone. ALVERIO asked, "Who I'm meeting on Wilcox, who this is?" BRYANT replied, "On Wilcox?" ALVERIO replied, "Somebody just told me to link up with them on Wilcox and the land, they called my phone, 702 number."[16] BRYANT replied, "That's Bud [BRENT], that's my cousin. That's TREMAINE [BRENT]." ALVERIO replied, "What I'm dropping off some paper [proceeds from narcotics sales] to 'em?" BRYANT replied, "Mmm... Shit, you already hollered at Johnno [Grant] right?" ALVERIO replied, "Yeah." BRYANT continued, "I don't know what he [BRENT] want then, shit. He [BRENT] probably want to make sure you straight on the CD [crack cocaine]." ALVERIO replied, "Yeah on the CD [crack cocaine] I should. I got... 12, I got another whole [1 whole jab]... I think I got another 2 wholes [2 jabs] and it was 1 in there with a 12 count. I'm busing that bitch off now." BRYANT replied, "A 12, he gave you the 20 to that motherfucker... he gave you the 20 with that motherfucker?" ALVERIO replied, "No, I ain't even think so. I ain't see it 'till I bust it down that it was 12 in that bitch." BRYANT replied "[Unintelligible] give you a dub. I mean [unintelligible] soft [heroin]." ALVERIO replied, "I need that soft [heroin]." BRYANT replied "Better call his ass." ALVERIO continued, "I already tried to call, his ass ain't pick up." BRYANT replied, "Yeah, he gon' play the, 'I was sleep, bro'." ALVERIO replied, "I'mma get it from his ass the next go round." BRYANT continued, "Yeah, you know how ni--as be acting like they dead." ALVERIO replied, "A'ight, I'm finna hit

---

[16] The number for BRENT's Phone is 702-XXX-2076.

[unintelligible] see what he talking about." BRYANT replied, "Yeah, call that ni--a 'cause he really like... he be doing the CD's [crack cocaine] for me though." ALVERIO replied, "A'ight, 'cause what's his name gave me a half... 3 on the DVD's [heroin] and a half one. I popped that half one off [unintelligible] gave me 10 to pop that half one off." BRYANT asked, "A half of what?" ALVERIO answered, "[Unintelligible] half and another whole one. I got you pops." BRYANT replied, "He gave you a half of what?" ALVERIO replied, "On the D [heroin], it was like 5 in that bitch." BRYANT replied, "Oh." ALVERIO continued, "He gave me some wholes [jabs] and he gave me a half when it was only like 5-6 [unintelligible]." BRYANT replied, "Oh, a'ight."

52.     At approximately 6:40 p.m. (Target Phone 6, Session 371), BRYANT, using BRYANT Phone 1, received a call from ALVERIO, who was using AVLERIO's Phone. During this call, ALVERIO stated, "Hey, call B [JOHNSON] for me and tell him to hit my line." BRYANT asked, "B?" ALVERIO replied, "BBB, whatever the fuck his name is. Mother fucker I was [unintelligible] know." BRYANT replied, "Nah, Weezy [MCDOWELL], bro'." ALVERIO replied, "Oh. What the fuck he talking about about, BB?" BRYANT replied, "He ain't never said, BB. I hope BB didn't call you. BB ain't give no mothafucka [unintelligible]. You tweaking." ALVERIO replied, "On folk, he called my phone. BB, called my phone. I don't know how..." BRYANT replied, "BB ass dead tonight. You tweaking. He don't even do the night. He can't even get the night. He be going in and shit. Hell nah." ALVERIO replied, "[Unintelligible] I know he ain't say, Weezy [MCDOWELL]. I know he said, BB [JOHNSON]." BRYANT replied "Hell nah he ain't goin' tonight. Hell nah. Hell nah." ALVERIO replied,

"A'ight. Well send me Weezy [MCDOWELL] number." BRYANT replied "A'ight. I'm finna call him right now."

53.     At approximately 7:40 p.m. (Target Phone 6, Session 385), BRYANT using BRYANT Phone 1, received a call from ALVERIO, who was using ALVERIO's Phone. During this call, ALVERIO stated, "Hey call 'em. Tell 'em I'm out here. These phones ain't letting us call each other. I been out for 10 minutes." BRYANT asked, "Where you at? On Maypole?" ALVERIO replied, "Yeah. I'm on Maypole and Wood."

54.     As discussed in more detail below, ¶¶151-160, on June 15, 2020, after an undercover officer (UC-4) called the DTO phone and spoke to ALVERIO, ALVERIO arranged to meet the UC and sold UC-4 2.09 grams (net weight) of heroin/fentanyl.

**6.     June 15 and 18, 2020: BRYANT Managed the Use of the DTO Phone.**

55.     On June 15, 2020, at approximately 3:33 p.m. (Target Phone 6, Session 341), BRYANT, using BRYANT Phone 1, received a call from I. WILLIAMS, who was using telephone number (773) XXX-9593 ("I. WILLIAMS' Phone").[17] During this call, BRYANT asked, "Hey, that ni--a Weezy [MCDOWELL] ain't never pay that phone bill?" I. WILLIAMS replied, "Yeah. We paid the phone bill." BRYANT replied, "Fuck they saying the calls ain't going out then?" I. WILLIAMS replied, "I don't know. We paid that mothafucka when we was on the phone talking to Torre. He showed us how

---

[17] The identification of I. WILLIAMS throughout this Affidavit, including as the user of I. WILLIAMS' Phone, is based on a comparison to I. WILLIAMS voice from recordings of a UC purchase of narcotics from I. WILLIAMS on June 13, 2020.

to do it." BRYANT replied, "Right. Damn, man. I don't know the calls ain't going through on that lately. I don't know." I. WILLIAMS asked, "Who got the phone?" BRYANT answered, "You don't know him. I don't think you know the lil' ni--a." I. WILLIAMS replied, "They better do what we was doing [sell as much narcotics as I. WILLIAMS]. Shit."

56.     On June 18, 2020, at approximately 1:54 p.m. (Target Phone 6, Session 609), BRYANT, using BRYANT Phone 1 had a conversation with I. WILLIAMS, who was using I. WILLIAMS' Phone. I. WILLIAMS said, "Hey man, why y'all be puttin' dumbass ni--s on the line [the DTO Phone]?" I. WILLIAMS stated, "Hey, we go over there where this ni---a at, this ni---a got two other n---as in the car with him. This n---a can't even look a motherfucker in the face when he talkin' to his ass. This n---a don't know how to count." BRYANT replied, "Yeah man, don't worry about him." I. WILLIAMS stated, "From now on, Dex [BRYANT], I ain't giving no ni--a no motherfuckin' money [narcotics proceeds]." BRYANT replied, "Y'all shouldn't did that anyway. I don't ever want y'all to do that shit, anyway. I don't know why ni--as be doing that shit, put some cash in another ni--a hand, then it got to go to another ni--a hand. Shit don't ever go right." I. WILLIAMS stated, "We would do that back in the day when [unintelligible] was running shit, we had all the loyal motherfuckers, but these new motherfuckers…" BRYANT replied, "Yeah, these, yeah. They goin' play, man. I don't know, man, shit bogus." I. WILLIAMS said, I know what the [unintelligible] is and what is goin' on. I'm never gonna play with nobody money like that. I was [unintelligible] holdin' all the money last night, countin' shit. I know what

we gave that ni--a. He lyin'. I ain't bought shit yesterday. I ain't get high, I ain't smoke, I ain't do shit yesterday. I was sober as hell. And we weren't kickin' it with no motherfuckers. It was just me and him in the car." BRYANT said, "It's all good, man." I. WILLIAMS said, "That ni--a can't count." BRYANT said, "I'm a take buddy [unintelligible]." At this point, MCDOWELL appeared to join the conversation.[18] MCDOWELL said, "No, you ain't takin' shit... I just told this buddy, man, before shorty get off I'm finna meet up with shorty. [Unintelligible] get that shit straight, he talkin' to me like we playin' but we not playin' with that money, he's already got that shit." BRYANT said, "I just told shorty to take the line [the DTO Phone] back to Johnny [Grant]. I don't even want to fuck with him no more. I don't want to deal with none of that shit." MCDOWELL asked, "Who's gonna work [sell narcotics from the DTO Phone]?" I. WILLIAMS said, "We available. Just woke up. We ready. We ain't goin' like that. I ain't givin' nobody shit, man, and I'm taking pictures of everything I give to a motherfucker, I'm a send it to your phone. I ain't goin' like that, boy." MCDOWELL said, "That shit crazy." I. WILLIAMS said, "Ain't nobody say I took shit, or nothing. I ain't on none of that." MCDOWELL said, "And then they don't even be knowin' that you be workin' and [unintelligible]. I don't want to do nothin' bro." I. WILLIAMS said, "That's why I'm tellin' you the ni--a lyin'; I had the merch and the

---

[18] The identification of MCDOWELL throughout this Affidavit is based on agent's familiarity with MCDOWELL's voice from a comparison to several UC narcotics purchases from MCDOWELL throughout this investigation. Specifically, UC-4 performed a voice comparison between the person UC-4 spoke with during recorded calls on June 13, 2020 and subsequent recorded calls and in-person meetings with MCDOWELL referenced in this Affidavit and determined it was the same person (MCDOWELL). MCDOWELL did not speak during the meeting with UC-4 for the June 13, 2020 transaction.

motherfuckin' cash. That's how I'm tellin' you he lyin'. That boy is lyin' you know...
Dex [BRYANT], you know a mother [button pressed] I'm not gonna play with that
money, it got you and my behind and shit, I ain't gonna do nothin' like that." BRYANT
said, "Don't worry about it. I'm finna tell Johnny [Grant] to give y'all the line [the
DTO Phone]." I. WILLIAMS said, "Alright." MCDOWELL said, "Alright." BRYANT
said, "Give me a second, I'm finna call him, see if he got it yet." I. WILLIAMS replied,
"Alright."

###     7.     June 15 and 16, 2020: BRYANT Assigned DTO Workers to the DTO Phone.

57.     As detailed further below, on June 15, 2020, law enforcement
intercepted calls between BRYANT and JOHNSON, in which BRYANT asked
JOHNSON if he wanted to work the DTO Phone morning shift on June 16, 2020.
JOHNSON stated that he wanted to work and BRYANT told JOHNSON to reach
out to MCDOWELL in the morning to get the phone from MCDOWELL because he
was currently working the DTO Phone. Further, on June 16, 2020, law enforcement
intercepted a call between BRYANT and Individual WD wherein Individual WD
reached out to BRYANT to request to a work shift for the DTO Phone. BRYANT
then called the DTO Phone and learned that JOHNSON was assigned to work the
phone. BRYANT informed Individual WD that he had double booked the DTO
Phone and assured Individual WD that he would be assigned to work JOHNSON's
shift the following day.

58.     Specifically, on June 15, 2020, at approximately 7:18 p.m., (Target
Phone 6, Session 380), BRYANT, using BRYANT Phone 1, placed a call to

JOHNSON, who was using 312-XXX-7096 ("JOHNSON's Phone").[19] During this call, BRYANT asked, "Shit, what you on tomorrow in the morning, Ray? You gon' be around?" JOHNSON replied, "Yeah, yeah. Hell, yeah. I'mma be around. I ain't been working since I got fired." BRYANT replied, "Shit, in the morning, though. I got you, though. In the morning, just be on point at like 7:00, Joe. Weezy [MCDOWELL] got it [the DTO Phone], so yeah, definitely be on point, though." JOHNSON replied, "Yeah, I told him whenever he ready to wrap it up [stop selling narcotics from the DTO Phone], I'mma be around [to take the next DTO Phone shift]." BRYANT continued, "No, just be on his ass in the morning. Oh, yeah, or he like wanna give it to you earlier, just be on the [unintelligible] with him, too. Hell, yeah. If we wanna... end up leaving early, be on point for that, too.

59.     On June 16, 2020, at approximately 7:49 a.m. (Target Phone 6, Session 405), BRYANT, using BRYANT Phone 1, placed a call to Individual WD, who was using 773 XXX-3236 ("Individual WD's Phone").[20] During this call, BRYANT asked, "What's the word buddy?" Individual WD asked, "What's the word?" BRYANT replied, "Man, [unintelligible] phone [the DTO Phone], fell asleep with it. Um, shit, you ready [to work a shift]?" Individual WD replied, "Yeah." BRYANT replied, "I'm finna call Weezy [MCDOWELL] right now, you'." Individual WD replied, "Aight." BRYANT asked, "Where you at?" You here, around the way?" Individual WD replied, "Right

---

[19] The identification of JOHNSON, including as the user of JOHNSON's Phone, is based on agents' familiarity with JOHNSON's voice from several in-person UC narcotics purchases including on June 16, 24, 25, July 6, 2020, and August 13, 2020.

[20] Agents identified Individual WD as the user of Individual WD's Phone based on a voice comparison following a post-arrest interview of Individual WD on October 2, 2020.

here on uh, Warren and [unintelligible]." BRYANT replied, "A'ight, I'm finna call that ni--a right now though. He waiting." Individual WD replied, "A'ight." BRYANT continued, "You ain't got Weezy [MCDOWELL] number?" Individual WD replied, "Uh-uh." BRYANT replied, "A'ight just give me a second, let me see... what's going on."

60.    At approximately 7:53 a.m. (Target Phone 6, Session 409), BRYANT, using BRYANT Phone 1, placed a call to the DTO Phone and spoke with JOHNSON.[21] BRYANT stated, "What's the word? Who this?" JOHNSON answered, "This BB. Who is this?" BRYANT replied, "This Dex, boy. I didn't tell you to come out today [work the shared narcotics phone]." BRYANT continued, "You won't supposed to pop out [work the shared narcotics phone] today." JOHNSON replied, "This BB." BRYANT replied, "I know, I tell you, boy, you was supposed to pop out tomorrow, right?" JOHNSON replied, "Nah, nah, nah. You told, you said, you told me, nah, I thought you said hum... be on point for 'em. For Wednesday." BRYANT replied, "Today is Tuesday?" JOHNSON replied, "Yeah." BRYANT continued, "Damn, man, you supposed to pop out Wednesday, bro. You supposed to pop out tomorrow, bro." JOHNSON replied, "You had called me last night and and, and just told me hum...

---

[21] Agents identified JOHNSON's based on the following: (1) during the calls on June 16,2020 with BRYANT, JOHNSON self-identified himself as "BB," which agents know to be a nickname for JOHNSON; (2) later on June 16th, an undercover officer purchased heroin/fentanyl from JOHNSON who was working the DTO Phone. After the deal, the undercover officer identified JOHNSON as the person with whom the undercover officer was talking to earlier on the DTO Phone and; (3) the vehicle used by JOHNSON during the deal was registered to JOHNSON, agents matched a known photo of the registered owner of the vehicle to person that sold the narcotics to the undercover officer and observed that it was the same person (JOHNSON).

don't pop out here 'til Wednesday." BRYANT replied, "Damn, man, you supposed to pop out tomorrow, man. I had somebody else coming out [working the DTO Phone] today, bro." JOHNSON replied, "Shit, where they at?" BRYANT replied, "I'm finna call uh... Yeah, I don't, I, I, I fucked up, man. I told you, I thought I told you..." JOHNSON replied, "You the one who told me, Weezy [MCDOWELL]... You said call him and get it [the DTO Phone] and shit. Talking about being on point cause he..." BRYANT replied, "Yeah-yeah-yeah, I did say to be on point. But I tweak. bro, I told [nickname for Individual WD] to come out today. Double booking, man, I be fucking up, bro." Later during the call, BRYANT stated, "No man, I be fucking up, bro! I'mma start writing that shit down or somethin'." BRYANT continued, "When you get out, buddy? How long you been out?" JOHNSON replied, "Shit, I just came out, shit! Well at 7:00."

61.     At approximately 7:55 a.m. (Target Phone 6, Session 410), BRYANT, using BRYANT Phone 1, placed a call to Individual WD, at Individual WD's Phone. During this call, BRYANT said, "Yo, you got BB's [JOHNSON's] number?" Individual WD replied, "Yeah." BRYANT continued, "Yeah, call Lil' BB, man. That's who ended up [unintelligible]. I did that shit again. I did tell him last night to come out, but man, I be tweaking. I don't know what the fuck? I definitely been told you pop out [work the DTO phone] Tuesday." Individual WD laughed and replied, "Alright, what you want me to call BB?" BRYANT replied, "Yeah, call BB, man, tell him to get up with you, man. I fucked up. I'mma just have to let Shorty pop out tomorrow or somethin',

man." Individual WD replied, "Who BB?" BRYANT replied, "Yeah, man. I sure, I been told you Tuesday though." Individual WD replied, "Alright, I'm finna call him now."

62.     At approximately 7:58 a.m. (Target Phone 6, Session 414), Individual WD, using Individual WD's Phone, placed a call to BRYANT, at BRYANT Phone 1. During this call, Individual WD stated, "Yeah, I called him [JOHNSON] and he ain't answer. You want me to go on and let him get this one now and I'll pick his [DTO Phone shift] up tomorrow?" BRYANT replied, "Yeah, do that then. That's cool. That'll work too, man. Just be on point tomorrow." Individual WD replied, "A'ight, bet [unintelligible]." BRYANT replied, "Fuck it, I'm finna let him just go ahead and do that." Individual WD replied, "Alright, jo'." BRYANT replied, "I appreciate it though. I appreciate it. Don't worry about it. I ain't gonna forget you, man. Tomorrow, jo'..." Individual WD replied, "A'ight."

63.     As described in more detail below, as described in ¶¶173-178, that same day, on June 16, 2020, UC-3 ordered heroin from JOHNSON, who was using the DTO Phone. At approximately 10:08 a.m., UC-3 purchased approximately 3.5 grams (net weight) grams of fentanyl/heroin from JOHNSON.

**8.     June 16, 2020: BRENT Met with JOHNSON, Who Was Using the DTO Phone, And JOHNSON Gave BRENT Money.**

64.     As described below, on June 16, 2020, based on intercepted calls and surveillance, BRYANT and BRENT met in the afternoon and then, shortly thereafter, BRENT met with JOHNSON, who was working the DTO Phone. During BRENT's meeting with JOHNSON, JOHNSON gave BRENT cash and BRENT handed JOHNSON an item.

38

65. On June 16, 2020, at approximately 1:35 p.m. (Target Phone 6, Session 436), BRYANT, using BRYANT Phone 1, placed a call to BRENT, who was using BRENT's Phone. BRENT said, "Yo!" BRYANT responded, "Yo, hey how long before you get down here, boy?" BRENT said, "I'm coming now." BRYANT said, "I need you, boy." BRENT responded, "I'm coming now." BRYANT said, "Okay."

66. At approximately 1:50 p.m., law enforcement observed, via surveillance footage, BRENT's Vehicle park at BRYANT's apartment building.[22] Court-authorized tracking device location information also placed BRENT's Vehicle in the rear of BRYANT's apartment building at this time. Surveillance footage captured an individual matching BRENT's physical description walk from the BRENT's Vehicle to the rear of BRYANT's apartment building. At approximately 2:01 p.m., law enforcement observed, via surveillance footage, the same individual matching BRENT's physical description walk from the area behind BRYANT's apartment building, enter the driver's side of BRENT's Vehicle, and drive away from the area.

67. Shortly thereafter, at approximately 2:23 p.m., surveillance observed BRENT's Vehicle park in front of a school located at 2838 W. Adams Street. Surveillance observed JOHNSON in a vehicle pull up next to BRENT's Vehicle. Surveillance observed JOHNSON exit the vehicle and walk towards BRENT's Vehicle. BRENT was sitting in the front driver's seat with the door open.

---

[22] Agents identified BRYANT's Residence based on the following: (1) agents obtained location information order for BRYANT Phone 1, which consistently showed BRYANT Phone 1 to be in the area of the 50-100 block of E. 59th St, and agents are also aware that BRYANT is on house arrest, with limited movement, and (2) Cook County pre-trial services lists BRYANT's Residence as located at the same address on E. 59th St., Chicago, Illinois.

68. At approximately 2:24 p.m., surveillance observed JOHNSON hand BRENT cash. In exchange, BRENT handed JOHNSON an unknown object. Surveillance then observed JOHNSON put the unknown object into his front left pants pocket.

69. Based on agents training, experience, and the intercepted calls referenced above, agents believe BRYANT called BRENT to come to BRYANT's residence to pick up narcotics to resupply the worker of the DTO Phone, who was JOHNSON at the time. BRENT then took the narcotics to JOHNSON, who was working the DTO Phone and re-supplied JOHNSON with narcotics from BRYANT. In exchange, JOHNSON gave BRENT the proceeds from the narcotics sales he had already made from working the DTO Phone.

**9.** **June 17, 2020: BRYANT and Individual WD Discussed Sales on the DTO Phone and Individual WD Alerted BRYANT to Customer Complaints Regarding Narcotics.**

70. As described further below, during intercepted calls between Individual WD and BRYANT, Individual WD explained that a DTO Phone customer did not want to purchase narcotics that were packaged in the "blue" packaging. BRYANT told Individual WD that he was planning on starting up a new narcotics delivery phone line and that BRYANT would need help from Individual WD and other DTO Phone workers to get the line started.

71. Specifically, on June 17, 2020, at approximately 11:26 a.m. (Target Phone 6, Session 498), BRYANT, using BRYANT Phone 1, placed a call to Individual WD, at Individual WD's Phone. During this call, BRYANT asked, "What's the word?"

Individual WD replied, "Shit, they said... it's like 3 motherfuckers going to [unintelligible]." BRYANT replied, "Oh, yeah?" Individual WD continued, "Yeah, uh... the ni--a, uh, [unintelligible] boy say he was gonna buy 8 [quantity of narcotics] of them if it was [unintelligible] I told him I had the blue [packaging of narcotics], he said he didn't want this." BRYANT replied, "Damn." Individual WD replied, "He say he was on Ogden and Harlem. I was gonna get that [sell customer narcotics] before he asked what color [packaging of heroin], I [said], 'blue,' [blue tinted baggies] he [said], 'it ain't [unintelligible] I don't want it.'" BRYANT replied "Damn. I'm a have to [unintelligible]." Individual WD replied unintelligibly. BRYANT continued, "I'm [unintelligible] keep them [unintelligible] on that end, man…I'm finna start a whole nother line [another narcotics delivery phone line] anyway, though." Individual WD replied, "Yeah?" BRYANT replied, "Hell, yeah, I'm a need some help getting that motherfucker right, though. Don't worry about it. It ain't gonna take no one off." Individual WD replied, "You know I'm open, I'm down." BRYANT replied, "Hell yeah, for sure need some help [unintelligible] 'cause I'm probably gonna do like 15's [$15 baggies of narcotics] on that bitch or something. Just to get it going." Individual WD replied, "Just let me know, ni--a, I'm a call you when I get low on either one [heroin/fentanyl or crack cocaine supply]."

72.    At approximately 11:27 p.m. (Target Phone 6, Session 547), Individual WD, using Individual WD's Phone, placed a call to BRYANT, who was using BRYANT Phone 1. During this call, BRYANT asked, "What you did today, boy?" Individual WD replied, "A nick [$500]." BRYANT replied, "You can't [unintelligible] no packs?"

Individual WD replied, "I got up with him at 6:00, they kept most of the people with the what you call it, the DVDs [heroin/fentanyl], they complaining and talkin' about if it ain't the stars [the blue star Ziploc-style baggies packaging] they ain't want it. They talkin' about the blues [blue tinted Ziploc-style baggie packaging]." BRYANT replied, "Mmm..." Individual WD replied, "I told buddy, though, he say he just goin' try to put them stars or somethin' get that star [unintelligible] but that's what a few of them said, the ni--a John and Erika [DTO Phone customers]." BRYANT replied, "Right." Individual WD continued, "And John wanted a 8 piece [quantity of narcotics]. He ended up buying 4 of the little blues." BRYANT replied, "Damn. Alright, don't worry about it." Individual WD replied, "[Unintelligible] get back to how it was." BRYANT replied, "Yeah. It's gonna definitely get better, buddy." Individual WD replied, "That ni--a just hit me, I'm [unintelligible] at 4:00." BRYANT replied, "I got you, I definitely got you, shit, I might have to [unintelligible] night shift, boy." Individual WD asked, "Yeah?" BRYANT answered, "Yeah, I might need you to help on that night lick, yo." Individual WD replied, "Alright, just let me know. Anything like, tomorrow, anything. Let me know."

> ### 10. June 25, 2020: BRYANT Directed the Transfer of the DTO Phone to DTO Phone Shift Workers and Discussed Mixing Fentanyl with Heroin to Increase Sales.

73.     As described below, on June 25, 2020, law enforcement intercepted calls between BRYANT, MCDOWELL, Grant, and others. During the intercepted calls, BRYANT solicited Grant's assistance with managing the exchange of the DTO Phone from MCDOWELL to JOHNSON. Further, BRYANT and GRANT discussed that to

make more money from narcotics sales they needed to "step" on the narcotics, which based on my training and experience, means adding cutting agents to the narcotics to increase the volume.

74. Specifically, on June 25, 2020, at approximately 7:29 a.m. (Target Phone 6, Session 1291), BRYANT, using BRYANT Phone 1, spoke with JOHNSON, who was using JOHNSON's Phone. During this call, BRYANT asked, "You trying to do it [work the DTO Phone to sell narcotics]?" JOHNSON replied, "Yeah." BRYANT replied, "A'ight, hit me when you swinging that way. I'm just gonna have buddy get up with Johnnie [Grant]. So there don't be no confusion, man. Just tell me when you're ready to slide out then I'll have buddy go and get ready slide on [unintelligible]." JOHNSON replied, "I'm already west right now." BRYANT asked, "You already out?" JOHNSON replied, "Yeah." BRYANT asked, "How long it's gonna be till you come out?" JOHNSON replied, "Like 15." BRYANT replied, "A'ight, I'm finna get ready to try to make everything happen [organize the shift change for the DTO Phone workers]."

75. At approximately 7:31 a.m. (Target Phone 6, Session 1292), BRYANT, using BRYANT Phone 1, spoke with to I. WILLIAMS, who was using I. WILLIAMS' Phone. BRYANT asked, "Where Weezy [MCDOWELL] bald head at?" I. WILLIAMS replied, "In the alley right here with his daddy." BRYANT, later in the conversation, stated, "That ni--a BB [JOHNSON] finna get ready to pop out [work the DTO Phone] though. I know ya'll gotta... motherfuckers gotta pop out tonight so I know ya'll trying to get up out of there. Go chill, lay back and do whatever ya'll gotta do. Tell Weezy [MCDOWELL] he can holla at [nickname for Grant] real quick." I. WILLIAMS

replied, "A'ight." BRYANT replied, "Yeah, 'cause BB [JOHNSON] finna get ready to pop out in like the next 10 minutes."

76.     At approximately 7:38 a.m. (Target Phone 6, Session 1298), BRYANT, using BRYANT Phone 1, spoke to Grant, who was using Grant's Phone. During the phone call, BRYANT stated, "BB [JOHNSON] finna get ready and come holla at you, buddy. Weezy [MCDOWELL] gonna drop the line [the DTO Phone] off to you. I want everything to go smooth, so Weezy [MCDOWELL] finna drop it off, BB [JOHNSON] gonna come get that motherfucker." Grant replied, "A'ight." BRYANT replied, "Buddy, you ready to make some lucrative business decisions when you get that 10 [quantity of narcotics], boy? We need that motherfucker to step on it [mix/stretch narcotics]. I needed this little jump start. I ain't on shit thought. You [unintelligible] get up, yo'." Grant replied, "A'ight."

77.     At approximately 8:21 a.m. (Target Phone 6, Session 1303), BRYANT, using BRYANT Phone 1, spoke with BRENT, who was using telephone number 702-XXX-1495 ("BRENT Phone 2").[23] During the call, BRENT stated, "I don't even know who out or none of this shit [who is working the DTO Phone]." BRYANT replied, "Who out?" BRENT replied, "Yeah." BRYANT replied, "What's his name just got up with [Grant], BB [JOHNSON], Weezy [MCDOWELL] and 'em just took it in [brought in the DTO Phone] but Weezy [MCDOWELL] back out tonight. Where [Individual SH]

---

[23] Agents identified BRENT's voice based on a comparison to calls made by the user of BRENT's Phone and determined it was the same person (BRENT). Law enforcement as discussed above, was also familiar with BRENT's voice from two in-person meetings with BRENT.

bitch ass at? He ain't come back out, he got that little 10 [proceeds from narcotics sales] and said fuck it." BRENT replied, "Yeah, buddy got his shit." BRYANT replied, "Them ni--as don't even call or nothing. That shit cray." BRENT replied, "[Unintelligible] I know he probably told you. I end up giving him a whole thing. I had gave him 12 [quantity of narcotics], he was in the bed and shit, so I gave Weezy [MCDOWELL] the other 5 [quantity of narcotics]." BRYANT replied, "That's cool, what Weezy ass... what his shit was [what were MCDOWELL's narcotics proceeds]?" BRENT replied, "750 I think, 750 [$750]." BRYANT replied, "Oh, okay." BRENT replied, "Said he double back on 'em afterwards. I don't know about that." BRYANT replied, "I don't know either, I gotta call Gabe real quick too. Get that trey [quantity of narcotics] soon as you go out too, yo'." BRENT replied, "A'ight. I was sure finna ask you, me get it for you or me."

78.     At approximately 8:34 a.m. (Target Phone 6, Session 1304), BRYANT, using BRYANT Phone 1, spoke with MCDOWELL, who was using telephone number (708) XXX-1154 ("MCDOWELL's Phone"). During this call, MCDOWELL asked, "Hey, who coming out? I'll keep going [selling narcotics], I ain't doing shit." BRYANT replied, "BB up [JOHNSON is next DTO Phone shift worker]. Holla at BB [JOHNSON]. I'm still finna call him make sure he pop out. I was just telling you..." MCDOWELL replied, "He ain't gotta come out, we ain't doing shit." BRYANT replied, "I wanted you to go out later. He had already said he was finna pop out. I'm a need you tonight anyways." MCDOWELL replied, "I already know." Later in the call, MCDOWELL stated, "Everything [crack cocaine and heroin] is moving a'ight but they

45

[customers] talking about the size of the music [quantity of narcotics being sold]."
BRYANT replied, "Fuck them people." MCDOWELL replied, "It's good, the same
motherfuckers [customers] steady buying it." BRYANT replied, "Hey, [unintelligible]
what they want quality or quantity [of narcotics]." MCDOWELL, "On my momma."
BRYANT replied, "Can't get both of 'em right now."

79.     At approximately 9:02 a.m. (Target Phone 6, Session 1309), BRYANT,
using BRYANT Phone 1, spoke with JOHNSON, who was using JOHNSON's Phone.
During this call JOHNSON stated, "Yeah, I just hollered at him." BRYANT asked,
"At Johnno [Grant] or who?" JOHNSON replied, "Weezy [MCDOWELL]." BRYANT
replied, "Oh, shit. Make sure that shit [narcotics proceeds from earlier sales and
narcotics to sell] straight with Johnno [Grant]. Make sure he [MCDOWELL] gave you
everything right." JOHNSON replied, "A'ight. I told him drop it off over there [Grant's
residence] anyways." BRYANT replied, "Okay, then."

80.     At approximately 9:03 a.m., BRYANT, using BRYANT Phone 1, called
MCDOWELL, who was using MCDOWELL's Phone. During this call, BRYANT
stated, "Okay, fam. I'm a give you that little receipt [payment for working the DTO
Phone]. You gonna probably come get that shit later." MCDOWELL replied, "Okay."
BRYANT replied, "Ya'll can probably slide down here on me [BRYANT's Apartment
Building]." MCDOWELL replied, "A'ight."

81.     At approximately 5:02 p.m. (Target Phone 6, Session 1345), BRYANT,
using BRYANT Phone 1, spoke with Grant, who was using Grant's Phone. During
the call, BRYANT said, "Damn, that's what I was finna ask you. How that shit

[narcotics sales] looking?" Grant replied, "Yeah. He got the last 4 [quantity of narcotics]. I'm out though." BRYANT said, "Get the fuck outta here!" Grant replied, "Yeah." BRYANT said, "Damn, boy. I gave ya'll the 17 [quantity of narcotics] yesterday." Grant said, "Yeah, 'cause he gave me 12 [$1,200]." BRYANT said, "Oh, okay. That mean... Oh, but you had said you gave Weezy [MCDOWELL] the 5 [quantity of narcotics] right?" Grant replied, "3, 4, of 'em [quantity of narcotics]." BRYANT said, "Oh, man! That's crazy." Grant replied, "Oh, you ain't got shit put together [BRYANT had not mixed and packaged narcotics for distribution]." BRYANT replied, "I got like 7 [quantity of narcotics] put together [for distribution]." Grant replied, "Oh, okay." Later during the conversations, BRYANT said, "Yeah, buddy. That's why it was doing what it was doing [why the narcotics were selling so well]. That mothafucka [heroin] got that thang [fentanyl] on there." Grant replied, "Yeah." BRYANT said, "That's why that shit [narcotics] be going [selling] fast when I got that [fentanyl]." Grant replied, "Mm-hum." BRYANT said, "I'm definitely super stretching [mixing narcotics to increase the volume] now." Grant replied, "Yeah." BRYANT said, "Like 23 [quantity of narcotics after mixing] off that..." Grant replied, "Damn!" BRYANT said, "Man, shit. Who you telling? You see it's still going [selling] though." Grant replied, "Yeah but it's whatchu ma call it, you got that drop [cutting agents] in there right?" BRYANT said, "Hell yeah. Just drops [cutting agents] man." Grant replied, "Okay." BRYANT said, "Hell yeah. I ain't gonna play with it when I throw it on. That's why I'm, [unintelligible]…" Grant replied, "For real now, boy." BRYANT said, "That's exactly what Weezy [MCDOWELL] said a day earlier.

47

Man, they [customers] ain't gonna stop [buying/using]. They [customers] want quality or quantity? Fuck they talking about? It's going, right [selling]? Always telling me what the fuck they [customers' opinion of the quality of narcotics] said." Grant replied, "Yeah, he got a 100 [$100] too. He [MCDOWELL] suppose to run me 100 [$100]. I don't know why he give it to [unintelligible]." BRYANT said, "He [MCDOWELL] always be playing. I don't be liking that shit." Grant replied, "What his count [total daily narcotics sold] was? I think his count was 9 [$900]." BRYANT said, "Yeah. Better [unintelligible] come around that shit." Grant replied, "Yeah, his count was a g [$1,000], he gave him 9 [$900] and keep the hundred. What the fuck was that? You might as well gave that to him." BRYANT said, "Yeah, shit. Make him [MCDOWELL] bring that [$100] to you."

82. At approximately 5:53 p.m. (Target Phone 6, Session 1348), JOHNSON, who was using JOHNSON's Phone, called BRYANT, at BRYANT Phone 1. During the call, JOHNSON said, "Hey, who going [selling] at 7:00 buddy?" BRYANT replied, "Weezy [MCDOWELL]." JOHNSON said, "A'ight. Hey, they say don't change the size neither. That's the best they ever had on both sides [crack cocaine and heroin]." BRYANT replied, "Oh, yeah?" JOHNSON said, "Hell yeah. All they asses [customers] was eating that shit [narcotics]." BRYANT replied, "Yeah, I could tell. They keeping me busy." JOHNSON said, "Yeah." BRYANT replied, "Yeah, buddy."

83. As described below in more detail in ¶¶187-192, on June 25, 2020, at approximately 5:33 p.m., UC-4 ordered heroin from JOHNSON, who was using the DTO Phone. UC-4 purchased approximately 7.63 grams (net weight) of

fentanyl/heroin from JOHNSON. Further, on June 25, 2020, at approximately 11:39 a.m., UC-5 ordered heroin from JOHNSON, who was using the DTO Phone. UC-5 purchased approximately 3.64 grams (net weight) of fentanyl/heroin from JOHNSON.

> **11.    June 28, 2020: BRYANT directed BRENT to Transport Narcotics Trafficking Materials and BRYANT and Grant Discussed Police Activity and Narcotics Sales.**

84.    On June 28, 2020, at approximately 12:26 p.m., BRYANT, using BRYANT Phone 1, placed a call to BRENT, who was using BRENT's Phone. During this call, BRYANT stated, "I need you to...I was supposed to give you some receipts [proceeds from narcotics transactions] to holla J-6 [nickname for Grant] for me, man." BRENT replied, "[Unintelligible] gave me some receipts [proceeds from narcotics transactions]?" BRYANT continued, "Yeah, man. He [unintelligible], he got it the way I be liking it. I was supposed to give your ass...You already out?" BRENT replied, "I'm finna double back. I'm right here on 55th [unintelligible]." BRYANT replied, "Yeah, come back to me. I'm tripping." BRENT replied, "Aight."

85.    At approximately 4:08 p.m. (Target Phone 6, Session 1556), BRYANT, using BRYANT Phone 1, received a telephone call from an unidentified female who is referred herein as "UF6-1556," who was using telephone number 773-XXX-0916. During the call, BRYANT advised UF6-1556 that BRYANT's brother, "Dre," was out on the back porch yelling that BRYANT had contraband inside of BRYANT's apartment building. BRYANT further stated, "This ni***, Bowleg, over here pissing me off. Finna make me pop [shoot] him." BRYANT continued, "He tweaking. He just

walked off. Stormed off like a little hoe. I was finna pop [shoot] him." Later in the conversation, BRYANT stated, "I'm finna have to move everything [contraband] out my house real quick." UF6-1556 replied, "Bring it [contraband] over."

86.     At approximately 4:30 p.m., surveillance was established near BRYANT's apartment building.

87.     At approximately 4:32 p.m., surveillance observed BRYANT and an unknown male involved in a physical altercation on the back porch of BRYANT's apartment building. After approximately one minute, BRYANT and the male separated. BRYANT returned back inside his residence. The unknown male entered a blue vehicle and departed the area.

88.     At approximately 4:49 p.m., law enforcement observed, via surveillance footage, BRENT's Vehicle arrive and park near the alley of BRYANT's residence. BRENT and an unknown black female exited BRENT's Vehicle and entered BRYANT's apartment building. According to law enforcement observations, BRENT was not carrying anything.

89.     At approximately 5:01 p.m., law enforcement observed, via surveillance footage, BRENT and the unknown black female exit BRYANT's residence and return to BRENT's Vehicle. At this time, agents observed that BRENT was carrying a black and red backpack over his shoulder. BRENT placed the backpack in the trunk of the vehicle. BRENT and the unknown female entered BRENT's Vehicle and departed the area. Law enforcement began surveilling BRENT's Vehicle until it was stopped by Chicago police officers as described below.

90. At approximately 5:05 p.m., Chicago Police officers, at the direction of agents in this case, conducted a traffic stop of BRENT's Vehicle in the 200 block of W. 59th Street. BRENT and the unknown female were asked to step out of the vehicle for an interview. Officers then searched BRENT's Vehicle. During the search, a CPD officer located in the trunk of BRENT's Vehicle the red and black backpack that BRENT was observed carrying from BRYANT's apartment building. As depicted in the photos below, inside the backpack, officers found: (1) a plastic bag containing a coffee grinder with white powdery residue; (2) a large amount of various plastic baggies with apple logos on them; (3) a digital scale; (4) a plastic bottle labeled "Monitol" containing a white powdery substance; (5) a paper with a label "Mannite Conoscent" containing a white powdery substance; (6) one 7.62 caliber live rifle round; and (7) one box containing 51 live rounds of 9mm ammunition.[24] Based on my training and experience, "Monitol" and "Mannite Conoscent" are medicinal diuretic powders, which are often used as an adulterant while mixing heroin in order to increase the volume of the heroin; grinders/blenders are used by narcotics traffickers to mix narcotics with cutting agents and; scales are used to weigh narcotics for packaging. The items were sent to the laboratory for testing for narcotics residue; those tests are still pending.

---

[24] According to certified criminal history records, BRYANT and BRENT both have sustained felony convictions.

 

91.    Meanwhile, as the traffic stop was occurring, at approximately 5:10 p.m. (Target Phone 6, Session 1570), BRYANT, using BRYANT Phone 1, placed an outgoing call to telephone number 312-XXX-6537 ("Individual TP Phone").[25] During the call, BRYANT said, "Open the back, open the door real quick! Hurry up! Hurry up!" Individual TP replied, "The back door open." BRYANT said, "The front! The front! The front!" Individual TP stated aside, "Open the door." BRYANT said, "Hurry up! Hurry up! You gotta hurry up! You gotta hurry up!" Based on the content and context of this call, my training and experience, and my knowledge of this investigation, I believe BRYANT was alerted to the traffic stop of BRENT and called Individual TP to open the door front door to her apartment.

92.    At approximately 5:28 p.m., law enforcement observed, via surveillance footage, as BRYANT walked up the far-east back porch stair well and entered

---

[25] Cellular telephone number 312-XXX-6537 is subscribed to Individual TP. Further, during intercepted calls between BRYANT and Individual TP they discuss "Lil Dex," as a child they share.

a second floor apartment on the far-east side of the Individual TP's apartment building.

93.     At approximately 5:34 p.m. (Target Phone 6, Session 1575), BRYANT, using BRYANT Phone 1, received a telephone call from BRENT, who was using telephone number 702-XXX-1495 ("BRENT Phone 2"). During the call, BRYANT said, "What they talkin' about?" BRENT replied, "They [police] ain't say shit. They ain't ask a ni--a no questions, like, Man, you ain't get out of the car? Like, Hell, no [unintelligible] food back there. They, You sure? So there's nothing in your car? If I search the car, ain't gon' find nothing? Like, Hell, no, man! They searched, go through the back, go in the trunk... I couldn't see if they got the book bag or not." BRYANT said, "I thought you said they didn't go in the trunk?" BRENT replied, "No, they [police] went in there! They did! They went in that motherfucker, but I couldn't see if they did. I couldn't see what they was doing 'cause they way they had the... the way they got that car parked, they put me in a whole different car. Then them other cars was like they blocked the ni--a in, G. P came fast right before that, uh... 'Whoo'. It just ain't feel right, right before that [unintelligible] whoo." BRYANT said, "What you left, what you talking 'bout? Right before you left?" BRENT replied, "No, right before they box the ni--a in." BRYANT said, "Right. Did they get the bag or not?" BRENT replied, "They got the bag. They get the bag out the bag." BRYANT said, "The black bag?" BRENT replied, "Yeah, with the tacos [contraband]." BRYANT said, "Mmm! Damn, that's all they took?" BRENT replied, "Yeah. I don't know. I ain't even go in the trunk and just get the book... the black bag with the book bag was still in there. You say

53

they ain't take the book bag, but they get the black bag." BRYANT said, "That's where you had them licks [contraband] at?" BRENT replied, "I don't know, I ain't..." BRYANT said, "Yeah, yeah..." BRENT replied, "Oh, man [unintelligible]." BRYANT said, Right, right." BRYANT and BRENT continued to discuss the traffic stop and that BRYANT saw police vehicles parked in front of his residence.

94.     At approximately 5:38 p.m. (Target Phone 6, Session 1587), BRYANT, using BRYANT Phone 1, placed an outgoing call to Grant, who was using Grant's Phone. Grant said, "What's the deal?" BRYANT replied, "I don't know, man. This shit driving me crazy." Grant said, "What happened? They [police] let Bud [BRENT] go?" BRYANT replied, "Yeah, but they snatched the bag from him. He [BRENT] don't know, I don't know... I don't know if these fucking jacks right." Grant said, "Right." BRYANT replied, "I don't wanna talk about that shit. But yeah, they snatched some shit up off him and let him [BRENT] go." Grant said, "Yeah..." BRYANT replied, "Yeah, man." Grant and BRYANT continued to discuss how BRYANT's apartment building must be under police surveillance. Grant later said, "I said, I'mma hit you back. I'mma buy us, I'm about to buy some new licks for us. Some phones." BRYANT replied, "Yeah, definitely gotta do ASAP. Go get me one [new phone] too." Grant said, "Yeah." BRYANT replied, "That shit crazy. A'ight, I'mma holler at you." Grant replied, "A'ight."

95.     At approximately 6:50 p.m. (Target Phone 6, Session 1599), BRYANT, using BRYANT Phone 1, received an incoming call from Grant, who was using Grant's Phone. BRYANT and Grant continued to discuss how BRYANT's apartment

building was under police surveillance. At one point, Grant said, "I was finna try to come with the lick [narcotics]." BRYANT replied, "Nah, hell nah. I don't even want to touch that. And they [police] just, oh my God! I don't even wanna... Nah, we can't... I can't do shit now." Grant said, "Right." BRYANT replied, "I don't want nothing in this bitch [BRYANT's residence]. 'Cause they [police] might hit this bitch now [execute a search warrant]." Grant said, "That's crazy. Goof ass shit." Later in the conversation BRYANT stated, "I'm finna have to give Ari all my mothafucking paper [money] and everything. This shit irritating." Grant replied, "Yeah, who you telling..." BRYANT stated, "That shit just fucked the whole move [narcotics operation] up." Grant replied, "Yeah, boy. That's why I was telling him to go on get the fuck on. 'Cause I already knew that's what's gon' happen [draw police attention]." BRYANT and Grant continued to talk about how angry BRYANT was about the fight with his brother and about the police presence around BRYANT's apartment building. Eventually Grant said, "It's over with though?" BRYANT replied, "Man, they just..." Grant said, "[Unintelligible] right now?" BRYANT replied, "Man, it wasn't even over, G. I told you that he [police] just took everything from Bud [BRENT], bro'." Grant said, "Right." BRYANT replied, "They [police] just took like 25 licks [contraband/items], boy." Grant said, "Oh, eyah. [Unintelligible] That's crazy." BRYANT replied, "Let him [BRENT] go though."

### 12. Following the Traffic Stop, BRYANT and BRENT Discuss Getting New Telephones.

96. On June 29, 2020, at approximately 10:39 a.m., BRYANT had a conversation with BRENT (Target Phone 6, Session 1666). During this conversation,

BRYANT said, "Yeah, Ronda [HOSEY] finna come out [sell narcotics on the DTO Phone]." BRENT said, "A'ight." BRYANT replied, "Man, when you get a chance boy, grab me a new line [telephone]." BRENT said, "I was finna just tell you. I was just finna go get us some flip joints [flip phones]." BRYANT replied, "I ain't want no flips [flip phones]. Get me two different joints [telephones]. I want two of 'em. [telephones]." BRENT said, "A'ight, I'm a grab me one [telephones] too." BRYANT replied, "A'ight." BRENT said, "I'll grab a flip, it don't matter to me." BRYANT replied, "A'ight." BRENT said, "I sure finna call you and say that shit this morning." BRYANT replied, "Yeah, go ahead and get me two of 'em [telephones]. I don't care what they is." BRENT said, "A'ight." BRYANT replied, "A'ight."

### D. The BRYANT DTO Used Grant's Residence as a Stash House and Hub for Transferring the DTO Phone.

97.     As discussed in more detail below, over the course of this investigation, that 803 S. Karlov Avenue in Chicago, Illinois ("Grant's Residence") managed by Grant served as a stash house and central hub to organize the logistics of the DTO— where workers could trade in the DTO Phone, pick up narcotics, and drop off money from their narcotics activity.

98.     For example, as described below, on August 5, 2020, WASHINGTON traveled to Grant's Residence and then, one minute later, using the DTO Phone, told a customer that he had "just got it," and that's why it "took so long." Compl. at ¶ 99-103. On August 17, 2020, HOLLINS, a DTO worker, told Grant that he had "100 [$100] and then I got 10 [quantity of narcotics]. I gotta give you 20 bucks [$20]." Compl. at ¶129. HOLLINS and Grant then met up and exchanged multiple items at

Grant's Residence. Lastly, on September 1, 2020, a federal search warrant was executed on Grant's Residence and the following was recovered: four firearms, 49.868 grams (net weight) of heroin/fentanyl, 35.3 grams (net weight) of cocaine base, $6,645 in cash, tools used in manufacturing and packaging narcotics, including an electronic scale, packaging materials, and a strainer.

### 1. August 5, 2020: WASHINGTON and MCDOWELL, While Working the DTO Phone, Obtained Narcotics from Grant's Residence.

99. As detailed further below, based on intercepted calls and surveillance observations, on August 5, 2020, WASHINGTON and MCDOWELL "re-upped" or obtained additional narcotics from Grant's Residence in order to continue selling the DTO's narcotics using the DTO phone.[26]

100. Specifically, on August 5, 2020, at approximately 11:31 a.m., law enforcement observed, via surveillance footage, a white Cadillac sedan parked in the 800 block of S. Karlov Avenue. Surveillance observed WASHINGTON driving earlier that day in a 1998 white Cadillac Coupe bearing Illinois registration CG48510

---

[26] Law enforcement identified Grant's Residence based on the following: (1) on June 12, 2020, intercepted calls between Individual KP and Grant (Target Phone 3, Sessions 7104, 7107, 7111, 7119, 7126) that Individual KP planned to meet with Grant at his residence to pick up narcotics. Shortly after those calls, physical surveillance observed Individual KP's maroon Chevrolet parked on S. Karlov Ave. Surveillance observed Individual KP, Individual CH and an unknown male exit the basement of 803 S. Karlov Ave. Individual KP and Individual CH then approached Individual KP's vehicle; (2) on multiple occasions, agents, via electronic surveillance, have observed a subject matching Grant's physical description—a black male with long dreads using crutches, entering and exiting Grant's Residence. Agents are familiar with Grant's appearance based on a traffic stop of Grant conducted on April 24, 2020 and; (3) As discussed herein, on September 1, 2020, a search warrant was executed on Grant's Residence and Grant was located there as was indicia of his residence to include mail addressed to Grant at Grant's Residence.

("WASHINGTON's Vehicle") while WASHINGTON engaged in suspect narcotics transactions. [27] At approximately the same time as agents observed the Cadillac, information from the DTO Phone's geographic location placed the phone in the area of Grant's Residence.

101.  At approximately 11:32 a.m., law enforcement observed, via surveillance footage, a black male matching the description of WASHINGTON approach Grant's Residence.[28] The individual entered the gate of Grant's Residence and walked down to the basement level.

102.  At approximately 11:34 a.m., law enforcement observed, via surveillance footage, the same individual exit Grant's Residence and walk out of view of surveillance.

103.  At approximately 11:35 a.m. (Target Phone 9, Session 186), WASHINGTON, using the DTO Phone, placed a call to FNU LNU a/k/a Lou, who was using telephone number 312-XXX-4023 ("FNU LNU a/k/a Lou's Phone").[29] During this call, FNU LNU a/k/a Lou asked, "Can you swing by the crib?" WASHINGTON replied, "Yeah I just got it [re-upped narcotics supply] that why I took so long, I'm

---

[27] According to law enforcement database records, the white Cadillac coupe is registered to "Allen L. Washington" on W. Warren Boulevard, Chicago, Illinois. As noted below, WASHINGTON was observed driving the same vehicle when he and MCDOWELL sold narcotics to two UCs after the UC's ordered from the DTO Phone.

[28] Law enforcement, due to the distance and angle, could not see WASHINGTON's face but his appearance as well as his clothing matched that of WASHINGTON's as observed the same day during a purchase of narcotics by an undercover law enforcement officer.

[29] The identification of WASHINGTON throughout this Affidavit, including over the DTO Phone, is based on a voice comparison between the voice on the phone and WASHINGTON's voice as reflected in the audio/video recordings of a UC purchase from WASHINGTON on August 5, 2020, as set forth below.

finna come your way. What you trying to do?" FNU LNU a/k/a Lou replied, "I'm grab four [quantity of narcotics]." WASHINGTON replied, "Alright."

104.     As described further below in ¶¶ 250 through 257, on August 5, 2020, UC-1 ordered crack cocaine from an unidentified male, who was using the DTO Phone. At approximately 4:10 p.m., WASHINGTON and MCDOWELL met with UC-1 and sold approximately 0.399 grams (net weight) of cocaine base to UC-1.

### 2.     August 6, 2020: DTO Workers Meet at Grant's Residence.

105.     As detailed further below, based on my training and experience, content and context of intercepted calls, and surveillance observations, on August 6, 2020, WILKINS went to Grant's Residence to turn in the DTO Phone so that MCDOWELL could collect the phone to work the next shift.

106.     Specifically, on August 6, 2020, at approximately 7:08 p.m. (Target Phone 9, Session 1030), WILKINS, using the DTO Phone, spoke with Casey LNU, who was using telephone number 312-XXX-0069.[30] During this call, Casey LNU stated, "This Casey, I'm up here at Pete's on Western and Monroe, getting ready to walk to my house on Campbell and Jackson. You wanna meet me at my crib?" WILKINS stated, "You know, it's time for me to go in [time for WILKINS to end his shift and turn the phone over to the next DTO worker]. Somebody else'll probably bring it." Casey LNU replied, "You ready to turn the phone in?" WILKINS replied,

---

[30] The identification of WILKINS throughout this Affidavit, including over the DTO Phone, is based on a voice comparison between the voice on the phone and WILKINS' voice as reflected in the audio/video recordings of several UC purchases from WILKINS on August 6 and 12, 2020, as set forth below

"What you trying to do?" Casey LNU replied, "I was getting ready to get 4 [quantity of narcotics]. Well, go ahead. You know what? Go ahead and turn it in [let the DTO change workers] and I'll call the next people. You getting ready to turn it in, that's cool."

107.    At approximately 7:24 p.m., law enforcement observed, via surveillance footage, WASHINGTON's Vehicle park on the 800 block of S. Karlov Avenue near Grant's Residence. MCDOWELL exited the driver's seat of the vehicle and walked through the front gated area of Grant's Residence and downstairs towards the basement unit. At approximately 7:30 p.m., surveillance observed, via surveillance footage, MCDOWELL exit the basement unit of Grant's Residence and approach WASHINGTON's Vehicle. MCDOWELL reached into the open front driver's window, retrieved something from inside the vehicle, and then returned to sit on the front stairs of Grant's Residence.

108.    At approximately 7:36 p.m., law enforcement observed, via surveillance footage, a 2007 white Ford Sedan, bearing Illinois registration BM24855 ("WILKINS' Vehicle"), near Polk Street and Karlov Avenue.[31] At this time, location data for the DTO Phone placed it in the area of Grant's Residence.

109.    At approximately 7:38 p.m., law enforcement observed, via surveillance footage, WILKINS exit WILKINS' Vehicle and approach the front gate of Grant's Residence. At this time, MCDOWELL exited the front gate. MCDOWELL and

---

[31] On August 6 and 12, 2020, WILKINS' used WILKINS' Vehicle to meet with UCs to complete narcotics transactions.  According to law enforcement database records, WILKINS' Vehicle is registered to "Paul E. Wilkins" on 5th Avenue, Hines, Illinois 60141.

WILKINS then re-entered the gate and walked towards the basement unit of Grant's Residence.

110.    At approximately 7:40 p.m., WILKINS left the area of Grant's Residence and walked to WILKINS' Vehicle and entered the vehicle.

111.    At approximately 7:44 p.m., law enforcement observed, via surveillance footage, MCDOWELL walk to WASHINGTON's Vehicle, which was parked near the corner of Polk St. and Karlov Ave., and enter it. While inside the vehicle, according to surveillance footage, MCDOWELL reach into the rear buttock area of his pants, remove an object, and place it in the center console.

112.    At approximately 7:45 p.m., MCDOWELL, using the DTO Phone, had a conversation with UM9-1044, who was using telephone number (773) XXX-5940. During this call, UM9-1044 stated, "Yeah, I need 3 [unintelligible] uh…Francisco and Wilcox." MCDOWELL replied, "Alright. I'm finna pull up. Be on Francisco and Wilcox." Based on location information for the DTO Phone, during this call, the phone was located in the area of Grant's Residence.

### 3.    August 8, 2020: Grant Worked the DTO Phone After WILKINS Dropped Off the Phone At Grant's Residence.

113.    As described below, on August 8, 2020, WILKINS went to Grant's Residence to drop off the DTO Phone. After WILKINS dropped off the phone, Grant began using the DTO phone to sell narcotics. After Grant received a call from a customer requesting narcotics, surveillance observed Grant's Vehicle travel to a residence to meet with an unidentified male to engage in a suspected narcotics transaction. Subsequent to the meeting, CPD officers conducted a traffic stop of

Grant's Vehicle. Following that traffic stop, Grant changed vehicles and continued to use the DTO Phone to distribute the DTO's narcotics.

114. On August 8, 2020, at approximately 8:03 a.m., law enforcement observed, via surveillance footage, WILKINS' Vehicle park near Grant's Residence. An individual matching the physical description of WILKINS exited the vehicle, entered the front gate of Grant's Residence, and walked towards the basement unit.

115. At approximately 8:04 a.m., location information for the DTO Phone placed the phone in the area of Grant's Residence.

116. At approximately 8:07 a.m., the individual exited the basement unit of Grant's Residence, reentered WILKINS' Vehicle, and departed the area. According to the location information for the DTO Phone near this time, the DTO Phone moved from the area of Grant's Residence and proceeded to travel to several locations on the west side of Chicago.

117. Later that night, at approximately 8:19 p.m., law enforcement observed, via surveillance footage, WILKINS' Vehicle park near Grant's Residence. An individual believed to be WILKINS, based on a physical description as well as prior clothing description, exited the driver's seat and walked towards the basement unit of Grant's Residence.

118. At approximately 8:23 p.m., the individual exited the basement unit of Grant's Residence, reentered WILKINS' Vehicle, and departed the area.

119. At approximately 9:06 p.m. (Target Phone 9, Session 2817), Grant, using the DTO Phone, spoke with FNU LNU a/k/a Red, who was using telephone number

(312) XXX-8568 ("FNU LNU a/k/a "Red" Phone"). During this call, FNU LNU a/k/a Red asked, "Can I get 10 hard [10 crack cocaine rocks]?" Grant replied, "Yeah, where you at?" FNU LNU a/k/a Red replied, "36th and Leavitt." Grant replied, "Okay."

120. Between 9:56 p.m., and 10:19 p.m. (Target Phone 9, Sessions 2866, 2877, and 2881), Grant, using the DTO Phone, exchanged three more calls with FNU LNU a/k/a Red, wherein they discussed the narcotics transaction and FNU LNU a/k/a Red's location.

121. At approximately 10:20 p.m., surveillance observed a green van, bearing Mississippi registration KMA5613 ("Grant's Vehicle"), pull up to 3603 S. Leavitt.[32] An unidentified male exited the residence and approached the passenger side of Grant's Vehicle. The unidentified male then returned to the residence. Law enforcement continued to surveil Grant's Vehicle.

122. At approximately 11:05 p.m., at the direction of agents, CPD officers conducted a traffic stop of Grant's Vehicle on Washtenaw Avenue, just north of Gladys Street. During the stop, the occupants provided identification, and officers identified the driver of the vehicle to be Individual CG and the passenger to be Grant. Furthermore, location data placed the DTO Phone in the area of the traffic stop at this time.

123. At approximately 11:37 p.m. (Target Phone 9, Session 2957), Grant, using the DTO Phone, spoke with FNU LNU a/k/a "Short", who was using telephone

---

[32] According to law enforcement databases, Mississippi registration KMA5613, corresponds to a 2005 green Buick registered to Grant at an address in Scooba, Mississippi.

number (312) XXX-0795. During this call, FNU LNU a/k/a "Short" complained that he had been waiting awhile. Grant replied, "I got pulled over by the police on some hoe shit, ni--a." FNU LNU a/k/a "Short" asked, "How long you gonna be man?" Grant replied, "Give me like 15 minutes for real, cause we had to re-route once they [the police] let me go man."

124.    At approximately 11:30 p.m., law enforcement observed, via surveillance footage, Grant's Vehicle park near Grant's Residence.

125.    At approximately 11:32 p.m., Grant exited the front passenger seat of Grant's Vehicle. Grant, using crutches, walked towards the front passenger side of a black Nissan sedan and entered. The black Nissan departed the area at approximately 11:41 p.m.

126.    At approximately 11:49 p.m. (Target Phone 9, Session 2964), Grant, using the DTO Phone, spoke with UM9-1627, who was using telephone number (312) 330-6702. During this call, Grant told UM9-1627 that he was in a Nissan.

### 4.    August 17, 2020: DTO workers Exchanged the DTO Phone and Narcotics at Grant's Residence.

127.    On August 17, 2020, based on interceptions over the DTO Phone, surveillance observations, location information for the DTO Phone, as well as my experience and training:

a.    HOLLINS went to Grant's Residence to drop off the DTO Phone. HOLLINS and Grant met on the porch of Grant's Residence. During that meeting, law enforcement, via surveillance footage, observed Grant and HOLLINS engage in multiple hand-to-hand transactions. Phone location information placed the DTO at

64

Grant's Residence at the time HOLLINS arrived. After HOLLINS left, phone location information still placed the DTO Phone at Grant's Residence.

b.      JOHNSON arrived at Grant's Residence after HOLLINS' departure. Surveillance footage captured JOHNSON enter the basement area of Grant's Residence. A short while later, JOHNSON entered his vehicle and drove away. Location information placed the DTO Phone in the area of Jackson and Washtenaw Avenue after JOHNSON left Grant's Residence.

c.      Based on the above sequence and the sources noted above, I believe that JOHNSON went to Grant's Residence to obtain the DTO Phone to work the next shift. Specifically:

128.   On August 17, 2020, at approximately 8:31 a.m. (Target Phone 9, Session 7488), Grant, who was using telephone number (708) XXX-8425 ("Grant Phone 2"), placed a call to the DTO Phone.[33] During this call, Grant asked, "What it's looking like [how is the DTO Phone's narcotics supply]?" HOLLINS replied, "I got 6 DVD's [heroin/fentanyl] and 4 CD's [crack cocaine]." Grant replied, "How many whole CD's [crack cocaine] you got?" HOLLINS replied, "I'm a have to count that, probably like…3 [quantity of crack cocaine]…You heard me?" Grant replied, "You got 3 whole ones?" HOLLINS replied, "Yeah, I got 3 whole ones. I need to get the money out the car." Grant replied, "I'm finna call you right back."

---

[33] Law enforcement identified Grant as the user of GRANT Phone 2 based on a voice comparison to the user of Grant's Phone and determined them to be the same person. The identification of Grant's Phone is discussed above.

129.    At approximately 8:33 a.m. (Target Phone 9, Session 7489), Grant, using Grant Phone 2, placed a call to the DTO Phone and spoke with HOLLINS. During this call, Grant stated, "Just bring me everything [the narcotics, the narcotics proceeds and the DTO Phone]." HOLLINS replied, "Alright."

130.    Between approximately 9:52 a.m. and 9:54 a.m., law enforcement, via surveillance footage, observed a green Infiniti sedan with no front license plate pull up in front of Grant's Residence.[34] An individual matching the physical description of HOLLINS exited the green Infiniti sedan, walked towards the gate of Grant's Residence, opened the gate, walked to another gate, and then up the stairs to the main level of Grant's Residence.   HOLLINS walked over to a window and made contact with an individual inside Grant's Residence. At approximately 9:54 a.m., HOLLINS sat down on the porch of Grant's Residence. At approximately the same time (Target Phone 9, Session 7511), HOLLINS, using the DTO Phone, placed a call to Grant, who was using Grant Phone 2. During this call, HOLLINS asked, "Yeah, I got 100 [$100] and then I got 10 [quantity of narcotics]. I gotta give you 20 bucks [$20]. You in the basement [of Grant's Residence]?" Grant replied, "No, I'm upstairs." HOLLINS replied, "I'm finna come up." Grant replied, "Yup. A'ight let me

---

[34] Agents have previously observed HOLLINS driving a green Infiniti sedan with no front registration plates and one Illinois temporary plate attached to the rear (295V774 registered to a 1997 blue Infiniti, registered to Enrique HOLLINS on W. Jackson Boulevard, Chicago, Illinois 60612) based on prior surveillance on June 14, 2020 and August 8, 2020. Agents identified HOLLINS based on a comparison of the individual shown in the surveillance and a known booking photograph of HOLLINS.

[unintelligible] come out." During this call, phone location information placed the DTO Phone in the area of Grant's Residence.

131.    At approximately 9:59 a.m., law enforcement, via surveillance footage, observed Grant exit the main floor door of Grant's Residence and sit and down on the porch next to HOLLINS.

132.    At approximately 10:00 a.m., law enforcement, via surveillance footage, observed HOLLINS and Grant engage in multiple hand-to-hand exchanges. During these exchanges, Grant's hand reached in and out of a fanny pack bag that was strapped across his body. HOLLINS then exited the porch, entered the Infiniti sedan and drove northbound on Karlov Avenue.

133.    At approximately 10:10 a.m., law enforcement, via surveillance footage, observed Grant, who was using crutches, travel down the stairs of Grant's Residence. At this time, phone location information placed the DTO Phone in the area of Grant's Residence.

134.    At approximately 10:12 a.m., law enforcement, via surveillance footage, observed JOHNSON walk southbound on Karlov Avenue, enter the front gate of Grant's Residence and walk towards the basement area.

135.    At approximately 10:14 a.m., law enforcement, via surveillance footage, observed JOHNSON exit Grant's Residence and walk to a black Chevrolet Impala and depart the area.

136.   At approximately 10:25 a.m., phone location information placed the DTO Phone in the area of Jackson and Washtenaw Avenue, a different location from Grant's Residence.

137.   Based on a review of intercepted calls, law enforcement familiar with the voices of JOHNSON and HOLLINS determined that HOLLINS was the user of the DTO Phone until approximately 10:55 a.m., at which time; JOHNSON began using the DTO Phone.

**5.     September 1, 2020: Law Enforcement Seized Heroin/Fentanyl, Cocaine Base, and Firearms from Grant's Residence.**

138.   On September 1, 2020, law enforcement executed a court-authorized search warrant of Grant's Residence. During the search of Grant's bedroom, which was located in the basement, law enforcement agents recovered fentanyl-laced heroin, crack cocaine, narcotics paraphernalia, and cutting agents from inside Grant's bedroom. The seized narcotics were sent to the DEA North Central Laboratory for testing and found to consist of total of 49.868 grams (net weight) of heroin/fentanyl and 35.3 grams (net weight) of cocaine base. Law enforcement recovered the narcotics from inside of a black fanny-pack under the bed and also in the dresser inside Grant's bedroom. The packaging material and other narcotics paraphernalia were located in the dresser of Grant's bedroom. The packaging that was recovered were green and purple tinted small Ziploc-style baggies and clear Ziploc-style baggies with an apple print logo.

139.   In addition, in Grant's bedroom, law enforcement also recovered $6,645 in cash and tools used in manufacturing and packaging narcotics, including an electronic scale, packaging materials, and a strainer.

140.   Finally, also in Grant's bedroom, agents recovered the following firearms:

- a Smith & Wesson Shield 9mm semi-automatic pistol;
- a Smith & Wesson Bodyguard .380 semi-automatic pistol; and
- a Smith & Wesson M&P Shield 9mm semi-automatic pistol.

**E.     DTO Workers Used the DTO Phone to Sell the BRYANT DTO's Narcotics.**

141.   As described in detail below, based on intercepted calls, surveillance, seizures, and controlled purchases, between June 12, 2020 and September 1, 2020 date, the DTO's workers sold the DTO's heroin/fentanyl and crack cocaine using the DTO Phone to undercover law enforcement officers. In total, through seizures and UC sales, law enforcement recovered 124.186 grams of fentanyl/heroin, 0.32 grams of fentanyl, and 38.372 grams of cocaine base.

a.     ALVERIO—sold fentanyl/laced heroin to UC's on June 15, 2020.

b.     BLAIR—sold fentanyl/laced heroin to a UC on August 11, 2020 (with MITCHELL). In addition, law enforcement seized the DTO Phone and suspect fentanyl heroin and cocaine base from BLAIR on September 1, 2020. Based on a voice comparison from recorded buys with UC's to calls over the DTO Phone as well as surveillance, BLAIR additionally worked shifts over the DTO Phone on August 12 and 19, 2020.

c.     HOSEY—sold fentanyl/laced heroin to UC's on June 12, 2020, June 29, 2020, and July 4, 2020.

a.     HOLLINS—sold fentanyl/laced heroin to a UC on August 25, 2020.  Based on a voice comparison from recorded buys with UC's to calls over the DTO Phone as well as surveillance, HOLLINS additionally worked the DTO phone on the following dates: August 10, 16, 17, 24, 2020.

d.     JOHNSON—sold fentanyl/laced heroin to UC's on June 16, 2020, June 24, 2020, June 25, 2020, July 6, 2020, and August 13, 2020.

e.     MCDOWELL—sold fentanyl/laced heroin to UC's on June 13, 2020 (with I. WILLIAMS), June 27, 2020, July 13, 2020, and on August 5, 2020 (with WASHINGTON; included cocaine base).  In addition, based on a voice comparison from recorded buys with UC's to calls over the DTO Phone as well as surveillance, MCDOWELL additionally worked the DTO phone on the following dates: August 22, 28, 29, and 30, 2020; Lastly, WASHINGTON and MCDOWELL worked together over the DTO Phone on August 20, 2020.

f.     MITCHELL—sold fentanyl/laced heroin to a UC on August 11, 2020.

g.     WASHINGTON—sold fentanyl/laced heroin to UC's on August 5, 2020 (with MCDOWELL). Based on a voice comparison from recorded buys with UC's to calls over the DTO Phone as well as surveillance, MCDOWELL worked with WASHINGTON on August 20, 2020.

h.     D. WILLIAMS—sold fentanyl/laced heroin to UC's with WILKINS on August 6, 2020.

i.     I. WILLIAMS sold fentanyl/laced heroin to UC's with MCDOWELL on June 13, 2020.

j.     WILKINS—sold fentanyl/laced heroin and cocaine base to UC's with D. WILLIAMS on August 6, 2020 and on August 12, 2020. In addition, law enforcement seized heroin/fentanyl from customers that WILKINS had sold narcotics to on August 16, 2020 and August 24, 2020. Lastly, based on a voice comparison from recorded buys with UC's to calls over the DTO Phone as well as surveillance, WILKINS additionally worked the DTO phone on August 10, 14, 18, 20, 22, 28, and 31, 2020.

### 1.     June 12, 2020: HOSEY Distributed 2.488 Grams (Net Weight) of Heroin to UC-4.

142.     As described above in ¶¶ 21 through 32, on June 12, 2020, HOSEY distributed 2.488 grams (net weight) of heroin/fentanyl to UC-4 after UC-4 ordered from the DTO Phone.

143.     At approximately 11:05 a.m., an undercover officer ("UC-4") placed a consensually recorded call to the DTO Phone in an attempt to order narcotics. During the call, UC-4 stated, "Yo, I got 50 [$50] can I swing through?" HOSEY replied, "Yeah, where you at?" UC-4 replied, "I'm coming through can I meet you like Halsted and Madison? There's like a bank over there." HOSEY, replied, "A bank?" UC-4 replied, "Yeah, yeah, it's right on the corner." HOSEY asked, "What you need?" UC-4 replied, "I got $50, can I get 5 [5 baggies of heroin/fentanyl]." HOSEY replied, "Yeah 5 what?

You ain't saying what you need." UC-4 replied, "Oh can I get blows [heroin/fentanyl]. You got blows [heroin/fentanyl]." HOSEY replied, "Yeah, call me when you get right there."

144. At approximately 11:37 a.m., HOSEY, using the DTO Phone, placed a call to UC-4's phone. During this consensually recorded call, HOSEY asked, "Yo where you at?" UC-4 related to HOSEY that her boyfriend stole her money and that she needed time to put more money together.

145. Later that day, at approximately 4:55 p.m., UC-4 placed a consensually recorded call to the DTO Phone. HOSEY answered the call. UC-4 asked, "I got 50 bucks, can I get some blows [heroin/fentanyl]?" HOSEY asked, "Where you say you at?" UC-4 asked, "Can you meet me over uh Roosevelt and Canal, there's like a Jewel over there." HOSEY replied, "Okay yea I can meet you. What you say you needed?" UC-4 advised, "I need some blows [heroin/fentanyl], I got 50 [$50]." HOSEY replied, "You got 50 [$50] so you need 5 [5 baggies of heroin/fentanyl]?" UC-4 replied, "Yeah." HOSEY advised, "A'ight give me 10 minutes."

146. At approximately 5:05 p.m., UC-4 arrived at the Jewel-Osco and parked the undercover vehicle in the lot.

147. At approximately 5:10 p.m., HOSEY, using the DTO Phone, called UC-4. During this consensually recorded call, HOSEY advised, "Yeah, I'm almost there, I'm almost there, I'm getting off the e-way on Racine."

148. At approximately 5:48 p.m., surveillance observed HOSEY, driving a white Dodge Avenger, pull into the Jewel-Osco parking lot.

149.    As captured by UC-4's audio/video recording device and the photo below, when UC-4 approached the Dodge Avenger, HOSEY was seated in the driver's seat. UC-4 passed HOSEY $50 through the front passenger side window. In exchange, HOSEY gave UC-4 five small clear Ziploc-style baggies with blue star print containing a white powdery substance.



150.    The baggies HOSEY sold to UC-4 were submitted to the DEA North Central Laboratory for testing and determined to contain a total of 2.488 grams (net weight) of a mixture of fentanyl and heroin.

> **2.     June 15, 2020: ALVERIO Distributed to UC-4 2.09 Grams (Net Weight) of Heroin/Fentanyl.**

151.    As discussed above in ¶¶ 37 to 54, BRYANT authorized ALVERIO to work the DTO Phone on June 15, 2020. During his shift, as described further below, ALVERIO, using the DTO phone, sold UC-4 approximately 2.09 grams (net weight) of fentanyl/heroin.

152. Specifically, on June 15, 2020, at approximately 4:07 p.m. and 4:09 p.m., UC-4, placed a consensually recorded call the DTO Phone. Both calls were unanswered and went to voicemail.

153. At approximately 4:14 p.m., UC-4 received an incoming call from the DTO Phone. During the consensually recorded call, ALVERIO stated, "Yeah, my bad, I was uh just at the table. What you need?" UC-4 replied, "I need 5 [5 baggies of heroin/fentanyl]. I uh got 50 [$50]. You got blows [heroin/fentanyl] on you?" ALVERIO replied, "Yeah, where you at?" UC-4 replied, "Yeah, I'mma be like a half hour, can I meet you over like uh Western and Madison [referring to the location of a Pete's Fresh Market store] over there?" ALVERIO replied, "Yeah, just call me."

154. At approximately 4:59 p.m., UC-4 placed a recorded call to the DTO Phone. During the consensually recorded call, UC-4 stated, "I'm gonna be getting off the E-way in like 5 minutes here." ALVERIO asked, "You the one that wants the 5 soft [heroin/fentanyl] right?" UC-4 replied, "Yeah." ALVERIO replied, "A'ight, bet. Let me know when you get off the E-way, I'm grabbing another bundle [approximately 10 jabs of heroin/fentanyl]."

155. At approximately 5:05 p.m., UC-4 arrived and parked traveled to Pete's Fresh Market located at 2333 S. Madison Street in Chicago.

156. At approximately 5:15 p.m., UC-4 placed a consensually recorded call to the DTO Phone. During the call, UC-4 stated, "Hey I just pulled in by Madison and Western in the Pete's lot." ALVERIO replied, "Madison and Western [unintelligible] A'ight, bet. I'm on my way to you. I'm coming down Lake, uh I'm on Lake and Hamlin.

Meet me in the Walgreens again." UC-4 replied, "I'm in the Pete's lot right now." ALVERIO replied, "In the Pete's, a'ight just stay there."

157.    At approximately 5:25 p.m., surveillance observed a white Kia sedan pull into the parking lot of the Pete's Fresh Market and park.

158.    At approximately 5:26 p.m., UC-4 received a call from the DTO Phone. During the consensually recorded call, ALVERIO stated, "Yeah, where you at?" UC-4 replied, "I'm parked right along Madison in the lot, like right over by that bus station, I'm in a blue, teal SUV." ALVERIO replied, "I'm right here in Pete's parking lot, basically right by the bus stop, parked in the back." UC-4 replied, "Yeah that's exactly where I'm at. What are you driving?" ALVERIO replied, "The white car, you hear the horn [car honking]?" At that time, UC-4 heard honking of a car horn coming from a white sedan parked a couple spots west of the undercover vehicle.

159.    According to UC-4's audio/video recording device as well as a debrief of UC-4, at approximately 5:27 p.m., UC-4 exited his/her vehicle and approached the driver's side of the white sedan. As depicted in the top photo below, UC-4 observed ALVERIO in the driver's seat, and a female in the front passenger seat.[35] UC-4 also observed a child in the back seat, who was not secured in a safety seat. ALVERIO rolled down the driver's side window. UC-4 observed ALVERIO holding an unknown number of small Ziploc-style baggies, containing a white powdery substance in his hands. UC-4 stated, "I got 5 [$50 for 5 baggies of heroin/fentanyl]." ALVERIO counted

---

[35] Law enforcement surveillance officers and UC-4 reviewed a booking photograph of ALVERIO and, based on a comparison, identified ALVERIO as the driver and the person who distributed narcotics to UC-4 on June 15, 2020.

out five baggies. ALVERIO then handed the small clear Ziploc-style baggies with blue star print to UC-4. UC-4 passed the $50 to ALVERIO. UC-4 then returned to the undercover vehicle.





160.    The baggies ALVERIO sold to UC-4 were submitted to the DEA North Central laboratory for testing and the laboratory concluded that the substance weighed approximately 2.09 grams (net weight) and contained fentanyl and heroin.

### 3. June 13, 2020: MCDOWELL and I. WILLIAMS Sold 2.416 Grams (Net Weight) of Heroin/Fentanyl to UC-4.

161. As described further below, on June 13, 2020, UC-4 ordered heroin from MCDOWELL, who was using the DTO Phone. At approximately 7:17 p.m., UC-4 purchased approximately 2.416 grams of fentanyl/heroin from MCDOWELL and I. WILLIAMS.

162. Specifically, on June 13, 2020, at approximately 4:44 p.m., UC-4 placed a consensually recorded call to the DTO Phone. UC-4 asked, "Where you at? Can I come through? I got $50 [$50 to buy 5 baggies of heroin/fentanyl]." MCDOWELL stated, "Who the fuck is this?" UC-4 replied, "It's [UC-4's name] man, I bought from uh the girl yesterday, she drives that white sedan [HOSEY], she hooked me up." MCDOWELL stated, "Where you at?" UC-4 replied, "I'm coming through. Can I meet you over at like Western and Roosevelt, in like 30, 30-40 [30 to 40 minutes]?" MCDOWELL stated, "Yeah."

163. At approximately 5:33 p.m., UC-4 placed another consensually recorded call to the DTO Phone and spoke to MCDOWELL. During this call, UC-4 stated, "Hey man, I'm like 5 minutes away can I just meet you over at that KFC right there at Roosevelt and Western [located at 1144 S. Western Avenue in Chicago]?" MCDOWELL replied, "Yeah."

164. At approximately 5:39 p.m., UC-4 arrived at the KFC and parked the undercover vehicle in the lot.

165. At approximately 5:41 p.m., UC-4 placed a consensually recorded call to the DTO Phone. UC-4 stated, "I just parked at the KFC, I'm in a blue SUV."

MCDOWELL replied, "What you trying to get? 5 what?" UC-4 replied, "I'm tryna get 5 blows [heroin/fentanyl]. You got 5 blows?" MCDOWELL replied, "Uh, say what?" UC-4 replied, "You got 5 blows [5 baggies of heroin/fentanyl]? I got 50 [$50]." MCDOWELL replied, "Yeah, yeah."

166. At approximately 6:29 p.m., UC-4 placed a consensually recorded call to the DTO Phone. MCDOWELL stated, "It's gonna be like 30 minutes man, I ran out 'fore [sold all his narcotics] I got to ya man."

167. At approximately 7:03 p.m., UC-4 placed a consensually recorded call to the DTO Phone. MCDOWELL asked, "Hey where you at? You're on Roosevelt and Western right?" UC-4 replied, "Yeah." MCDOWELL replied, "It'd be a little faster if you come on Western and Madison to Pete's."

168. At approximately 7:14 p.m., UC-4 arrived at Pete's Fresh Market, located at 2333 W. Madison Street in Chicago, and parked in the lot.

169. At approximately 7:17 p.m., UC-4 received a call from the DTO Phone. During the consensually recorded call, MCDOWELL asked UC-4, "Is that you?" UC-4 replied, "Yeah." MCDOWELL asked, "You smoke Newports [UC-4 was smoking a cigarette while inside the undercover vehicle]? Come on and bring me a cigarette too." During this call, surveillance observed a maroon Lincoln sedan pull into the Pete's Fresh Market parking lot from Madison Street and continue through the lot towards the undercover vehicle.

170. As captured by UC-4's audio/video recording device and reflected in the photos below, MCDOWELL was the driver and I. WILLIAMS was the front seat passenger. There was also another individual in the back seat.[36]



171. According to UC-4's audio/video recording as well as a debrief of UC-4, when UC-4 arrived at the passenger side window, I. WILLIAMS asked, "You said you want five right?" UC-4 replied, "Yeah five." UC-4 observed multiple small, clear Ziploc-style baggies containing white rocks in I. WILLIAMS' hands. UC-4 then stated, "I need blows, you got blows [heroin/fentanyl]." I. WILLIAMS asked, "You want blows? How many of them you want?" UC-4 stated, "Five of those." I. WILLIAMS then removed several small, clear Ziploc-style baggies with blue star print containing a white powdery substance from the front passenger side door area,

---

[36] Following this controlled buy, UC-4 reviewed a booking photograph of MCDOWELL and identified him as the driver of the vehicle. Moreover, after the controlled purchase, law enforcement conducted a traffic stop of the red sedan. MCDOWELL, who was driving the vehicle, provided officers with his driver's license.

Also, following this controlled buy, UC-4 reviewed a photograph from an Illinois identification card of I. WILLIAMS and identified her as the front seat passenger of the vehicle. Moreover, during the traffic stop, I. WILLIAMS provided officers with an Illinois identification card.

counted out five clear Ziploc-style baggies with blue star print, and passed them to UC-4. In exchange, UC-4 passed $50 to I. WILLIAMS.

172. The baggies that MCDOWELL and I. WILLIAMS sold to UC-4 were submitted to the DEA North Central laboratory for testing and the laboratory concluded that the substance weighed approximately 2.416 grams (net weight) and contained a mixture of fentanyl and heroin.

### 4. June 16, 2020: JOHNSON Distributed 3.5 Grams (Net Weight) of Heroin/Fentanyl to UC-3.

173. As described further below, on June 16, 2020, UC-3 ordered heroin from JOHNSON, who was using the DTO Phone. At approximately 10:08 a.m., UC-3 purchased approximately 3.5 grams (net weight) grams of suspect fentanyl/heroin from JOHNSON.

174. Specifically, on June 16, 2020, at approximately 9:42 a.m., UC-3 placed a consensually recorded call to the DTO Phone. JOHNSON answered the phone, and, during the call, UC-3 and JOHNSON agreed to meet at the Cali Quick Stop and Cellular store located at 342 S. California Avenue in order for UC-3 to purchase $100 worth of heroin/fentanyl.

175. At approximately 10:06 a.m., UC-3 placed a consensually recorded call to the DTO Phone and spoke to JOHNSON. During the call, UC-3 stated that he/she had arrived at the Cali Quick Stop and Cellular store.

176. At approximately 10:08 a.m., UC-3 observed a silver Lincoln sedan with Illinois temporary tag 352V076 ("JOHNSON's Vehicle"), pull into the parking lot of

80

the Cali Quick Stop and Cellular.[37] UC-3 got out of the undercover vehicle and approached JOHNSON's Vehicle. According to UC-3's audio/video recording device, UC-3 entered the passenger side of JOHNSON's Vehicle and observed JOHNSON in the driver's seat.[38] JOHNSON was the sole occupant of the vehicle. JOHNSON drove away from the parking lot and parked in the area of 2806 W. Van Buren Avenue.

177. According to the recording of the meeting as well as a debrief of UC-3, JOHNSON asked UC-3, "How many you want?" UC-3 replied, "100 [$100 worth of heroin/fentanyl] or 10 [10 baggies of heroin/fentanyl] same difference." JOHNSON asked, "10 what [what kind of narcotics]?" UC-3 replied, "Oh, soft [heroin/fentanyl] sorry." UC-3 observed JOHNSON reach into his waistband and remove two bags containing an unknown number of smaller Ziploc-style baggies containing a rocklike substance and place them on his lap. UC-3 then observed JOHNSON count out 10 small blue Ziploc-style baggies containing a white powdery substance and pass the baggies to UC-3. UC-3 then passed JOHNSON $100. UC-3 exited JOHNSON's Vehicle and walked back to the undercover vehicle.

178. The baggies that JOHNSON sold to UC-3 were submitted to the DEA North Central laboratory for testing and the laboratory concluded that the substance

---

[37] Law enforcement identified JOHNSON as the owner of JOHNSON's Vehicle based on the following: (1) According to Illinois Secretary of State records, the Lincoln sedan is registered to Justin D. Johnson on 72nd St., Chicago, Illinois 60649; (2) Law enforcement records show that JOHNSON resides that this address; and (3) as described in the Affidavit, on June 16, June 24, June 25 and July 6, 2020, JOHNSON drove the vehicle to meet with undercover officers to engage in narcotics transactions.

[38] Following this controlled buy, UC-3 identified JOHNSON as the person who sold UC-3 narcotics from a photo array.

weighed approximately 3.5 grams (net weight) and contained a mixture of fentanyl and heroin.

**5.    June 24, 2020: JOHNSON Distributed 3.74 Grams (Net Weight) of Heroin/Fentanyl to UC-2.**

179.    As described further below, on June 24, 2020, UC-2 ordered heroin from JOHNSON, who was using the DTO Phone. At approximately 5:05 p.m., UC-2 purchased approximately 3.74 grams (net weight) of suspect fentanyl/heroin from JOHNSON.

180.    On June 24, 2020, at approximately 4:50 p.m., UC-2 placed a consensually recorded call to the DTO Phone. During the recorded call, UC-2 asked to purchase $60 of "soft [heroin]." UC-2 and JOHNSON agreed to meet at Lake Street and Western Avenue. UC-2 informed JOHNSON that s/he was riding a bicycle.

181.    At approximately 4:55 p.m., surveillance observed UC-2 enter into the parking lot located at Lake Street and Western Avenue. Upon arrival in the parking lot, UC-2 sat on a parking rail in the lot.

182.    At approximately 5:05 p.m., UC-2 and surveillance observed a white Dodge Stratus enter into parking lot and park. UC-2 approached the Dodge Stratus and entered the passenger side of the vehicle. UC-2 observed the driver of the vehicle to be JOHNSON.

183.    According to the UC-2's audio/video recording as well as a debrief of UC-2, UC-2 said, "Soft [heroin], right?" JOHNSON replied, "Yeah, what you need?" UC-2 said, "Six [baggies of heroin]." UC-2 observed JOHNSON reach into the front inside of his pants and remove a clear Ziploc-style bag. UC-2 then said, "Fuck it, you know

what man, fuck that shit man, I am not going to see you for a minute, so…" JOHNSON replied, "You wanna buy the rest of them [heroin baggies] then." UC-2 said, "What up? Right, right… 6, 7, 8 let me get 10 [baggies of heroin], you got it [10 heroin baggies]?" JOHNSON replied, "Yeah, I got 10 [baggies of heroin]."JOHNSON gave UC-2 a strip of taped together clear Ziploc-style baggies with blue star print logos, containing a white powdery substance (suspect heroin/fentanyl). In exchange, UC-2 gave JOHNSON $100. UC-2 exited the vehicle and departed the area.

184.    At approximately 5:08 p.m., law enforcement surveilled the Dodge Stratus as it drove away from the parking lot.

185.    At approximately 5:17 p.m., CPD officers initiated a stop on the Dodge Stratus at the location of N. Western Avenue, just south of W. Fulton Street. During the stop, JOHNSON produced his Illinois driver's license. JOHNSON was then released to preserve the ongoing investigation.

186.    The baggies that JOHNSON sold to UC-2 were submitted to the DEA North Central laboratory for testing and the laboratory concluded that the substance weighed approximately 3.74 grams (net weight) and contained a mixture of heroin and fentanyl.

> **6.    June 25, 2020: JOHNSON Distributed 3.64 Grams (Net Weight) of Heroin/Fentanyl to UC-5.**

187.    As described further below, on June 25, 2020, UC-5 ordered heroin from JOHNSON, who was using the DTO Phone. JOHNSON sold approximately 3.64 grams (net weight) of fentanyl/heroin to UC-5. As discussed above at ¶¶78-79,

BRYANT, on June 25, 2020, discussed with others and JOHNSON that JOHNSON would be working the DTO Phone that day.

188.   On June 25, 2020, at approximately 11:39 a.m., UC-5 placed a consensually recorded call to the DTO Phone.[39] During this call, UC-5 advised JOHNSON that he wanted to meet with JOHNSON at the Currency Exchange near Lake and Western Avenue. JOHNSON advised UC-5 that he was on his way.

189.   At approximately 11:51 a.m., UC-5 received an incoming telephone call from the DTO Phone. During the consensually recorded call, UC-5 advised JOHNSON that UC-5 was standing by the Currency Exchange near the alley. JOHNSON related to UC-5 that he was pulling up in a gray car.

190.   At approximately 11:54 a.m., surveillance observed JOHNSON's Vehicle pull in to the Currency Exchange parking lot.

191.   According to UC-5's audio/video recording and a debrief of UC-5, UC-5 approached JOHNSON's Vehicle and entered the front passenger seat. UC-5 immediately recognized the driver, and the sole occupant, of the vehicle to be JOHNSON. JOHNSON said, "What you want?" UC-5 replied, "Ten me [10 baggies of heroin]. Ten." JOHNSON said, "Close the door. Ten what? Defense [heroin]?" UC-5 replied, "Yeah. Make it a little quick the fucking… the fucking unmarked [police vehicles] are coming around this motherfucker." JOHNSON said, "Who?" UC-5 replied, "The fucking unmarked [police vehicles] cars, them assholes." JOHNSON

---

[39] This conversation was partially audio recorded by UC-5's recording equipment. The recording equipment did not capture JOHNSON's portion of the conversation.

said, "You ain't no police no, ain't you?" UC-5 replied, "No, are you?" JOHNSON said, "Hell naw." UC-5 replied, "Hell no, I don't fuck with these motherfuckers man, I'm just trying to get back where the fuck I came from." UC-5 then observed JOHNSON reach into his front waist band  and remove a clear plastic bag containing numerous clear Ziploc style baggies with blue star logos containing a powdery like substance (suspect heroin) and smaller knotted clear plastic baggies containing a white-rock like substance (suspect crack cocaine). JOHNSON then counted aloud ten Ziploc style baggies with blue stars depicted on them and handed them to UC-5. In return, UC-5 gave JOHNSON $100. UC-5 then exited JOHNSON's Vehicle and departed the area.

192.    The baggies that JOHNSON sold to UC-5 were submitted to the DEA North Central laboratory for testing and the laboratory concluded that the substance weighted 3.64 grams (net weight) and contained a mixture of heroin and fentanyl.

**7.    June 25, 2020: JOHNSON Distributed Approximately 7.63 Grams (Net Weight) of Heroin/Fentanyl to UC-4.**

193.    As described further below, on June 25, 2020, UC-4 ordered heroin from JOHNSON, who was using the DTO Phone. UC-4 purchased approximately 7.63 grams (net weight) of fentanyl/heroin from JOHNSON.

194.    On June 25, 2020, at approximately 5:33 p.m., UC-4 placed a consensually recorded call to the DTO Phone. During this call, UC-4 stated, "Can I come through? I'm gonna have 200 on me, can I get 2 full ones?" JOHNSON answered, "Huh?" UC-4 replied, "I said I'm gonna have 200 [$200] you got 2 whole ones [2 jabs, a jab consists of approximately 10 to 13 baggies of

heroin/fentanyl]?" JOHNSON answered, "Yea." UC-4 stated, "I'mma be like 40 mins." JOHNSON replied, "Okay, let me know."

195. At approximately 6:18 p.m., UC-4 placed a consensually recorded call to the DTO Phone. UC-4 stated, "Hey I'm getting off the e-way now. Can I meet you at like Pete's again?" JOHNSON asked, "Yea, where you at?" UC-4 replied that s/he would park in the lot and call JOHNSON.

196. At approximately 6:23 p.m., UC-4 placed a recorded call to the DTO Phone. During the call, JOHNSON stated, "I was tryna see which one you wanted [what kind of narcotics]. D [heroin/fentanyl] right?" UC-4 replied, "I want blows [heroin/fentanyl] man." JOHNSON, "Ya ain't gotta say it like that."

197. At approximately 6:30 p.m., UC-4 arrived and parked in the lot of the Pete's Fresh Market located at 2333 W. Madison Street. At approximately the same time, UC-4 placed a recorded call to the DTO Phone. During the call, UC-4 stated, "Hey man, I just parked in the lot." JOHNSON, "Where you at?" UC-4 replied, "Pete's, at Madison and Western, right there." JOHNSON, "A'ight here I come."

198. At approximately 6:40 p.m., UC-4 received a phone call from the DTO Phone. During the recorded call, JOHNSON said, "What kinda car you in?" UC-4 replied, "I'm in a blue Volvo SUV." JOHNSON said, "I'mma be in a grey car, turning in."

199. At approximately 6:47 p.m., UC-4 observed JOHNSON's Vehicle pull into the lot and park next to the undercover vehicle.

200.   According to UC-4's audio/video recording device and a debrief of UC-4, UC-4 approached the front passenger side of JOHNSON's Vehicle and entered. As UC-4 got inside, s/he observed JOHNSON in the driver's seat of the vehicle. UC-4 further observed JOHNSON reach into the front, interior of his pants and remove an unknown number of bundled up Ziploc-style baggies, containing a white powdery substance (suspect heroin). UC-4 asked, "You got 2 [2 jabs]?" JOHNSON answered, "Yeah." UC-4 stated, "I ain't never seen you before." JOHNSON answered, "I'm good." UC-4 observed JOHNSON as he unraveled a plastic baggie containing a rolled up bundle of baggies. JOHNSON asked, "How many you trying to get?" UC-4 replied, "I'm tryna get 2 whole ones [2 whole jabs], I got $200." JOHNSON replied, "I can give you 22 [22 baggies of heroin/fentanyl] of them, for it." UC-4 replied, "Okay."

201.   As depicted in the screen shot below, which is taken from the concealed video/audio recording device worn by the UC, JOHNSON then counted aloud eight small Ziploc-style baggies, with blue printed stars, each baggie containing a white powdery substance (suspect heroin) and handed them to UC-4. JOHNSON stated, "There's supposed to be 14 in them."[40] JOHNSON then handed UC-4 1 small Ziploc-style baggie, with blue printed stars, containing a white powdery substance (suspect heroin). JOHNSON next counted aloud thirteen more small Ziploc-style baggies, with blue printed stars, each baggie containing a white powdery substance and handed them to UC-4. UC-4 passed JOHNSON $200 in exchange for the total of 22 small

---

[40] The date recorded on UC-4's recording equipment of June 24, 2020 is incorrect. This incident occurred on June 25, 2020.

Ziploc-style baggies JOHNSON had given to UC-4. UC-4 asked, "You want to count that?" JOHNSON stated, "Yeah, I'mma count it, you can go."



202.    At approximately 6:49 p.m., UC-4 exited JOHNSON's Vehicle, returned to the undercover vehicle and exited the parking lot.

203.    At approximately 6:50 p.m., surveillance observed JOHNSON's Vehicle depart the Pete's Fresh Market lot and law enforcement continued to surveil JOHNSON's Vehicle.

204.    At approximately 6:58 p.m., surveillance observed JOHNSON's Vehicle arrive and park in the cul-de-sac of the 2600 block of Gladys Avenue.

205.    At approximately 7:31 p.m., law enforcement observed, through surveillance footage, JOHNSON's Vehicle arrive at a residence located at Grant's Residence. Surveillance footage captured JOHNSON exit JOHNSON's Vehicle and walk to the front basement apartment door of Grant's Residence. A few moments

later, surveillance footage captured JOHNSON re-enter JOHNSON's Vehicle and drive away.

206. The baggies that JOHNSON sold to UC-4 were submitted to the DEA North Central laboratory for testing and the laboratory concluded that the substance weighed approximately 7.63 (net weight) grams and contained a mixture of heroin and fentanyl.

### 8. June 27, 2020: MCDOWELL Distributed Approximately 4.98 Grams (Net Weight) of Heroin/Fentanyl Mixture to UC-6.

207. As described further below, on June 27, 2020, UC-6 ordered heroin from an unidentified male, who was using the DTO Phone. MCDOWELL then sold UC-6 approximately 4.98 grams (net weight) of fentanyl/heroin.

208. Specifically, on June 27, 2020, at approximately 12:57 p.m., UC-6 placed a recorded call to DTO Phone. During this call, an unidentified male asked UC-6, "Whatchu tryin to do?"[41] UC-6 stated, "Two [two jabs of heroin/fentanyl, which is approximately 20 baggies of heroin/fentanyl, one jab contains approximately 10 to 14 baggies], $200." The unidentified DTO worker asked, "On what?" UC-6 replied, "Soft [heroin/fentanyl]." UC-6 and the unidentified DTO worker agreed to meet at "Pete's [referring the same Pete's Fresh Market location where prior deals occurred]." UC-6 advised s/he was approximately 20 minutes away.

---

[41] Law enforcement cannot identify the user of the DTO Phone during this call. Based on a voice comparison, law enforcement does not believe that MCDOWELL was the user at this time.

209.   At approximately 1:34 p.m., UC-6 arrived at the Pete's Fresh Market and parked the undercover vehicle.

210.   At approximately 1:36 p.m., UC-6 placed a recorded call to the DTO Phone. During this call, MCDOWELL confirmed that meet location and asked UC-6, "Whatchu tryin to do?" UC-6 requested $200 worth of heroin/fentanyl. MCDOWELL advised UC-6 that he only had "140 [$140 worth of heroin/fentanyl]" and would be on his way.

211.   At approximately 1:43 p.m., UC-6 received a call from the DTO Phone. During this call, MCDOWELL stated he had arrived and asked for details regarding where UC-6's vehicle was parked.

212.   At approximately 1:44 p.m., surveillance observed a maroon Lincoln sedan traveling northbound in the Pete's Fresh Market parking lot.[42] The Lincoln sedan pulled behind the undercover officer's vehicle, stopped, and honked the horn.

213.   According to a review of UC-6's audio/video recording device and a debrief of UC-6, when UC-6 approached the Lincoln sedan, MCDOWELL was in the driver's seat.[43] MCDOWELL pointed to the rear passenger side door and stated, "It's in the door...in the door." UC-6 then reached into the vehicle and removed a roll of numerous plastic baggies marked with blue stars, each of which contained a white powdery substance, from the handle area of the rear passenger door. UC-6 asked

[42] MCDOWELL drove the same vehicle on June 13, 2020, when MCDOWELL and WILLIAMS sold heroin/fentanyl to UC-4.

[43] UC-6 and other surveillance officers were familiar with MCDOWELL from reviewing a booking photograph of MCDOWELL.

90

MCDOWELL, "How many are there?" MCDOWELL replied, "140 [$140 worth of heroin/fentanyl]." UC-6 handed MCDOWELL $140 through the open driver's side window before returning to the undercover vehicle. MCDOWELL then departed.

214.    The baggies that MCDOWELL sold to UC-6 were submitted to the DEA North Central laboratory for testing and the laboratory concluded the substance weighed 4.98 grams (net weight) and contained a mixture of heroin and fentanyl.

### 9. June 29, 2020: HOSEY Distributed Approximately 5.25 Grams (Net weight) of Heroin/Fentanyl Mixture to UC-2.

215.    As described further below, on June 29, 2020, UC-2 ordered heroin from HOSEY, who was using the DTO Phone. HOSEY sold UC-2 approximately 5.25 grams (net weight) of fentanyl/heroin.

216.    Specifically, on June 29, 2020, at approximately 12:00 p.m., UC-2 placed an unrecorded telephone call to the DTO Phone and spoke to an unknown male. According to UC-2, UC-2 asked the worker of the DTO Phone for 10-15 baggies of heroin and asked to meet him in the area of Lake/Western at around 1:00 p.m. The worker of the DTO Phone agreed and advised UC-2 that he'll be there.

217.    At approximately 12:50 p.m., surveillance was initiated at the Currency Exchange, located at 149 S. Western Avenue in Chicago.

218.    At approximately 12:53 p.m., UC-2 arrived in the area of Lake/Western, and placed a consensually recorded telephone call to the DTO Phone and spoke to HOSEY. [44] UC-2 asked HOSEY for "15 blows," a common street slang term for heroin,

---

[44] This conversation was partially audio recorded by UC-2's recording equipment. The recording equipment did not capture HOSEY's portion of the conversation.  UC-2 after

and advised HOSEY to meet him near the Currency Exchange at Lake and Western. According to UC-2, HOSEY related to UC-2 that she was on her way and that she was driving a black vehicle.

219.   At approximately 1:06 p.m., surveillance observed a black Nissan sedan, bearing Illinois registration CA91393 ("HOSEYs Vehicle"), arrive and park in the parking lot to the south of the Currency Exchange. [45]

220.   Based on a review of the audio/video recording device and a debrief of UC-2, at approximately 1:06 p.m., UC-2 approached the front passenger side window of HOSEY's Vehicle and spoke to HOSEY through the open window. HOSEY advised UC-2 not to come inside the vehicle. UC-2 then handed HOSEY $150, which HOSEY counted. HOSEY gave UC-2 a black plastic bag containing 15 clear Ziploc style baggies with blue star logos that contained a powder like substance, suspect heroin. UC-2 said, "Yup, yup, you got me? Can I count it? Can I count mine?" HOSEY replied, "Yeah." UC-2 said, "Are they blue bags still?" HOSEY replied unintelligibly. UC-2 said, "The stars right? Alright, you got me?" HOSEY replied, "Yeah, I got you." UC-2 said, "Hey, what your name? Ok, I'm Jose, I'm Jose. Okay, next time?" HOSEY replied "Alright." UC-2 said, "You didn't short me?" HOSEY replied, "I didn't short you [unintelligible]." HOSEY's Vehicle then departed the area back on to Western Avenue and law enforcement continued to surveil HOSEY's Vehicle.

---

speaking with HOSEY during the deal, advised that HOSEY was the individual her was speaking to on the calls.

[45] According to law enforcement database records, the Nissan vehicle is registered to "Sharonda Hosey" at an address on S. Oglesby Avenue, Chicago, Illinois.

221. At approximately 1:16 p.m., CPD officers conducted an investigative stop of HOSEY's Vehicle and identified the driver and the sole occupant as HOSEY. At the conclusion of the traffic stop, HOSEY was allowed to leave and surveillance was terminated.

222. The baggies that HOSEY sold to UC-2 were submitted to the DEA North Central laboratory for testing and the laboratory concluded that the substance weighed 5.25 grams (net weight) and contained a mixture of heroin and fentanyl.

**10.    July 4, 2020: HOSEY Sold Approximately 10.577 Grams (Net Weight) of Heroin/Fentanyl Mixture to UC-4.**

223. As described further below, on July 4, 2020, UC-4 ordered heroin from HOSEY, who was using the DTO Phone. HOSEY sold UC-4 approximately 10.577 grams (net weight) of fentanyl/heroin.

224. Specifically, on July 4, 2020, at approximately 12:38 p.m., UC-4 and UC-6 placed a recorded call to the DTO Phone. During this call, UC-4 stated, "Me and my girl we're coming up the e-way, we're gonna be getting off here in a little bit, like 20 mins or so. We put together 300 [$300]. Can we meet you?" HOSEY stated, "Yeah, who is this?" UC-4 replied, "This is [UC's name], man. I'll meet you over by the Pete's again. Does that sound good?" HOSEY replied, "Yeah, what you need [what kind of narcotics]?" UC-4 replied, "I need soft [heroin/fentanyl], ya got soft? We need 300 [$300 worth heroin/fentanyl]." HOSEY replied, "Okay." UC-4 asked, "Ya gonna have 3 whole ones [3 whole jabs of heroin/fentanyl, a jab consists of approximately 10 to 13 baggies]." HOSEY replied, "Yeah." UC-4 replied, "Pete's then? Right off of Western

93

there, Western and Madison." HOSEY stated, "Yeah we can meet at that um Walgreens."

225.   At approximately 12:56 p.m., UC-4 and UC-6 arrived and parked in the Walgreens parking lot, along Madison Street. Between approximately 12:57 p.m. and 1:11 p.m., UC-4 placed four unanswered calls to the DTO Phone. At approximately 1:14 p.m., UC-4 sent a text message to the DTO Phone stating, "Wya [Where you at?]? were at walgreens."

226.   At approximately 1:15 p.m., HOSEY, using the DTO Phone, placed a call to UC-4's phone line. During the call, UC-4 advised, "We're at the Walgreens. Are you near by? We're parked." HOSEY, stated, "Okay. Give me 5 minutes."

227.   At approximately 1:28 p.m., UC-4 placed a call to the DTO Phone. During this call, HOSEY, "Yeah, I don't see you. What kinda car you in?" UC-4 replied, "We're in a blue Volvo, parked right along Madison. Right there, right in front of the Walgreens. What are you? Are you in the lot?" HOSEY, "Yeah." UC-4 replied, "What are you driving?" HOSEY said, "I don't see you. I don't see your car."

228.   According to a review of UC-4's audio/video recording device and a debrief of UC-4, at approximately 1:29 p.m., UC-4 and UC-6 exited the undercover vehicle. HOSEY stated, "Only one of ya'll get out and walk to the back." UC-4 then proceeded to walk to the north side of the parking lot. UC-4 observed HOSEY's Vehicle parked in the last row. As UC-4 approached HOSEY's Vehicle, UC-4 asked HOSEY, "Are you in that black right there?" HOSEY stated, "Yeah." UC-4 then walked to the front passenger side of the vehicle and got inside.  As UC-4 got into the

94

vehicle, as depicted in the photograph below, UC-4 observed HOSEY sitting in the driver's seat.[46] The date recorded on UC-4's recording equipment of June 24, 2020 is incorrect. This incident occurred on June 25, 2020. UC-4 observed HOSEY holding a white plastic knotted bag in her right hand between her legs. As UC-4 sat down in the passenger seat, HOSEY passed the white knotted plastic bag to UC-4. In exchange, UC-4 passed HOSEY $300. HOSEY stated, "I ain't seen you in awhile." UC-4 replied, "Yeah I haven't seen you either." UC-4 proceeded, "Hey that girl (referring to UC-6), that's my girl Ali. We've been, she's been up here a couple times, so have I, um this shit is moving, we're up north and this shit is moving quick [narcotics are selling fast]." HOSEY replied, "Be calling me then." UC-4 stated, "Okay." HOSEY replied, "I got other people so call me." UC-4 then opened the white knotted plastic bag and observed inside a multiple small clear plastic Ziploc-style baggies with blue stars printed on one side, each containing a white powdery substance (suspect heroin/fentanyl). UC-4 asked, "But how much do you think uh, if we came down with like 5 or 6 [5 or 6 jabs of heroin/fentanyl] would you guys be able to do something like that?" HOSEY replied, "Yeah." UC-4 then exited HOSEY's Vehicle and returned to the undercover vehicle. UC-4 and UC-6 entered the undercover vehicle and drove away.

---

[46]The date recorded on UC-4's recording equipment of July 3, 2020 is incorrect. This incident occurred on July 4, 2020.



229.  At approximately 2:20 p.m., law enforcement observed, via surveillance footage, HOSEY's Vehicle arrive and park in the 4000 block of W. Polk Street, just east of Karlov Street. HOSEY exited HOSEY's Vehicle and walked inside of Grant's residence carrying a black purse.[47]

230.  At approximately 2:29 p.m., law enforcement observed, via surveillance footage, HOSEY exit Grant's Residence and return to HOSEY's Vehicle carrying a plate in her right hand. HOSEY then departed the area. Surveillance was terminated.

231.  The baggies that HOSEY sold to UC-4 were submitted to the DEA North Central laboratory for testing. The DEA laboratory concluded that the substance weighed 10.577 (net weight) grams and contained a mixture of heroin and fentanyl.

---

[47] Subsequent to the UC purchase, UC-4 advised surveillance units of HOSEY's clothing description: blue t-shirt and white shorts.

**11.    July 6, 2020: JOHNSON Sold Approximately 4.97 Grams (Net Weight) of Heroin/Fentanyl to UC-2.**

232.    As described further below, on July 6, 2020, UC-2 ordered heroin from JOHNSON, who was using the DTO Phone. JOHNSON sold approximately 4.97 grams (net weight) of fentanyl/heroin to UC-2.

233.    Specifically, on July 6, 2020, at approximately 11:04 a.m., UC-2 placed a consensually recorded telephone call to the DTO Phone and spoke to an unidentified male. During this call, UC-2 said, "Hey what's up man?" The unidentified male replied, "Where you at?"[48] UC-2 said, "Hey Yo, I am going to be uhh coming up from work can you meet me over at Lake and Western?" The unidentified male replied, "Lake and Western. What you need?" UC-2 said, "Fifteen [baggies if heroin]. Who this? The one in a black car. You in the black car this time?" The unidentified male replied, "Yeah. You need what?" UC-2 said, "Fifteen. Fifteen." The unidentified male replied, "Fifteeen. I don't got fifteen man." UC-2 said, "Damn man." The unidentified male replied, "What you need fifteen rocks [crack cocaine]?" UC-2 said, "Nah, nah, the D [heroin], blows [heroin baggies]." The unidentified male replied, "D [heroin] D… a'ight hold on let me see how much I got, hold on." UC-2 advised, "I should be there by 12 man, I ain't gonna blow you up. I'm gonna jump on the train right now." The unidentified male replied, "I got six [baggies of heroin] of them man." UC-2 said, "How much?" The unidentified male replied, "I got six [baggies of heroin] of them." UC-2 said, "Six of them?" The unidentified male replied, "Aight man, I am still coming

---

[48] Law enforcement cannot identify the user of the DTO Phone during this call. Based on a voice comparison, law enforcement does not believe that JOHNSON was the user at this time.

man." The unidentified male replied, "Hit me up [unintelligible], hit me up the way man, so I could pass this phone to somebody else [unintelligible]." UC-2 and the unidentified male agreed to meet in the area of Lake/Western at around 12:00 p.m. UC-2 advised the unidentified male that UC-2 would let him know when UC-2 is close to that area.

234. At approximately 1:14 p.m., UC-2 received a call from the DTO Phone. During the recorded call, UC-2 informed JOHNSON that UC-2 was riding a bicycle and was one minute away from Lake and Western. Surveillance was initiated in the area of Lake and Western.

235. At approximately 1:22 p.m., UC-2 called the DTO Phone and advised JOHNSON that UC-2 was waiting for him by the "cash station" [Currency Exchange located at 149 S. Western Avenue]." JOHNSON replied, "Alright."

236. At approximately 1:26 p.m., UC-2 received a call from the DTO Phone. During this recorded call, JOHNSON advised UC-2 that he was pulling up and wanted to confirm UC-2's order. UC-2 related to JOHNSON that he wanted "fifteen blows [baggies of heroin]."

237. At approximately 1:33 p.m., UC-2 observed JOHNSON's Vehicle pull into the parking lot of the Currency Exchange from Western Avenue and honk twice at UC-2.

238. According to a review of UC-2's audio/video recording device as well as a debrief of UC-2, UC-2 immediately approached the front passenger side of JOHNSON's Vehicle and entered the vehicle. UC-2 observed that JOHNSON was

holding multiple clear Ziploc style baggies. JOHNSON said, "That's 150 [$150 worth of heroin]." UC-2 counted aloud $150 and handed the cash to JOHSNON. In exchange, JOHNSON provided UC-2 with 15 clear plastic baggies that were taped together, with blue stars logos printed on one side of the baggies. As UC-2 was exiting JOHNSON's Vehicle, UC-2 said, "You're the same guy I got from last time, bro? You remember me right?" JOHNSON replied, "Yeah, I remember." UC-2 then walked away from JOHNSON's Vehicle. JOHNSON's Vehicle departed the Currency Exchange lot northbound on Western Avenue. Surveillance of JOHNSON's Vehicle was terminated.

239.    The baggies that JOHNSON sold to UC-2 were submitted to the DEA North Central laboratory for testing and the laboratory concluded that the substance weighed 4.97 grams (net weight) and contained a mixture of heroin and fentanyl.

### 12.    July 13, 2020: MCDOWELL Sold Approximately 1.64 Grams (Net Weight) of Heroin/Fentanyl to UC-7.

240.    As described further below, on July 13, 2020, UC-7 ordered heroin from an unidentified male, who was using the DTO Phone. MCDOWELL later used the DTO Phone to arrange the meeting location.  UC-7 met with MCDOWELL who sold approximately 1.64 grams (net weight) of fentanyl/heroin to UC-7.

241.    Specifically, on July 13, 2020, at approximately 9:59 a.m., UC-7 placed a recorded call to the DTO Phone.[49] During this recorded call, UC-7 advised the unidentified male that UC-7 needed "three [baggies of heroin]", and that he would be

---

[49] This conversation was partially-audio recorded by UC-7's recording equipment. The recording equipment did not capture the user of the DTO Phone's portion of the conversation.

waiting at the "Cali Quick [Cali Quick Shop & Cellular Store, located at 324 S. California Avenue in Chicago)." The unidentified male instructed UC-7 to call the DTO Phone when UC-7 was at the location.

242. At approximately 10:23 a.m., UC-7 arrived at the Cali Quick Shop. At that time, UC-7 placed a call to the DTO Phone. During the recorded call, UC-7 informed the user of the DTO phone that UC-7 was waiting at the Cali Quick Shop. The user of the DTO Phone advised UC-7 that he would be there in two to three minutes.

243. At approximately 10:31 a.m., UC-7 observed a red four-door Pontiac Grand Prix, bearing temporary Illinois registration 394V954 ("I. WILLIAMS' Vehicle"), enter the parking lot of the Cali Quick Shop. [50]

244. According to a review of UC-7's audio/video recording device as well as a debrief of UC-7, UC-7 approached the front driver's side window of I. WILLIAMS' Vehicle. As depicted in the photos below, MCDOWELL was in the driver's seat. UC-7 said, "Let me get four [baggies of heroin] man. Uh... Blue stars [heroin] man." MCDOWELL then removed from inside a clear plastic bag four Ziploc style baggies with blue stars printed on one side with each containing a powdery like substance. UC-7 observed that MCDOWELL had additional suspect heroin/fentanyl baggies with blue stars on them inside a clear plastic bag. UC-7 handed MCDOWELL $40. UC-7 then walked away from I. WILLIAMS' Vehicle.

---

[50] According to law enforcement database records, I. WILLIAMS' Vehicle is registered to "Ina WILLIAMS" on the 1800 block of W. Maypole Avenue, Chicago, Illinois 60612.



245.    Subsequent to the deal, I. WILLIAMS' Vehicle departed the parking lot heading northbound on California Avenue and law enforcement continued to surveil I. WILLIAMS' Vehicle. As I. WILLIAMS' Vehicle approached the intersection of Washington Street and Kostner Avenue, CPD officers attempted to conduct a traffic stop. However, MCDOWELL failed to stop and fled at a high speed northbound on Kostner Avenue. As MCDOWELL then attempted to turn westbound on West End Avenue, he crashed into a parked vehicle near 4402 W. West End Avenue. MCDOWELL then fled from the Pontiac on foot. Officers gave chase but were not able to apprehend MCDOWELL.

246.    Officers then approached I. WILLIAMS Vehicle, at which time, they observed in plain view three cellular phones, car keys, and various documents for "Ina WILLIAMS," one TCF Bank debit card for "Tyjuan A. MCDOWELL," and $771. At that time, officers placed a surreptitious telephone call to the DTO Phone and one of the three cellular phones, a gray LG cellphone, rang. Officers observed their covert number on the caller ID screen of that phone. Furthermore, officers recovered the

$40.00 of pre-recorded funds used by UC-7 to purchase heroin/fentanyl from MCDOWELL. I. WILLIAMS' Vehicle was towed to a secure lot.

247. At approximately 1:00 p.m., I. WILLIAMS arrived at the CPD 15th Police District and spoke to the front desk personnel. According to CPD reports, I.WILLIAMS attempted to report I. WILLIAMS' Vehicle as stolen, but the report was not accepted because records showed the vehicle had already been towed to a secure lot.

248. At approximately 1:40 p.m., CPD officers assigned to this case made contact with I. WILLIAMS and tendered to her the three cellular phones (including the DTO Phone), car keys, and the various documents located inside I. WILLIAMS' Vehicle.

249. The baggies MCDOWELL sold to UC-7 were submitted to the DEA North Central laboratory for testing. The DEA laboratory concluded that the substance weighed 1.64 (net weight) grams and contained a mixture of heroin and fentanyl.

### 13. August 5, 2020: WASHINGTON and MCDOWELL Sold .399 grams (net weight) of Cocaine Base to UC-1.

250. As described further below, on August 5, 2020, UC-1 ordered crack cocaine from an unidentified male, who was using the DTO Phone. At approximately 4:10 p.m., WASHINGTON and MCDOWELL met with UC-1 and sold approximately 0.399 grams (net weight) of cocaine base to UC-1.

251. At approximately 3:36 p.m. (Target Phone 9, Session 242), UC-1 placed a call to the DTO Phone. During this call, UC-1 stated, "Hey what up? What up, dog?

Hey, I'mma get off work, will I be able to meet you? Bout to get off work in a minute." An unidentified male replied, "Yeah. Alright." UC-1 replied, "Ok. Alright you want me to hit you when I'm ughhh when I'm rollin' [on my way]?" The unidentified male replied, "Yeah." UC-1 and the unidentified male agreed to meet at a Popeye's Louisiana Kitchen, located at 50 N. Western Avenue in Chicago.

252. At approximately 4:06 p.m., UC-1 arrived at the Popeye's parking lot. At approximately 4:07 p.m. (Target Phone 9, Session 272), UC-1 placed a call to the DTO Phone. During the call, a DTO Phone worker stated, "Hello." UC-1 replied, "Hey, hey big dog, I'm ah… I'm at the Popeye's right here on Western and what is this Washington." The DTO Phone worker replied, "Alright. I'm [unintelligible] pull up." UC-1 replied, "Alright, cool." The DTO Phone worker said, "Whatcha tryin to do?"

253. At approximately 4:09 p.m., surveillance observed WASHINGTON's Vehicle travelling westbound in the 2300 block of W. Washington Boulevard. Surveillance observed WASHINGTON's Vehicle pull into the Popeye's parking lot.

254. Based on debriefing of UC-1 and a review of UC-1's audio/video recording device, at approximately 4:10 p.m., as UC-1 walked towards WASHINGTON's Vehicle, MCDOWELL, instructed UC-1 to walk towards the passenger side. As depicted in the below screenshot, MCDOWELL was in the driver's seat, and WASHINGTON was the front passenger seat.



255.    When UC-1 arrived at the passenger side window, UC-1 spoke to WASHINGTON and MCDOWELL. UC-1 said, "On the rocks [crack cocaine].... Y'all aren't going north are ya?" As depicted in the screenshot below, WASHINGTON held a clear plastic bag in his hand and removed from inside the bag small clear plastic baggies containing a white rock like substance (suspect crack cocaine). WASHINGTON then said, "C'mon" and handed UC-1 five clear plastic baggies containing a white rock like substance. UC-1 handed WASHINGTON $50, which WASHINGTON appeared to count. At the same time, MCDOWELL asked UC-1 for a cigarette, which UC-1 then handed to MCDOWELL.



256.   UC-1 then walked away from WASHINGTON's Vehicle, entered the undercover vehicle and left. WASHINGTON's Vehicle departed westbound on Washington Boulevard.

257.   The baggies that WASHINGTON and MCDOWELL sold to UC-1 were submitted to the DEA North Central laboratory for testing and the laboratory concluded that the substance weighed 0.399 grams and contained cocaine base.

**14.   August 5, 2020: WASHINGTON and MCDOWELL Sold 1.004 Grams (Net Weight) of Heroin/Fentanyl and 0.083 Grams (Net Weight) of Cocaine Base to UC-16.**

258.   As described further below, on August 5, 2020, following the aforementioned narcotics transaction, UC-16 engaged in a narcotics transaction with WASHINGTON and MCDOWELL. At approximately 4:10 p.m., UC-16 ordered heroin from MCDOWELL and WASHINGTON, who were using DTO Phone. At approximately 5:03 p.m., UC-16 purchased approximately 1.004 grams (net weight) of fentanyl/heroin and 0.083 grams (net weight) of cocaine base from MCDOWELL and WASHINGTON.

259.   At approximately 4:30 p.m., UC-16 called the DTO Phone, but no one answered. At approximately 4:33 p.m. (Target Phone 9, Session 305), UC-16 received a call from the DTO Phone. During the call, MCDOWELL said, "Hello?" UC-16 replied, "Y'all around?" MCDOWELL said, "Who?" UC-16 said, "I'm on Lake Street." MCDOWELL said, "You say what?" Can I get a four [crack cocaine] on Lake." The call then disconnected.

260. Moments later, UC-16 received another call from the DTO Phone (Target Phone 9, Session 306). During this call, MCDOWELL said, "Who?" UC-16 replied, "I'm on Lake Street." MCDOWELL said, "You saw what?" UC-16 replied, "Can I get a four [crack cocaine] on Lake?" MCDOWELL said, "Lake and what?" UC-16 replied, "I'm by the Al's [referring to Al's restaurant located at 2908 W. Lake Street under the CTA Elevated Green Line train]." MCDOWELL said, "You by the Ave?" UC-16 replied, "Al's." MCDOWELL said, "Who's this?" UC-16 replied, "Lil [unintelligible]. MCDOWELL said, "Lil Pinky?" UC replied, "[unintelligible]" MCDOWELL said, "Hey what you had said when you first this phone? What you had said?" UC-16 replied, "Four [four baggies of crack cocaine]." MCDOWELL said, "Huh?" UC-16 replied, "Four." MCDOWELL said, "Alright, be by Al's come by Al's." UC-16 replied, "Give me uh, five minutes."

261. At approximately 4:48 p.m. (Target Phone 9, Session 312), UC-16 arrived at Al's restaurant parking lot and called the DTO Phone. During the call, MCDOWELL said, "Hello?" UC-16 replied, "I'm at Al's." MCDOWELL said, "Hey, you in a car?" UC-16 replied, "Huh?" MCDOWELL said, "You in a car?" UC-16 said, "Nah, I'm walking, I'll be by the [unintelligible] green shirt on." MCDOWELL said, "I'm right here on Washington and Homan at the gas station, my car stalled… You can't make it up here?" UC-16 replied, "At what?" MCDOWELL said, "At Washington and Homan, at the gas station, Washington and Homan." UC-16 replied, "Washington and Homan?" MCDOWELL said, "Yeah." UC-16 replied, "Damn, okay."

262.  Subsequent to the call, UC-16 returned the undercover vehicle and relocated to the Falcon Fuel gas station, located at 43 N. Homan Avenue. Surveillance was re-established at that location.

263.  At approximately 4:56 p.m., surveillance observed WASHINGTON's Vehicle parked on the north side of the Falcon Fuel gas station.

264.  At approximately 5:00 p.m., UC-16 was dropped off in the vicinity of the gas station. UC-16 then walked towards the gas station

265.  Based on debriefing of UC-16 and a review of UC-16's audio/video recording device, at approximately 5:03 p.m., UC-16 approached the WASHINGTON's Vehicle. MCDOWELL and WASHINGTON were both outside the vehicle attempting to make repairs. WASHINGTON said, "How much do you want?" UC-16 said, "I just want [unintelligible]. You got soft [heroin]?" WASHINGTON said, "Yeah, what ya need?"   UC-16 replied, "Four [four baggies of heroin]." WASHINGTON walked back towards the front passenger door of the vehicle, opened the door, and entered. MCDOWELL stated, "See I ain't lying buddy." WASHINGTON said, "Shit, I only have three [three baggies of heroin] left." MCDOWELL said, "Hold on Nut ["Peanut," a known nickname for WASHINGTON]. Hold on." UC-16 replied, "Ya'll gonna give me something for walking?" WASHINGTON stated, "Shit." UC-16 replied, "Uh... give me one hard [$10 worth of crack cocaine]."  UC-16 stated, "See this is the reason why, here hold uh... this is the reason why they call me "Picky" Can I pick my own [crack cocaine rock]?" WASHINGTON replied, "No, I ain't gonna let, nah." UC-16 asked, "Any bigger [crack rock] than that?" WASHINGTON replied,

"Now you can't tell me that one ain't different." UC-16 stated, "That's [crack cocaine rock] a little bit bigger." UC-16 later stated, "That's why I'm called 'Picky' cause I wanna pick my own shit [narcotics]." WASHINGTON stated, "I'm just a distributor [sells narcotics], I don't bag [package narcotics]."

266. While conversing with WASHINGTON, UC-16 observed WASHINGTON open a clear plastic bag containing numerous smaller Ziploc style baggies with a white rock like substance (suspect crack cocaine). WASHINGTON handed UC-16 three Ziploc style baggies with blue stars containing a tan powder (suspect heroin) and one Ziploc style baggie containing a white rock like substance (suspect crack cocaine). In exchange, UC-16 gave WASHINGTON $40. UC-16 then departed the area.

267. At approximately 5:08 p.m., surveillance observed WASHINGTON and MCDOWELL enter WASHINGTON's Vehicle and depart.

268. The baggies that WASHINGTON and MCDOWELL sold to UC-16 were submitted to the DEA laboratory for testing and the laboratory concluded that one of the exhibits weighed 1.004 grams and contained a mixture of heroin and fentanyl and the second exhibit weighed 0.083 grams and contained cocaine base.

### 15. August 6, 2020: D. WILLIAMS and WILKINS Sold 1.61 Grams (Net Weight) of Heroin/Fentanyl and .36 Grams (Net Weight) of Cocaine Base to UC-13.

269. As described further below, on August 6, 2020, UC-13 ordered crack cocaine and heroin/fentanyl from WILKINS, who was using the DTO Phone. At approximately 12:23 p.m., WILKINS and D. WILLIAMS met with UC-13 and sold

1.61 grams (net weight) of heroin and fentanyl and 0.36 grams (net weight) of cocaine base to UC-13.

270.    At approximately 11:54 am, UC-13 placed a call to the DTO Phone that went unanswered. At approximately 11:54 a.m. (Target Phone 9, Session 829), UC-13 received a call from the DTO Phone. During the call, UC-13 asked, "Can you meet me at Walgreens in 15 minutes?" WILKINS replied, "What Walgreens?" UC-13 said, "On Western [referring to the Walgreens located at 2340 W. Madison Street, near the intersection of Madison and Western]." WILKINS replied, "Okay. You know what kind of car I got, right?" UC-13 said, "No." WILKINS replied, "A white car with a rag top on it." UC-13 said, "Okay, I'll call you when I get there."

271.    At approximately 11:58 a.m. (Target Phone 9, Session 834), WILKINS, using the DTO Phone, called UC-13. During the call, WILKINS stated, "How many of them things [narcotics] you said you wanted?" UC-13 replied "You got both [crack cocaine and heroin] 'em, I'll get 5 [crack cocaine rocks] and 5 [heroin baggies]." WILKINS replied, "A'ight, you'll be at Walgreens, right?" UC-13 responded, "Yeah."

272.    At approximately 12:20 p.m., UC-13 arrived and parked the undercover vehicle in the Walgreen's parking lot.

273.    At approximately 12:22 p.m., UC-13 observed a white Ford Sedan, bearing Illinois registration BM24855 ("WILKINS' Vehicle"), pull up and park near the undercover vehicle.[51]

---

[51] According to law enforcement database records, WILKINS' Vehicle is registered to "Paul E. WILKINS" on 5th Avenue, Hines, Illinois 60141.

274.    At approximately 12:22 p.m. (Target Phone 9, Session 846), UC-13 called the DTO Phone. During the call, UC-13 stated, "Hey, I'm parked right next to you." WILKINS responded, "Okay."

275.    According to a review of UC-13's audio/video recording device as well as a debrief of UC-13, at approximately 12:23 p.m., D. WILLIAMS entered the front passenger seat of the undercover vehicle. [52] After greeting each other D. WILLIAMS said, "You want five [crack cocaine rocks] and five [heroin baggies], right?" UC-13 replied, "Yup." D. WILLIAMS replied, "You got it." At that point, D. WILLIAMS provided UC-13 with a brown napkin that contained five clear Ziploc style baggies with blue star logos containing a white powdery substance (suspect heroin) and five clear Ziploc style baggies containing a white-rock like substance (suspect crack cocaine). UC-13 handed D. WILLIAMS $100. UC-13 said, "You ain't got no different rocks [crack cocaine]." D. WILLIAMS replied, "No, that's it boo." As depicted in the photo below, D. WILLIAMS exited the undercover vehicle. D. WILLIAMS entered the front passenger seat of WILKINS' Vehicle, and the vehicle drove away.

---

[52] Subsequent to this UC purchase, CPD Enforcement officer conducted a traffic stop, in furtherance of this investigation, of WILKINS' Vehicle. The driver was identified as Paul E. WILKINS from an Illinois Identification Card and the passenger was identified as Dorothy WILLIAMS from a CTA bus card, she provided to officers and through law enforcement databases records.



276.  At approximately 12:54 p.m., at the direction of agents, CPD officers conducted an investigatory traffic stop of WILKINS' Vehicle. CPD officers identified the driver as WILKINS and the front seat passenger as D. WILLIAMS. After the conclusion of the traffic stop, WILKINS and D. WILLIAMS were allowed to leave.

277.  The baggies that WILKINS and D. WILLIAMS sold to UC-13 were submitted to the DEA laboratory for testing. The DEA laboratory concluded that one of the exhibits weighed 1.61 grams and contained a mixture of heroin and fentanyl and the second exhibit weighed 0.36 grams and contained cocaine base.

### 16.  August 6, 2020: D. WILLIAMS and P. WILKINS Sold .226 Grams (Net Weight) of Cocaine Base to UC-14.

278.  As described further below, on August 6, 2020, following the narcotics transaction with UC-13 described immediately above, UC-14 ordered crack cocaine from WILKINS, who was using the DTO Phone. At approximately 1:14 p.m.,

WILKINS and D. WILLIAMS met with UC-14 and sold .226 grams (net weight) of cocaine base to UC-14.

279. Specifically, on August 6, 2020 (Target Phone 9, Session 856), at approximately 1:02 p.m., UC-14 placed a call to the DTO Phone. During the call, UC-14 said, "Can I get 4 soft [heroin baggies] and 2 hard [crack cocaine rocks]". WILKINS replied, "We ain't got no soft [heroin]." UC-14 said, "You ain't have no soft [heroin]? Damn. Let me just get the hard [crack cocaine] for now. Ya'll gonna have some more later?" WILKINS replied, "Mm-huh." UC-14 and WILKINS discussed where they were going to meet and UC-14 said, "By the Citgo by Lake." WILKINS asked, "Where?" UC-14 said, "At the Citgo on Western by Lake." WILKINS replied, "Okay, alright." UC-14 said, "About ten minutes. I gotta get some gas too." WILKINS replied, "Alright."

280. At approximately 1:11 p.m., UC-14 arrived at the Citgo and parked near a gas pump. At approximately 1:12 p.m., surveillance observed WILKINS' Vehicle arrive and park near a pump near the UC.

281. At approximately 1:14 p.m. (Target Phone 9, Session 861), UC-14 placed a telephone call to the DTO Phone. During the call, UC-14 said, "What kind of car you in?" WILKINS replied, "I'm in a white car. I'm at the gas station already." UC-14 said, "Oh, you in a white car?" WILKINS replied, "Yeah." UC-14 said, "You just passed me. We [unintelligible] in this car." WILKINS replied, "You at Citgo?" UC-14 said, "We right here, you just passed us." WILKINS replied, "I'm at Citgo." UC-14 said, "I'm just saying, okay." WILKINS replied, "Citgo is on Western and Lake." UC-

14 replied, "Yeah, we right here." WILKINS replied, "You right where?" UC-14 said, "In that silver car." WILKINS replied, "In the Citgo?" UC-14 said, "Yeah, right here." WILKINS replied, "You in the car?" UC-14 said, "Yeah. Okay."

282.    According to a review of UC-14's audio/video recording device as well as a debrief of UC-14, UC-14 exited the undercover vehicle and walked over to WILKINS' Vehicle. UC-14 entered the rear passenger seat and spoke to WILKINS and WILLIAMS. D. WILLIAMS said, "What you want?" UC-14 replied, "You don't have no soft [heroin]." D. WILLIAMS replied, "Nah." UC-14 said, "Well let me just get three hard [crack cocaine]." UC-14 then asked, "When will y'all have some more soft [heroin]?" D. WILLIAMS replied, "Maybe later." WILKINS then exited the vehicle and opened the hood. D. WILLIAMS began to fidget with an unknown item in her hands before stating, "Hold on, I'm trying to find you some [crack cocaine] that looks like something." UC-14 provided D. WILLIAMS with $30.00. In exchange, D. WILLIAMS handed UC-14 three plastic baggies that contained a white-rock like substance (suspect crack cocaine). UC-14 said, "Is that the best that you have?" WILLIAMS replied, "Yeah." UC-14 said, "Okay. Will y'all have some more soft [heroin] later?" WILLIAMS replied, "Yeah, just call us back later." UC-14 said, "Okay, thank you." UC-14 exited WILKINS' Vehicle, returned to the undercover vehicle, and drove away.

283.    The baggies that WILKINS and D. WILLIAMS sold to UC-14 were submitted to the DEA North Central laboratory for testing. The DEA laboratory concluded that substance weighed 0.226 grams and contained cocaine base.

17.     **August 6, 2020: D. WILLIAMS and P. WILKINS Sold 2.53 grams (net weight) of Heroin/Fentanyl and 0.15 grams (net weight) of Cocaine Base to UC-2.**

284.    As described further below, on August 6, 2020, following the narcotics transaction with UC-14, UC-2 ordered crack cocaine from WILKINS, who was using the DTO Phone. At approximately 5:31 p.m., WILKINS and D. WILLIAMS met with UC-2 and sold 2.53 grams (net weight) of heroin/fentanyl and 0.15 grams (net weight) of cocaine base to UC-2.

285.    Specifically, on August 6, 2020, at approximately 5:09 p.m. (Target Phone 9, Session 988), UC-2 placed a call to the DTO Phone. During the call, UC-2 asked, "Can you meet me over on Lake and Western? I'm coming up the line." WILKINS replied, "How long you gon' before you get there?" UC-2 said, "10-15 minutes." WILKINS replied, "Alright. How many? UC-2 said, "You soft [heroin] today?" WILKINS replied, "Yeah." UC-2 said, "Alright. Let me get two hard [crack cocaine] and five soft [heroin]. Cool?" WILKINS replied, "Okay." UC-2 said, "I'll call you when I get there, bro'." WILKINS replied, "Okay."

286.    At approximately 5:12 p.m. (Target Phone 9, Session 992), UC-2 received a call from the DTO Phone. WILKINS said, "Hey, ain't no L at Lake and Western." UC-2 clarified that he was referring to the Currency Exchange located at 149 S. Western Avenue.

287.    At approximately 5:24 p.m., UC-2 arrived in the area of the Currency Exchange. At that time, UC-2 placed a telephone call to the DTO Phone (Target Phone 9, Session 999). UC-2 said, "Hey, I'm arriving in like two minutes." WILKINS

114

replied, "Alright. I'mma head that way." Later in the conversation WILKINS asked, "You wanted what now? How many?" UC-2 replied, "Two hard [crack cocaine] and like maybe five soft [heroin]." WILKINS said, "Okay."

288. At approximately 5:31 p.m., surveillance observed WILKINS' Vehicle arrive in the area and park on Lake, just east of Western Avenue. UC-2 entered the rear passenger side of WILKINS' Vehicle.

289. According to a review of UC-2's audio/video recording device as well as a debrief of UC-2, once inside the vehicle, WILKINS said, "What you say you wanted, two rocks [crack cocaine] and?" UC-2 replied "Two rocks. And you know what, I'm fucking gonna spend it all. Fuck it." WILKINS said, "Mmhm, c'mon tell me?" UC-2 replied, "Let me get two rocks [crack cocaine]. Here you go. And… let me get seven blows [heroin baggies] man." At that point, UC-2 provided WILKINS with $20. WILKINS handed UC-2 two small clear Ziploc style baggies containing a white-rock like substance (suspect crack cocaine). UC-2 observed D. WILLIAMS, who was seated in the front passenger seat, pass to WILKINS numerous plastic baggies containing a powdery substance. D. WILLIAMS advised that she was only able to remove six baggies of heroin and needed WILKINS to get an additional baggie. WILKINS first provided UC-2 with the six clear Ziploc baggies with blue stars printed on one side, before using a box cutter knife to cut open a pack of suspect heroin baggies that were taped together. UC-2 handed over $70 to WILKINS. WILKINS then handed UC-2 a baggie containing a powdery substance with blue stars printed on one side.

290.     At approximately, 5:34 p.m., surveillance observed UC-2 exit WILKINS'

Vehicle and depart the area.

291.     Law enforcement later submitted the substances sold by WILKINS and

D. WILLIAMS to UC-2 to the DEA laboratory for testing and the laboratory

concluded that one of the exhibits weighted 2.53 grams and contained a mixture of

heroin and fentanyl and the second exhibit weighted 0.15 grams and contained

cocaine base.

### 18.     August 11, 2020: MITCHELL and BLAIR Sold 1.59 Grams of Heroin/Fentanyl (Net Weight) to UC-11.

292.     As described further below, on August 11, 2020, UC-11 called the DTO

Phone and spoke with Grant and BLAIR to arrange a meeting to purchase heroin.

Following the intercepted calls, UC-11 purchased approximately 1.59 grams (net

weight) of heroin/fentanyl from MITCHELL and BLAIR.

293.     Specifically, on August 11, 2020, at approximately 6:21 p.m. (Target

Phone 9, Session 4485), UC-11 called the DTO Phone. UC-11 said, "Can I get 5 soft

[heroin baggies]." Grant replied, "Where you at?" UC-11 said, "I'm walking toward

Lake and Western." Grant replied, "Alright, gimme 10 minutes. I got somebody in

front of you. I'm coming that way, anyway."

294.     At approximately 6:37 p.m. (Target Phone 9, Session 4490), UC-11

placed a call to the DTO Phone. During the call, UC-11 said, "What we looking like

on Lake and Western?" Grant replied, "I'm finna be coming off the e-way, getting off

Western. Here I come." UC-11 said, "Alright."

295.    At approximately 6:40 p.m., UC-11 arrived in the area of Lake and Western.

296.    At approximately 6:41 p.m. (Target Phone 9, Session 4494), UC-11 placed a call to the DTO Phone. During this call, UC-11 said, "Y'all here yet?" BLAIR replied, "Who it is? I just got this joint [the DTO Phone]. Uh how long? Where you at?"[53] UC-11 said, "I'm at Lake and Western." BLAIR replied, "What you need over there?" UC-11 replied, "5 soft [heroin baggies]." BLAIR replied, "Alright, here I come."

297.    At approximately 6:58 p.m. (Target Phone 9, Session 4500), UC-11 received a call from the DTO Phone. During the call, BLAIR said, "Where you at on Washtenaw?" UC-11 replied, "I'm on Lake and Western, right there at the Currency Exchange." BLAIR said, "Alright. I know exactly where you at. I'm finna pull up now."

298.    Subsequently, UC-11 observed a red Mercury sedan, bearing Illinois registration CE83833 ("BLAIR's Vehicle"), come to stop near 2358 W. Lake Street. According to law enforcement database records, BLAIR's Vehicle is registered to "JARVIS BLAIR" on W. Jackson Boulevard, Chicago, Illinois 60624.

299.    According to UC-11 and surveillance observations, as UC-11 approached BLAIR's Vehicle, UC-11 observed BLAIR in the driver's seat and a female (later

---

[53] Agents are familiar with BLAIR voice based on the following: On September 1, 2020, CPD Enforcement stopped BLAIR and spoke with BLAIR during a traffic stop. The CPD Officers listened to intercepted calls from September 1, 2020 and identified BLAIR as the user of the DTO Phone as detailed later in this affidavit. Agents then completed a voice comparison from with the calls from August 11, 2020, and determined that it was the same individual [BLAIR] speaking in the calls.

identified as MITCHELL) in the front passenger seat.[54]  MITCHELL gestured for UC-11 to come to BLAIR's Vehicle. When UC-11 approached the vehicle, MITCHELL asked "What you need?" UC-11 replied, "Give me five soft [heroin baggies]." MITCHELL then handed UC-11 five blue tinted Ziploc style baggies each containing a white powdery like substance (suspect heroin). UC-11 gave MITCHELL $50. UC-11 departed the area and law enforcement continued to surveil BLAIR.

300.   At approximately 7:10 p.m., at the direction of agents, CPD officers conducted a traffic stop of BLAIR's Vehicle. During the stop, the occupants provided identification. The driver was identified as BLAIR. The front seat passenger was identified as MITCHELL.

301.   The baggies that MITCHELL and BLAIR sold to UC-11 were submitted to the DEA North Central laboratory for testing. The DEA laboratory concluded that the substance weighed 1.59 grams and contained a mixture of heroin and fentanyl.

### 19.   August 12, 2020: WILKINS Sold 2.64 Grams (Net Weight) of Heroin/Fentanyl to UC-7.

302.   As described further below, on August 12, 2020, UC-7 ordered heroin from WILKINS, who was using the DTO Phone. WILKINS sold approximately 2.64 grams (net weight) of heroin/fentanyl to UC-7.

303.   Specifically, on August 12, 2020, at approximately 11:19 a.m. (Target Phone 9, Session 4905), UC-7 placed a call to the DTO Phone, and spoke with

---

[54] This deal was not audio/video recorded. However, law enforcement obtained video footage from a nearby CPD Pod camera that captured the deal.

WILKINS.[55] During this call, UC-7 asked, "Ya'll moving around [selling narcotics]?" WILKINS replied, "Yeah." UC-7 replied, "Give me about 30 minutes. I'll be over at Family Dollar on Kedzie and Van Buren." WILKINS replied, "Okay."

304.    At approximately 11:51 a.m. (Target Phone 9, Session 4919), UC-7 called the DTO Phone. During this call, WILKINS stated, "I been calling you, I'm downstairs." UC-7 replied, "I'll be there in about 5 minutes." WILKINS replied, "This the Milwaukee and Division, right?" UC-7 replied, "No, I'm over at Van Buren and Kedzie." WILKINS replied, "Oh, Van Buren and Kedzie. You gonna call me when you get there or you already there?" UC-7 answered, "I'll be there in about 5 minutes but I'll hit [call] you." WILKINS replied, "Okay."

305.    At approximately 11:58 a.m., UC-7 walked to the Family Dollar located at 413 S. Kedzie Avenue.

306.    At approximately 11:59 a.m. (Target Phone 9, Session 4923), UC-7 placed a call to the DTO Phone. During the call, UC-7 stated, "I'm over here, how long you gonna be?" WILKINS stated, "Uh, give me about 6-7 minutes. I'm at Lake and Woods so I'm taking Lake Street all the way down. So give me about 7-8 minutes." UC-7 asked, "What you coming up in?" WILKINS answered, "A white car?  What you trying to do [how much/what narcotics do you want]?" UC-7 replied, "Trying to get 8 [quantity of narcotics]." WILKINS replied, "I'll be there sooner than that now."

---

[55] UC-7 identified the user of the DTO Phone on August 12, 2020 during call sessions 4905, 4919, and 4923 to be WILKINS based on a voice comparison after speaking with WILKINS during the narcotics transaction on August 12, 2020.

307.    At approximately 12:08 p.m., UC-7 observed WILKINS' Vehicle pull into the parking lot.

308.    According to a debriefing of UC-7 and a review of UC-7's audio/video recording device, when UC-7 approached the driver's side of WILKINS' Vehicle, they greeted. UC-7 observed WILKINS pull a clear plastic bag from the front of his pants and place it in his lap. WILKINS removed from inside the clear plastic bag several knotted bags containing several rock like items and several clear Ziploc-style baggies with blue stars printed on one side, each containing a white powdery substance. As WILKINS opened the bags with the rock like substance, UC-7 stated, "Nah the soft [heroin/fentanyl]." WILKINS replied, "Ah the soft," and asked, "How many?" UC-7 replied, "Eight." WILKINS counted aloud as he counted out eight of the clear plastic Ziploc-style baggies with blue stars and passed them to UC-7. In exchange, UC-7 gave Wilkins $80. UC-7 exited the vehicle and left the area.

309.    The baggies that WILKINS sold to UC-7 were submitted to the DEA North Central laboratory for testing. The DEA laboratory concluded that the substance weighed 2.64 (net weight) grams and contained a mixture of heroin and fentanyl.

### 20.    August 13, 2020: JOHNSON Sold 1.34 Grams (Net Weight) of Heroin/Fentanyl to UC-10.

310.    As described further below, on August 13, 2020, UC-10 ordered heroin from JOHNSON, who was using the DTO Phone. JOHNSON sold 1.34 grams (net weight) of heroin/fentanyl to UC-10.

311. Specifically, on August 13, 2020, at approximately 3:45 p.m. (Target Phone 9, Session 5287), UC-10 placed a call to the DTO Phone. UC-10 said, "I'mma be at Ogden and Sacramento by the park." JOHNSON replied, "Who is you?" UC-10 said, "Danny." JOHNSON replied, "What the bag look like?" UC-10 said, "Last time it was blue stars and shit." JOHNSON replied, "Oh, okay. Let me know when you make it right there." UC-10 said, "Give me twenty minutes, I'm on foot." JOHNSON replied, "Alright."

312. At approximately 3:52 p.m. (Target Phone 9, Session 5289), UC-10 received a call from the DTO Phone. During the call, UC-10 advised JOHNSON that UC-10 was walking to the meeting location.

313. At approximately 4:15 p.m., as UC-10 stood at the southwest corner of the Ogden/Sacramento intersection, UC-10 observed a black Chevrolet Impala, bearing Illinois registration 463V353 ("JOHNSON's Vehicle 2") honk in order to gain UC-10's attention.[56]

314. According to a debrief of UC-10 and a review of UC-10's audio/video recording device, UC-10 approached the front passenger door of JOHNSON's Vehicle 2 and spoke to the driver, JOHNSON, through the open window. UC-10 said, "What's up, are you the guy? I called you earlier. Danny, for four [baggies of heroin]." JOHNSON replied, "You ain't the police, is you?" UC-10 said, "C'mon mother fucker, bro… playing games out here." JOHNSON replied, "Is you the police?" UC-10 and

---

[56] According to law enforcement database records, JOHNSON's Vehicle is registered to "Justin D. JOHNSON" on E. 72nd Street, Chicago, Illinois.

JOHNSON continued to argue whether or not UC-10 was a police officer. UC-10 then walked away from JOHNSON's Vehicle 2.

315.    However, JOHNSON continued to yell at UC-10. JOHNSON again asked, "Is you police, yes or no?" UC-10 replied, "No, motherfucker, shit fucking stupid ass." UC-10 then re-approached JOHNSON's Vehicle 2. JOHNSON again asked UC-10 what he wanted to buy, to which UC-10 replied, "Same shit, blue stars [heroin baggies] motherfucker." UC-10 provided JOHNSON with $40. In exchange, JOHNSON handed UC-10 four clear plastic Ziploc style baggies with blue stars printed on one side that contained a white powdery substance (suspect heroin/fentanyl).

316.    The baggies that JOHNSON sold to UC-10 were submitted to the DEA laboratory for testing. The DEA laboratory concluded that the substance weighed 1.34 grams and contained a mixture of heroin and fentanyl.

### 21.    August 16, 2020: WILKINS Sold Individual GF Approximately 1.29 Grams of Heroin/Fentanyl (Net Weight) and 1.03 Grams of Crack Cocaine (Net Weight).

317.    As described further below, on August 16, 2020, agents seized approximately 1.29 grams of heroin/fentanyl and 1.03 grams (net weight) of cocaine base from Individual GF, who, based on intercepted calls, had purchased the narcotics from the DTO Phone. WILKINS was assigned to the DTO Phone at the time Individual GF ordered the narcotics.

318.    Specifically, on August 16, 2020, at approximately 1:30 p.m. (Target Phone 9, Session 6872), while monitoring the DTO Phone, agents intercepted a

conversation between WILKINS and a narcotics customer, later identified as Individual GF, who was using telephone number (312)-XXX-9655. During the call, Individual GF said, "Is this Old School [WILKINS]?" WILKINS replied, "Yup." Individual GF said, "I'm gonna com meet you. Where you at?" WILKINS replied, "Where you at?" Individual GF said, "I'm at my house but I don't want you to have to come out this way again." WILKINS replied, "What you trying to do?" Individual GF said, "Fourteen hard [crack cocaine], four soft [heroin]." WILKINS replied, "I'm on Kedzie and Van Buren." Individual GF said, "You know where Maypole and California by the train, it's by California and Lake. That's a good spot 'cause it's quiet." WILKINS replied, "How long take you get out there?" Individual GF said, "Probably ten minutes." WILKINS replied, "What you in? What you driving in?" Individual GF said, "I got a motorcycle." WILKINS replied, "I'll meet you at California and Kedzie. You gonna call me when you get there? You said 10 minutes, I don't California and Kedzie. You gonna call me when you get there? You said 10 minutes, I don't want to be sitting there." Individual GF said, "Let's shoot for ten minutes, but I got a phone on me." WILKINS replied, "Alright."

319. At approximately 1:55 p.m. (Target Phone 9, Session 6880), agents intercepted another conversation between WILKINS, who was using the DTO Phone, and Individual GF, who was using Individual GF's Phone. During the call, Individual GF said, "I'm over here on Maypole and California." WILKINS replied, "You by the L, right?" Individual GF said, "Yeah, that's what we talked about." WILKINS replied, "Shit, I'm sitting right here on California and Lake, I don't see nobody." Individual

GF said, I'm on Maypole. I'll come around the corner, I'll be there. I'm just gonna get off my motorcycle and walk over." WILKINS replied, "A'ight."

320.   At approximately the same time, surveillance observed WILKINS sitting in WILKINS' Vehicle near 2809 W. Lake Street. Surveillance also observed Individual GF park his black Yamaha motorcycle near 2754 W. Maypole Avenue. Individual GF then walked northbound on California Avenue. Once Individual GF reached WILKINS' Vehicle, Individual GF entered the front passenger seat.

321.   At approximately 1:59 p.m., surveillance observed as Individual GF exited WILKINS' Vehicle, crossed the street, and entered a store. Minutes later, Individual GF exited the store while carrying a white plastic shopping bag, and walked back towards his motorcycle.

322.   At approximately 2:05 p.m., CPD officers conducted an investigative stop of Individual GF near 124 N. California Avenue. During a search of Individual GF's person, officers located approximately four clear Ziploc style baggies containing a white-rock like substance, and four blue tinted Ziploc style baggies containing a white powdery substance inside Individual GF's left jacket pocket. After officers seized the narcotics, Individual GF was released.

323.   As the officers were conducting the stop and search of Individual GF, surveillance observed that WILKINS remained in the vicinity of Lake/California and appeared to watch Individual GF's stop by the CPD officers.

324.   At approximately 5:55 p.m. (Target Phone 9, Session 6949), WILKINS, who was using the DTO Phone, placed a call to Individual GF, who was using

Individual GF's Phone. Individual GF said, "Hey man, did you see me fucking get… You see me get fucking rolled up [stopped] by those guys [CPD Officers]?" WILKINS replied, "Mm-hum." Individual GF said, "Damn man! They [CPD Officers] took everything from me [seized narcotics]. They let me go but…" WILKINS replied, "Yeah…" Individual GF said, "Man, that's why I can't fucking go over there, dude! It sucks. This is what happens. You're white… They just fucking jump [stop] you like that… 'What you doing?' He [officer] said, that I fucking… 'Cause I was starting to cross the street, and I thought he was stopping. And he's like… 'Cause you know how there's all these fucking rioters now?'" WILKINS replied, "Mm-hum." Individual GF said, "He's like, 'how do I know you weren't going to throw a fucking [unintelligible]?' I'm like… then they just start [unintelligible]." WILKINS replied, "Okay." Individual GF said, "So… But hey man, are you… Can you help me out at all? [Individual GF wanted more narcotics] Cause…" WILKINS replied, "It's over with for me. I'm finna go in [turn the DTO Phone in for the next shift worker]." Individual GF said, "Fuck! Alright." WILKINS replied, "Yeah. I'll see what we could do tomorrow. But right now, it's over with for me." Individual GF said, "Yeah. Alright."

325. The items seized from Individual GF were submitted to the DEA laboratory for testing. The DEA laboratory concluded that one of the exhibits weighed approximately 1.29 grams and contained a mixture of heroin and fentanyl and the second exhibit weighed approximately 1.03 grams of cocaine base.

**22. August 24, 2020: WILKINS Sold Individual AD Approximately 0.981 Grams (Net Weight) of Heroin/Fentanyl, Which Was Seized From Law Enforcement.**

326. As described further below, on August 24, 2020, agents seized approximately 0.981 grams (net weight) of heroin/fentanyl from Individual JM and Individual AD, who, based on intercepted calls, had purchased the narcotics from WILKINS, who was using the DTO Phone.

327. Specifically, on August 24, 2020, at approximately 4:36 p.m.., surveillance observed WILKINS' Vehicle parked at the intersection of south Albany Avenue and west Van Buren Street. WILKINS was the driver and D. WILLIAMS was seated in the front passenger seat.

328. At approximately 4:45 p.m. (Target Phone 9, Session 11024), WILKINS, using the DTO Phone, received a call from UM9-1728, who was using telephone number (815)-XXX-0585.[57] UM9-1728 said, "Yeah. I need 4 DVD's [4 baggies of heroin/fentanyl]." WILKINS replied, "Where you at?" UM9-1728 replied, "Okay, I'm at Jimmy's right here on Washington, between Hoyne and Leavitt." WILKINS asked, "On Washington between Hoyne and Leavitt?" UM9-1728 replied, "Yeah. You know where Jimmy store is? The grocery store and restaurant together? On Washington." WILKINS replied, "Uh...…" UM9-1728 replied, "I'm in a car too." WILKINS asked, "Oh, so you right there by the store then, right?" UM9-1728 replied, "Yeah. I'm by the store. You know Jimmy's, right." WILKINS replied, "Okay. I know where the store at

---

[57] According to subscriber records, this telephone number is registered to Individual AD.

on Washington." UM9-1728 replied, "Yea. I'm right here sitting in the red SUV." WILKINS replied, "Okay. A'ight." UM9-1728 asked, "How close are you to me?" WILKINS replied, "I'm on Kedzie and Van Buren right now." UM9-1728 replied, "Okay. Anybody in front of me [any customers to be served before UM9-1728]?" WILKINS answered, "Nah." UM9-1728 replied, "Okay. So you on your way?" WILKINS replied, "Yeah." UM9-1728 replied, "All right. I'll see you in a minute."

329.   At approximately 4:47 pm., surveillance observed WILKINS' Vehicle relocate to approximately, 2156 W. Warren Avenue in Chicago.

330.   At approximately 4:47 p.m., surveillance observed WILKINS' Vehicle park in front of a red Ford Escape with two occupants (later identified as Individual JM and Individual AD) at approximately 2156 W. Warren Avenue.   Shortly thereafter, surveillance observed Individual AD exit the passenger side of the red Ford Escape and approach the driver's side of WILKINS' Vehicle.[58] At this time, surveillance observed Individual AD engage in a hand-to-hand narcotics transaction with WILKINS. Once the exchange was completed, Individual AD returned to the passenger side of the red Ford Escape.

331.   At approximately 4:57 p.m., surveillance observed the red Ford Escape drive eastbound on Warren Avenue, and northbound on Leavitt Avenue to West Lake Street.

---

[58] Subsequent to the observed narcotics transaction, CPD Enforcement Officers conducted a traffic stop of the red Ford Escape and identified its occupants to be Individual AD and Individual JM, from Illinois Identification cards.

332. At approximately 4:58 p.m., at the direction of agents, CPD officers conducted a traffic stop of the red Ford Escape for a lane violation at 2155 W. Lake Street, Chicago Illinois.

333. During the traffic stop, CPD officers identified the driver as Individual JM and the passenger as Individual AD based on identification cards provided by both individuals. Officers searched Individual JM, and found three Ziploc-style baggies with blue stars printed logo, taped together, each containing a white powdery substance in Individual JM's right sock.

334. The items seized from Individual JM were submitted to the DEA North Central laboratory for testing. The DEA laboratory concluded that one of the exhibits weighed 0.981 grams (net weight) and contained a mixture of heroin and fentanyl.

**23. August 25, 2020: HOLLINS, Using the DTO Phone, Sold Approximately 3.404 Grams (Net Weight) of Suspect Heroin/Fentanyl Mixture to UC-4.**

335. As described further below, on August 25, 2020, UC-4 ordered heroin from HOLLINS, who was using the DTO Phone. HOLLINS sold UC-4 approximately 3.404 grams (net weight) of heroin/fentanyl.

336. On August 25, 2020, at approximately 8:22 a.m. (Target Phone 9, Session 11336), UC-4 placed a call to the DTO Phone. UC-4 asked, "Yo, are you up?" HOLLINS replied, "Yeah, where you at?" UC-4 replied, "I'mma be like 15 minutes. Can I meet you over at Madison and Western? At like...uh fuck what's over there...uh Pete's? Can I meet you in the Pete's lot?" HOLLINS asked, "Yeah how many [what quantity of narcotics]?" UC-4 replied, "I need uh...I got 100 [$100]." HOLLINS replied,

"Alright you need soft [heroin/fentanyl] or hard [crack cocaine]?" UC-4 replied, "Soft [heroin/fentanyl]." HOLLINS replied, "Okay." UC-4 replied, "I'll hit up [call you] when I get there." HOLLINS asked, "How long you finna be?" UC-4 replied, "Like 15 minutes. I'm on 290, I'll be jumping off the E-way in just a second." HOLLINS replied, "Okay call me when you get in Pete's lot."

337.    At approximately 8:42 a.m., UC-4 arrived in the Pete's Fresh Market parking lot located at 2333 W. Madison Street and parked on the northwest side of the lot.

338.    At approximately the same time (Target Phone 9, Session 11338), UC-4 placed a call to the DTO Phone. During this call, UC-4 stated, "I just pulled into Pete's. I parked right uh right around Madison by that bus stop over there." HOLLINS replied, "Okay. Alright, I'm finna pull up." UC-4 asked, "What are you, are you coming up now?" HOLLINS replied, "Yeah, I'm finna pull up." UC-4 stated, "Alright I'll see you in a bit."

339.    At approximately 8:43 a.m., surveillance observed HOLLINS driving a blue/green Infiniti sedan, without any license plates affixed to the vehicle, northbound through the parking lot. HOLLINS parked in the west portion of the Pete's Fresh Market parking lot.

340.    At approximately 8:44 a.m. (Target Phone 9, Session 11340), UC-4 received a call from the DTO Phone. During this call, HOLLINS asked, "Where you at?" UC-4 replied, "Uh right by the bus stop, I'm in a blue SUV, where you at." HOLLINS replied, "A'ight I see you. Uh hold on, I see the police right there, let the

police drive off then..." UC-4 stated, "Oh yeah right in front of us okay. Are you coming to me or you want me to jump out?" HOLLINS replied, "Uhh I might come to you." UC-4 replied, "Okay. Let's let these guys (referring to a Chicago police car that was nearby) let them roll through."

341.    According to a debriefing of UC-4 and a review of UC-4's audio/video recording device, at approximately 8:44 a.m., HOLLINS opened the front passenger door of the undercover vehicle and entered the vehicle.[59] UC-4 observed HOLLINS reach into the front crotch area of his pants and remove a taped roll of Ziploc-style baggies, with blue star print logo, containing a white powdery substance. HOLLINS asked, "How many you wanted?" UC-4 stated, "I got a hundred [$100] can you give me a whole one [a full jab of heroin/fentanyl] or do me something good?" HOLLINS replied, "I heard that." UC-4 observed HOLLINS struggle to open the roll of taped Ziploc-style baggies. HOLLINS stated, "Let's see what we got." UC-4 observed HOLLINS tear the roll open and rip off two Ziploc-style baggies with blue star print logo, containing a white powdery substance and then pass UC-4 the baggies remaining in the roll. HOLLINS stated, "There's 10 [10 baggies of heroin/fentanyl]." UC-4 then passed HOLLINS $100 and stated, "Here ya go." HOLLINS stated, "Sorry I couldn't do ya any better." UC-4 stated, "Nah, nah I hear ya, I gotcha, I appreciate it though." HOLLINS responded by laughing and stated, "No problem." UC-4

---

[59] Following the narcotics transaction, UC-4 reviewed a known booking photograph of HOLLINS and positively identified him as individual who sold UC-4 10 baggies of suspect heroin/fentanyl.

replied, "I might be hitting you uh a little later." HOLLINS replied, "Okay no problem."

342.    At approximately 8:46 a.m., HOLLINS exited the front passenger seat of the undercover vehicle and entered the Infinite vehicle. Moments later, UC-4 drove away.

343.    Law enforcement later submitted the substances sold by HOLLINS to UC-4 to the DEA laboratory for testing. The DEA laboratory concluded that the substance weighed 3.404 grams (net weight) and contained a mixture of heroin and fentanyl

### 24.    September 1, 2020: Law Enforcement Seized Suspect Narcotics and the DTO Phone from BLAIR.

344.    On September 1, 2020, at approximately 1:20 a.m., law enforcement observed, via surveillance footage, a red colored sedan, matching the physical description of BLAIR's Vehicle, depart the area of Grant's residence.

345.    At approximately 3:51 a.m. (Target Phone 9, Session 14674), BLAIR, using the DTO Phone, spoke with an unknown female, using telephone number 773-XXX-6316. During this call, the unknown female stated, "I wanted 2 hards [2 baggies of crack cocaine] too. Come, come, come back around. I'm finna come out at the door man, he fucked up." BLAIR replied, "So what you wanted to get? You want me to bring 2 more C [crack cocaine]?" The unknown female replied, "Yea two more hard [crack]."

346.    At approximately 3:56 a.m. (Target Phone 9, Session 14695), an unknown female, using telephone number 773-XXX-0029, spoke with BLAIR, who

was working the DTO Phone. During this call, BLAIR stated, "I'm on Washtenaw and Wilcox."

347.    Based on this call, surveillance was established in the area of Washtenaw and Wilcox. At approximately 3:58 a.m., surveillance observed BLAIR's Vehicle traveling eastbound on Madison Street through Western Avenue.[60]

348.    At approximately 4:06 a.m., surveillance observed BLAIR's Vehicle stop at Madison Street and Paulina Street and complete a hand-to-hand transaction through the passenger side window of the vehicle with another individual.

349.    At approximately 4:12 a.m., at the direction of agents, CPD Officers conducted a traffic stop on BLAIR's Vehicle in the area of Homan and Gladys Street. During the stop, officers observed BLAIR fondling an unknown item in his waistband. Officers asked BLAIR to exit the vehicle and he complied.

350.    At approximately 4:19 a.m., UC-4 placed a phone call to the DTO Phone. CPD observed and heard a blue Samsung cellular telephone ringing. Officers retrieved the DTO Phone from BLAIR's waistband area and observed the contact name "Petes" and UC-4's covert telephone number listed on the screen.[61] Officers also recovered from BLAIR the following narcotics: four purple and 26 clear small Ziploc-style baggies containing a rock-like substance (suspect crack cocaine) and 15 orange small Ziploc-style baggies, containing a white powdery substance (suspect

---

[60] According to law enforcement databases, Illinois registration CE83833 is registered to a 2007 red Mercury Sedan to "Jarvis M. Blair") at on Jackson Blvd, Chicago, Illinois.

[61] As referenced throughout this affidavit, UC-4 had contacted the DTO Phone on several occasions from UC-4's covert telephone number to arrange meetings at Pete's Fresh Market, located at 2333 W. Madison Street in Chicago to purchase narcotics.

heroin/fentanyl), and $819. Officer further recovered $282 from Individual DG, the front seat passenger. A certified CPD K9 performed a narcotics sniff and positively alerted the presence of narcotics on the cash seized from BLAIR and Individual DG. After the suspect narcotics, the DTO Phone, and cash were seized, BLAIR and the other vehicle occupants were released.

351. The suspect narcotics recovered from BLAIR's person have been submitted to the DEA North Central Laboratory for chemical testing. Laboratory results are pending. Preliminary results for the 15 orange tinted Ziploc-style baggies seized from BLAIR, shows the presence of heroin and fentanyl and has a net weight of 4.6 grams (this weight has not been added to the total of the DTO's distribution).

## CONCLUSION

352. Based on the foregoing, there is probable cause to believe that, from on or about April 23, 2020 to on or about September 1, 2020, DEXSTIN BRYANT (a/k/a "Dex"), TREMAINE BRENT (a/k/a "Bud"), TEVIN ALVERIO, JARVIS BLAIR, ENRIQUE HOLLINS (a/k/a "Rique"), SHARONDA HOSEY, JUSTIN JOHNSON (a/k/a "BB"), TYJUAN MCDOWELL (a/k/a "Weezy"), RIKITA MITCHELL, ALLEN WASHINGTON (a/k/a "Peanut"), PAUL WILKINS, DOROTHY WILLIAMS, and INA WILLIAMS conspired to knowingly and intentionally distribute a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled

Substance, and 28 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II Controlled Substance in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

FURTHER AFFIANT SAYETH NOT.

ARTYOM POSTUPAKA
Special Agent, Drug Enforcement
Administration

SWORN TO AND AFFIRMED by telephone November 3, 2020.

Honorable Sunil R. Harjani
United States Magistrate Judge

134